UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BONNIE KRAHAM,

                Plaintiff,                04 Civ 1684 (SCR)

    -against-                    <u>AFFIDAVIT</u>

JONATHAN LIPPMAN, sued in his individual
and official capacity as Chief Administrative
Judge of the State of New York; and
OFFICE OF COURT ADMINISTRATION,

                Defendants.

---

STATE OF NEW YORK

COUNTY OF NEW YORK

      JONATHAN LIPPMAN, being duly sworn, says:

      1. I am the Chief Administrative Judge of the Unified Court System of the State of New York. I make this affidavit in support of defendants' cross-motion for summary judgment and in opposition to plaintiff's motion for summary judgment. The facts set forth in this affidavit are based upon my personal knowledge and the books and records of the Office of Court Administration ("OCA").[1]

---

[1] Pursuant to section 212(1)(b) of the Judiciary Law, OCA is the "administrative office for the courts."

1

2. Plaintiff moves, pursuant to Fed.R.Civ.P. 56(a), for summary judgment against defendants on her cause of action relating to her claim that section 36.2(c)(4)(i) of the Rules of the Chief Judge violates her First Amendment freedom of association. Section 36.2(c)(4)(i) is contained in Part 36 of the Rules of the Chief Judge, which governs appointments by the court to a number of fiduciary positions, including guardians, guardians ad litem, and receivers. Section 36.2(c)(4)(i) provides:

> No person who is the chair or executive director, or their equivalent, of a state or county political party, or the spouse, sibling, parent or child of that official, shall be appointed while that official serves in that position and for a period of two years after that official no longer holds that position. This prohibition shall apply to the members, associates, counsel and employees of any law firms or entities while the official is associated with that firm or entity.

3. This restriction on fiduciary appointments is part of the most current attempt by court administrators to regulate remunerative judicial appointments that have long been the subject of public attention and controversy.

4. Fiduciary appointments are judicial assignments of individuals to perform a myriad of functions to assist the courts and provide services to litigants and other individuals. These are often highly remunerative appointments. For example, the fees approved for court evaluators, guardians, and guardians ad litem, who also are attorneys, typically are the same hourly rates that those attorneys set for their legal services, and can

2

range from $150 to over $300 per hour.[2] Similarly, because receivers can collect commissions of up to five percent of the proceeds of the property or business that is the subject of the receivership[3], such appointments can be highly remunerative. Historically, judges were permitted to make fiduciary appointments without uniform rules to regulate such appointments. This unchecked arena of judicial appointments opened the door for potential abuse of the appointment process based upon favoritism, nepotism, and political connections, with the resulting loss of public confidence in the judiciary. Accordingly, various attempts have been made over the years to regulate the fiduciary appointment process.

5. In 1967, the Legislature enacted section 35-a of the Judiciary Law to "bolster confidence in the disposition of court appointments" by ensuring that compensation information for judicial appointees was made publicly available.[4] That section required that all judicial appointees compensated with nonpublic funds file with OCA a notice of appointment and a statement of compensation award. Despite the intent of section 35-a, the appointees in many cases did not comply with the filing requirements. As such, the Legislature in 1975 amended section 35-a to eliminate the filing requirements of the

---

[2] See Report of Special Inspector General for Fiduciary Appointments attached hereto as Exhibit "B," pp. 13-14, 16-19, 59.

[3] See CPLR 8004(a)

[4] Governor Rockefeller's approval message, L. 1967, c. 625, McKinney's 1967 Session Laws of New York, p. 1535.

3

appointee and to substitute a requirement that the judge make a single filing concerning the compensation awarded (L. 1975, c. 834, § 1). That requirement also was established in new Part 26 of the Rules of the Chief Judge.

6. In the 1970's extensive public criticism arose in response to the practice of certain New York City Supreme Court judges to appoint close relatives of other Supreme Court judges as fiduciaries. To address that problem, the Appellate Division, First Department, established rules in 1977 for New York and Bronx Counties (22 NYCRR § 660.24), which prohibited the judge presiding over a case in which a fiduciary was to be appointed from selecting the fiduciary. Instead, another judge of the court, whose name came up next on a strict rotational list, made the selection.

7. In connection with section 660.24, the First Department appointed a committee, chaired by Justice Samuel Silverman, to study the fiduciary appointment process and to make recommendations for improvement. The Silverman Committee issued a report in 1980, concluding that section 660.24 was cumbersome and should be repealed, and recommended that the judge handling the case be trusted to select the fiduciary. The Committee proposed certain limitations on such appointments, including that the judges' relatives be ineligible for appointment, that former judges be ineligible for two years after leaving the bench, and that appointees be ineligible to receive more than one "substantial" appointment within a 12-month period. However, these recommendations were not adopted.

4

8. Public criticism of a fiduciary appointment process in which judges made appointments without uniform regulation or oversight continued over the next several years. In the face of renewed public concerns that appointments were governed by favoritism, rather than merit, in 1986 then-Chief Judge Lawrence Cooke promulgated a comprehensive set of regulations governing fiduciary appointments.

9. These regulations, codified in Part 36 of the Rules of the Chief Judge (22 NYCRR Part 36), governed the appointments of guardians, guardians ad litem, court evaluators, attorneys for alleged incapacitated persons, receivers, persons designated to perform services for a receiver, and referees. Individuals interested in being considered for appointment were required to submit an application to OCA, and the resulting list of potential appointees was made available to judges.[5] A person who was a relative of, or related by marriage to, a judge of the Unified Court System was ineligible for appointment.[6] The judge alone was responsible for determining the qualifications of the appointee.

10. Part 36 provided that no appointee could receive more than one appointment in a 12-month period for which the compensation would exceed $5,000, except in unusual circumstances, such as continuity of representation or familiarity with the case. However,

---

[5]Although Part 36 contemplated that judges would make fiduciary appointments from the list, the judge could deviate from the list but was required to put the appointee's qualifications on the record, along with the reasons for deviating from the list.

[6]In 1996, the strict ban against appointment of judges' relatives was relaxed to permit the appointment of relatives beyond the sixth degree of relationship.

there were no limitations on the number of appointments that an appointee could receive that were below $5,000. In addition, fiduciaries had to file a notice of appointment with OCA, which was made publicly available, and had to file a certificate identifying the appointments received within the prior 12 months. The filing requirements were intended to open up to public view the fiduciary appointment process, and to provide information to appointing judges to facilitate compliance with the rules.[7]

11. Despite the enactment in 1986 of Part 36 of the Rules of the Chief Judge, public concerns about an appointment process based on favoritism continued. These public concerns were reflected in numerous newspaper articles about questionable appointment practices, including the disproportionately large number of appointments of high-level political party officials.[8] These fiduciary appointments were made almost exclusively by elected judges of the Supreme and Surrogate's Courts, who are dependent

---

[7] In 1989, the rules were amended to disqualify a judicial hearing officer from receiving appointments in a court in the county in which he or she serves on a JHO panel. 22 NYCRR 36.1(b)(2). In 1990, the rules were amended to require time constraints for filing the notices of appointment and the certifications for compliance with filing. 22 NYCRR 36.3(a), 36.4(c). In 1994, the rules were amended to include referees as subject to the rules.

[8] See, e.g., Joe Calderone & Thomas Zambito, "System's Exploiting the Helpless," Daily News, May 21, 2001, p. 6, col. 1; Salvatore Arena, "Top Politicians Get Lucrative Court Jobs," Daily News, January 30, 2000, p. 30, col. 1; Dan Morrison, "Dem Leader Profits From Court System: Judges Steer Assignments to Manton's Firm," Long Island Newsday, January 30, 2000; Jordan Rau and Katie Thomas, "Select Cast Gets Lucrative Roles," Long Island Newsday, September 24, 1999; Ed Tagliaferri, "High-Paying Surrogate Court Cases Go to Politically Connected Judges, Records Show," Gannett Surburban Newspapers, June 10, 1998, p. A1, col. 4; Maggie Haberman, et al., "Here's Who Gets Pick of Judge's Patronage Plums," New York Post, November 10, 1997, p. 6, col. 1; Michael Finnegan, "Judge Rolls Out Pork Barrel," Daily News (Queens edition), June 20, 1993, p. 1 (Q- LI), col. 1; Jack Newfield, "Judges: Patronage Saints to Their Pals," New York Post, May 13, 1993, p. 7, col. 1.

upon political parties for their nomination and eventual election, and who thereby could be viewed as subject to political influence.

12. Public concerns about political influence in the fiduciary appointment process reached a peak in January 2000, with the publication of a letter from two Brooklyn attorneys who had received numerous fiduciary appointments. Both attorneys were officers of the Brooklyn Democratic organization. In that letter, the attorneys complained that certain fiduciary appointments were being given to another attorney who had not demonstrated his "entitlement" to the appointments because he had no record of party service, despite his ties to a top political party official.[9]

13. In response to the explosion of public concern generated by the publication of this letter, and the resulting impairment of public confidence in the judicial system, in her 2000 State of the Judiciary Address, Chief Judge Judith S. Kaye announced a comprehensive program to reform the appointment process in New York. Chief Judge Kaye stated that "public confidence in the courts is put at risk when judicial appointments are based on considerations other than merit. Simply put, the public must have faith that the courts operate free of favoritism and partiality." To further that purpose, Judge Kaye created a Commission on Fiduciary Appointments ("Commission") to examine the existing rules and practices of judicial appointments of fiduciaries and to offer

---

[9]That letter is annexed to the reports of the Special Inspector General for Fiduciary Appointments (Exhibit "A") and the Commission on Fiduciary Appointments (Exhibit "B").

recommendations for improvement.[10] She also established an Office of the Special Inspector General for Fiduciary Appointments ("Special Inspector General") with the jurisdiction to investigate violations of the fiduciary rules. Finally, Chief Judge Kaye directed the State's Administrative Judges to evaluate the appointment process in their respective judicial districts and to make recommendations for improvement.

14. The Special Inspector General conducted a comprehensive investigation that involved hundreds of interviews and the review of thousands of court files. On December 3, 2001, the Special Inspector General issued a report to the Chief Judge and Chief Administrative Judge, detailing extensive problems with the appointment process and recommending significant reform, including rule changes. (Exhibit "A").

15. Among the findings about the extensive problems overall in the fiduciary appointment process,[11] the Special Inspector General confirmed the widespread public perception that fiduciary appointments were politically motivated, rather than merit-based. Specifically, she found that many of the recipients of multiple and lucrative

---

[10]The Commission was chaired by Sheila L. Birnbaum and included 10 prominent members of the bar and 7 current and former judges. A list of the Commission members is annexed to the report of the Commission. (Exhibit "B").

[11]In addition to her findings that a number of high-level political party officials had received extensive appointments, the Special Inspector General also found that former judges had received numerous appointments, relatives of nonjudicial court system employees had received numerous appointments, compliance with fiduciary filing requirements had been deficient, the rules had not been applied to secondary fiduciary appointments, there were widespread billing irregularities, courts were frequently appointing the court evaluator as the guardian, the limitations on lucrative appointments may have been widely violated, and judges had given appointments to high-level participants in their election campaigns.

appointments were officers of political parties. The following are a few of her findings in specific matters that were investigated:

- One county political party leader had received nearly 100 appointments.
- Another county political party leader had received over 75 appointments.
- A small law firm of another county political party leader had received over 200 appointments.
- A small law firm of another county political party leader had received over 100 appointments.
- An attorney whose small law firm employs a county political party leader had received nearly 100 appointments.

16. In addition to her findings about the fiduciary appointments of high-level political party officials, the Special Inspector General also found that other appointments were politically motivated. Specifically, she found that a number of judges had given appointments to high-level participants in their election campaigns.

17. At the same time, the Commission on Fiduciary Appointments conducted an extensive study of the fiduciary appointment process, which included interviews, reviews of reports and materials submitted by interested associations, reviews of fiduciary data, and public hearings. In December, 2001, the Commission also issued a report. (Exhibit "B"). That report detailed the extensive problems in the fiduciary appointment process and made recommendations for improvement.

18. As part of its report, the Commission found: "Among the fiduciary appointments in recent years that have generated the greatest criticism have been those received by political party leaders and their law firms. ... Party leaders exercise considerable influence over the judicial nomination and selection process. The sheer number of appointments that they and their law firms have received thus raises a troubling perception that political considerations may be influencing these appointments." See Exhibit "B," p. 39. The Commission thus recommended that state and county political party leaders, and their immediate relatives, be ineligible for appointment while they serve and for two years afterwards. Id.

19. In addition, because the Commission recognized that the restriction on appointments of political party leaders "would not be effective if the partners or employees of political party chairs who are lawyers could still receive appointments," the Commission recommended that the partners, legal associates, and other employees of the political party chairs' law firms be ineligible for appointment, also during the political party chairs' term and for two years afterwards. Id., pp. 39- 40.

20. The Commission's recommendation of a two-year period of ineligibility for appointment of high-level political party officials, their relatives, law firms, and professional associates after the official leaves office is consistent with the restrictions in the Public Officers Law on the professional activities of state officers, employees, and

party officers that continue for two years after leaving office or state employment.  See Public Officers Law § 73.

21. Similarly, with regard to the politically-motivated appointments of high-level participants in judicial campaigns, the Commission recommended that judges be prohibited from appointing persons serving in the capacity of campaign coordinator, manager, treasurer or finance chair for two years after the judicial election.  Id., p. 65.

22. By notice dated December 7, 2001, the Chief Administrative Judge requested public comment on the recommendations contained in the Commission's report.  Over 40 responses were submitted, including responses from bar associations, judges, social services agencies, and legal practitioners.  With regard to the recommendation that State and county political party leaders should be ineligible for appointment, that proposal was supported by the Attorney General's Office, the New York State Bar Association, the Women's Bar Association of the State of New York, the Association of the Bar of the City of New York, and the New York County Lawyer's Association.  Six lawyers, one party chair, and the Nassau County Bar Association opposed the proposal, commenting essentially that the recommendation would eliminate some qualified lawyers and would potentially foreclose political leaders from joining law firms.

23. In consultation with the Administrative Board of the Courts,[12] and with the approval of the New York Court of Appeals, on November 15, 2002, Chief Judge Kaye

---

[12] The Administrative Board of the Courts consists of the Chief Judge of the Court of Appeals and the four Presiding Justices of the Appellate Divisions.

11

adopted a new Part 36 of the Rules of the Chief Judge, to be effective June 1, 2003. A copy of the Administrative Order adopting the new Part 36 Rules is attached hereto as Exhibit "C."

    24. The preamble to Part 36 underscores the purpose of the new rules:

> Public trust in the judicial process demands that appointments by judges be fair, impartial and beyond reproach. Accordingly, these rules are intended to ensure that appointees are selected on the basis of merit, without favoritism, nepotism, politics or other factors unrelated to the qualifications of the appointee or the requirements of the case.

22 NYCRR § 36.

    25. The current section 36.2(c)(4)(i) furthers that purpose by eliminating the appearance of politically motivated fiduciary appointments. That section disqualifies from appointment as a fiduciary a person who is a chair or executive director of a state or county political party; the spouse, sibling, parent or child of that official; and the members, associates, counsel and employees of any law firms or entities associated with the official, while that official serves in that high-level political party position, and for two years thereafter.

    26. In response to concerns raised in the comments that the rule was unfair to incumbent party chairs who had existing employment commitments to law firms at the time that the new rule would take effect, the Administrative Order implementing the rule contained a grandfather provision. The restriction in section 36.2(c)(4)(i) on appointments of political party officials and the members, associates, counsel and

employees of any law firms associated with that official would apply only for those officials who remained in office after January 1, 2003. That exemption permitted a political party chair to make arrangements to step down by January 1, 2003, and if so, that official and associates of the law firm would face no future restrictions from fiduciary appointments. The grandfather provision also delayed the application of the restriction in section 36.2(c)(4)(i) to members, associates, counsel, and employees of law firms and entities associated with the political party official until June 1, 2003. That reasonable six-month delay permitted incumbent party officials who did not wish to step down from their high-level political party position to disengage from the law firm without penalty to the ability of the members, associates, counsel and employees of the associated law firm to receive appointments.

27. The restriction in section 36.2(c)(4)(i) on the ability of a high-level political party official to receive fiduciary appointments decreases the appearance that an appointment is based on that political association, as opposed to merit. Similarly, prohibiting the members, associates, counsel and employees of that official's law firm from obtaining appointments further reduces the appearance that the firm and those professional associates are receiving appointments because of that political association, as opposed to merit. Prohibiting such appointments to high-level political party officials and their professional associates thus serves to enhance public confidence that the fiduciary appointment process is fair and impartial.

28. The restriction in section 36.2(c)(4)(i) does not limit the ability of a political party official to associate with any political party, in any capacity. Rather, it incidentally limits the narrow non-political activity of obtaining a fiduciary appointment while simultaneously holding a high-level political party office.

WHEREFORE, plaintiff's motion for summary judgment should be denied, defendants' cross-motion for summary judgment should be granted, and the complaint should be dismissed.

_____
JONATHAN LIPPMAN

Sworn to before me this
28th day of December, 2004

_____
Notary Public

SHAWN KERBY
Notary Public, State of New York
No. 02KE5023988
Qualified in New York County
Commission Expires 2/22/06

STATE OF NEW YORK        )
                         )
COUNTY OF NEW YORK       )

      LORNA C. GREEN being duly sworn deposes and says that deponent is over the age of 18 years, is not a party to the action, and resides at 44 Quinn Street, Staten Island, New York 10304, and that on the 28th day of December, 2004, deponent served a copy of the within Affidavit upon the following, via express mail:

Stephen Bergstein, Esq.
Attorney for Plaintiff
Thornton, Bergstein & Ullrich, LLP
15 Railroad Avenue
Chester, New York 10918

at the last known address designated by him by depositing the same in a postpaid express mail wrapper in an official depository of the United States Postal Service in the State of New York.

                                        Lorna C. Green

Sworn to before me this
___ day of December, 2004

_____
Notary Public

SHAWN KERBY
Notary Public, State of New York
No. 02KE5023988
Qualified in New York County
Commission Expires _____