# EXHIBIT A

# Fiduciary Appointments in New York



*A Report to Chief Judge Judith S. Kaye and*

*Chief Administrative Judge Jonathan Lippman*

Office of the Special Inspector General for Fiduciary Appointments

Office of Internal Affairs, Internal Audit Unit

December 3, 2001

# TABLE OF CONTENTS

**Page**

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

PREFACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Part 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Secondary Appointments . . . . . . . . . . . . . . . . . . . 6

      Rules of Judicial Conduct . . . . . . . . . . . . . . . . . . 7

APPOINTMENTS IN GUARDIANSHIP CASES . . . . . . . . . . 8

      New York County . . . . . . . . . . . . . . . . . . . . . 12

          Court Evaluators . . . . . . . . . . . . . . . . . . . 13

          Counsel to AIP . . . . . . . . . . . . . . . . . . . . 15

          Guardians . . . . . . . . . . . . . . . . . . . . . . . 15

          Two Selected Cases . . . . . . . . . . . . . . . . . . 21

      Findings from Other Jurisdictions . . . . . . . . . . . 24

APPOINTMENTS IN RECEIVERSHIP CASES . . . . . . . . . . 34

      Kings County . . . . . . . . . . . . . . . . . . . . . . . 36

          The Cypress Hills Case . . . . . . . . . . . . . . . . 36

          Findings . . . . . . . . . . . . . . . . . . . . . . . . 39

      Findings from Other Jurisdictions . . . . . . . . . . . 52

## TABLE OF CONTENTS
(continued)

**GUARDIAN AD LITEM APPOINTMENTS** . . . . . . . . . .   58

    Nassau County . . . . . . . . . . . .   60

        Compliance . . . . . . . . . . . .   61

        One Selected Case . . . . . . . . .   66

    Findings from Other Jurisdictions . . . . . . . . .   68

**CONCLUSION** . . . . . . . . . . . . . .   72

    Attachment A . . . . . . . . . . . .   74

    Attachment B . . . . . . . . . . . .   82

## Executive Summary

Fiduciaries perform a wide range of functions in the New York courts. Courts, for example, appoint fiduciaries as guardians for incapacitated persons, as receivers for properties involved in foreclosure proceedings and as guardians ad litem for children involved in litigation. Fiduciary appointees are usually private attorneys, who are paid for their services from the assets of the litigants.

The fiduciary appointment process has been the target of extensive public criticism over the years, with charges that judges have selected fiduciaries based on factors other than merit and complaints that fiduciary appointees have mishandled cases or received excessive fees from their assignments. Following widely publicized allegations regarding the connection between political party service and receipt of fiduciary appointments in Brooklyn Supreme Court, Chief Judge Judith S. Kaye last year announced a broad program to reform the State's fiduciary appointment process. She created a high-level Commission on Fiduciary Appointments to examine existing rules and practices and make recommendations for improvement. She also established an Office of the Special Inspector General for Fiduciary Appointments, with jurisdiction to monitor and enforce existing rules governing the appointments.

This report is based on a comprehensive investigation, involving hundreds of interviews and examination of thousands of court files, by the Office of the Special Inspector General and the court system's Internal Auditing Unit. Most of the individuals involved in the cases discussed in the report were interviewed. The findings have been shared with the Commission on Fiduciary Appointments, which will be releasing its own report and recommendations shortly.

The findings are being released now so that the public can more fully understand the basis upon which many of the Commission's recommendations are being made and better evaluate its proposed reforms of fiduciary appointment rules and practice.

## Brief Synopsis of the Rules

The cornerstone of regulatory oversight of the fiduciary appointment process is Part 36 of the Rules of the Chief Judge. Under Part 36, individuals seeking appointment as a fiduciary must submit an application to the Office of Court Administration (OCA). OCA compiles lists of the applicants, which are made available to the judges. Anyone is eligible for inclusion on the lists, except a relative within the sixth degree of relationship of a Unified Court System judge. The rules contemplate that judges will make fiduciary appointments from the lists, although a judge may deviate from the lists in certain circumstances.

Part 36 also requires appointees, prior to accepting an appointment, to file with the court a written certification that: (1) the appointee is not related to a judge within the sixth degree of relationship; and (2) the appointment will not result in the appointee receiving within a 12-month period more than one appointment in which the anticipated compensation will exceed $5,000 (the "$5,000 rule"). Within ten days of appointment, appointees must file a notice of appointment with OCA. Additionally, when a judge approves payment greater than $500 to a fiduciary, the judge must file with OCA a statement of approval of compensation specifying the amount. Under the rules, judges are not authorized to approve payment unless the fiduciary appointee has filed the written certification and the notice of appointment.

OCA enters information from these filings in the court system's fiduciary database, which is electronically available to judges (along with the applications submitted by fiduciaries and the

lists of the applicants).  This information is also available to the public.

**Findings**

Given the thousands upon thousands of fiduciary appointments made in the New York courts each year, it was not possible to review all cases in which appointments were made.  Rather, the investigation focused on a representative number of cases in a representative group of jurisdictions throughout the State.   The review concentrated on guardianship cases and receivership cases in Supreme Court and guardian ad litem appointments in Surrogate's Court.

**Guardianship Cases**

When a petition for a guardianship is brought, the court must appoint a court evaluator or counsel for the alleged incapacitated person to assist the court in its determination of whether a guardian should be appointed.  A guardian will be appointed if the court determines that the individual is incapacitated because he or she is unable to provide for personal needs or property management (or both) and cannot adequately appreciate the nature and consequences of the inability.

Our examination revealed a series of problems and concerns in these cases.  Compliance with the Part 36 filing requirements was mixed:

- In some counties, notices of appointments, certifications of compliance and statements of approval of compensation were filed in a minimal number of cases.

- Even in the counties with the best rate of filing compliance, forms were filed in less than half of the cases.

The law gives judges discretion to determine the method of the guardian's compensation, and guardians were compensated in a variety of ways. Some received statutory commissions based

iii

on a percentage of the assets of the incapacitated person (the "IP") or based on the amounts that the guardian received and disbursed. Other appointees, usually guardians who were lawyers, received hourly fees for their guardian services, in some cases as much as $400 per hour. Still others received both statutory commissions and additional, separate legal fees. And guardians who were not attorneys often retained attorneys to assist them. In many of those cases judges regularly approved separate legal fees for services that appeared to be the statutory responsibilities of the guardian. For example, judges approved legal fees for services such as:

- preparing the guardian's reports and accountings;

- preparing the OCA filings;

- obtaining a bond; and

- gathering the IP's assets.

Additionally, when approving fees the courts frequently did not distinguish between legal services and services not legal in nature that should have been billed at a considerably lower rate. For example:

- A guardian and an employee of the guardian's law firm billed $850 to celebrate the IP's birthday when they brought her flowers and a cake and visited with her at the nursing home. On another occasion, when the guardian and one of his employees visited the IP at the nursing home, they took her out for a walk and bought her an ice cream cone. The guardian billed $1,275 for this visit.

- Another guardian received over $65,000 in compensation based on the guardian's billing rate for legal services for tasks that included visiting an eyeglass store, attending a holiday party, inventorying the IP's wardrobe and sewing and ironing

iv

labels on the IP's clothing.

- Another guardian received over $12,000 for services that included shopping for clothes, handling routine banking matters and attending medical appointments with the IP.

A closer examination of several selected guardianship cases revealed that the guardians apparently did not always act in the best interests of their wards. Serious lapses were found in the quality of care that guardians provided in meeting the personal needs of the IPs. Moreover, guardians apparently did not always strive to promote and preserve the IPs' financial interests, as they were obligated to do as fiduciaries.

The investigation further established that many of the recipients of multiple and lucrative appointments in guardianship cases had connections to judges, political parties or court system personnel, raising concerns that they were selected based on factors other than merit. These included:

- An attorney who received 10 appointments and approximately $250,000 in compensation from a judge for whom the attorney regularly served as a non-paying special master. The attorney, who appeared to lack the qualifications for these appointments, had twice declared bankruptcy.

- Several individuals who received appointments from judges for whom they had provided free legal and other professional services.

- Two attorneys with high-level positions in a local political party who received approximately 110 appointments between them in guardianship and receivership matters and were awarded compensation of approximately $400,000.

v

Our review also uncovered a significant number of individuals who received more than one appointment within a 12-month period for which they ultimately were paid more than $5,000, an apparent violation of the Part 36 rules.

### Receivership Cases

Compliance with the Part 36 filing requirements was extremely poor in receivership cases:

- In a number of jurisdictions there was minimal filing, particularly with regard to statements of approval of compensation.

- Even in counties with a better showing, there was barely compliance in a third of the cases.

In at least one county, a disproportionate number of the appointments and a disproportionate percentage of the fees went to a group of individuals with connections to the local political party establishment.  For example:

- An official of the local political party organization received 46 receivership appointments during a five-year period (about 10% of all the receivership appointments), and about one-third of all receiver fees during that period.

- A law firm, one of whose two members was a high-ranking local political party official, received 34 appointments during the same five-year period.

In general, and contrary to the requirements of the Part 36 rules, receivers, and not judges, appointed their counsel or property managers.  Indeed, the general practice across the State was not to apply the fiduciary rules to these "secondary" appointees.

- One extreme result of this practice was that, in one jurisdiction, a single, small law firm obtained approximately 75% of all counsel to receiver assignments over a five-

year period, amounting to over $700,000 in fees.  If the rules had been followed, two of the three lawyers in that firm would not have been eligible for even a single assignment because they were the sons of a current Supreme Court Justice.

- Another result of this practice was that, over a five-year period in one county, two management companies received 76% of all property manager appointments and 84% of all fees awarded from such appointments.

Although counsel were routinely retained in receivership cases, our investigation revealed that the work they performed often was not of a legal nature, involving tasks that the receiver should have been performing such as preparing accountings, preparing billings and meeting with tenants and property managers.  Because receivers are compensated at the statutory rate of a maximum of five percent of the amounts they receive and disburse, and the counsel are compensated at their hourly legal rates, the result was that in the smaller receivership cases (which made up the great number of the cases) usually the counsel were awarded higher fees than the receivers.  Moreover, in many cases the counsel were compensated for the full amounts they requested even though they failed to detail the work they performed.  Similarly, receivers frequently failed to specify expenditures they made, and in some cases they were paid fees that exceeded the five percent statutory maximum.

### Guardian Ad Litem Appointments

In general, compliance with the Part 36 filing requirements in cases in which guardians ad litem were appointed was much better than compliance in guardianship or receivership cases:

- In some counties, 80% or more of the required forms were filed.

- In a few counties, however, forms were filed in only half of the cases.

In some of the jurisdictions we examined, a disproportionate number of the higher-paying appointments went to a relatively small group of attorneys, who often had some close connection to the court.  For example:

- In one county, where roughly 100 attorneys received guardian ad litem appointments in the year we examined, a group of 11 attorneys received 40% of the appointments and nearly half of the total compensation awarded.

- In one case that we carefully examined, involving an unusually large estate, the court appointed a retired County Court Judge as guardian ad litem and a retired Surrogate as special referee.  The retired County Court Judge hired as his assistants two attorneys--his daughter and the county's deputy public administrator (a close friend of the Surrogate).  All told, the combined fees paid to the appointees and the assistants were nearly $1.5 million.

Additionally, a significant number of attorneys received guardian ad litem appointments in apparent violation of the $5,000 rule.

## Conclusion

Despite the extensive problems found, we are confident that significant reform of the fiduciary appointment process is underway.  First, the Commission on Fiduciary Appointments is about to release its report and recommendations, which will directly address concerns we have raised.  Second, to correct the widespread flaws in the fiduciary filing process, the court system has already implemented a new oversight system involving designation of special fiduciary clerks and close monitoring of all aspects of this process.  This will better ensure that forms are properly -filed and that fiduciaries are not paid unless the required filings are made.  Third, clear violations

of the fiduciary rules and ethical standards that we have identified have resulted in referrals to appropriate disciplinary authorities. This is sending strong message to the bar and bench that violations of these important rules will not be tolerated. Finally, the Office of the Special Inspector General has been established as a permanent entity within the court system, and we are continuing our efforts to promote compliance with the fiduciary rules and facilitate greater public confidence in the fiduciary appointment process.

ix

## Preface

Courts have long relied on fiduciaries to perform a range of functions in our justice system.  For example, courts appoint fiduciaries as guardians for incapacitated persons, as guardians ad litem for children involved in litigation and as receivers for properties involved in foreclosure proceedings.  Fiduciary appointees are usually private attorneys, but unlike private attorneys who are assigned to represent indigent persons in criminal, family and other proceedings, fiduciaries are not compensated with public funds.  Rather, they are usually paid from the assets of the litigants.

Allegations that judges have selected fiduciaries based on factors other than merit have undermined public confidence in our courts, as have charges that fiduciary appointees have mishandled cases or received excessive fees from their assignments.  Criticism of the fiduciary appointment process soared recently with the public disclosure of an extraordinary letter written by two attorneys who had been retained but then dismissed as counsel to a court-appointed receiver in a Brooklyn Supreme Court proceeding.  The letter laid bare the long-suspected influence that political connections can have on the fiduciary appointment process.  This time, however, the allegations of political influence came from an unlikely source--disgruntled attorneys seeking to perpetuate their receipt of fiduciary appointments, which they considered their entitlement based on their service and loyalty to the county political organization.

In the wake of these developments, Chief Judge Judith S. Kaye announced a comprehensive program to reform the fiduciary appointment process in New York.  She directed the establishment of an Office of the Special Inspector General for Fiduciary Appointments, with

Statewide jurisdiction to monitor and enforce the existing rules governing judicial appointments. She also created a high-level Commission on Fiduciary Appointments to examine existing fiduciary rules and make recommendations for improvement.

This report is based on a far-reaching investigation conducted by the Office of the Special Inspector General for Fiduciary Appointments and the Unified Court System's Internal Audit Unit. As part of this investigation, we have examined thousands of court files and conducted hundreds of interviews with individuals directly involved in or knowledgeable about the process of appointing fiduciaries. Most of the individuals involved in the cases discussed in the report were interviewed. We have also reviewed extensive information in the Unified Court System's fiduciary appointment database. Comprehensive investigation of the fiduciary appointment process is a huge undertaking--in any given year, thousands upon thousands of fiduciary appointments are made in the New York courts. We have not examined all of these appointments, nor would it be possible to do so. What we have done in this report is present our findings with regard to a representative group of cases and jurisdictions. In doing so, we have identified a series of problems and concerns that require the attention of court administrators, policy makers and, perhaps most importantly, the Commission on Fiduciary Appointments, which will be issuing its report and recommendations in the next several days. The Commission's report will include recommendations for rule changes that will be considered by the Administrative Board of the Courts and ultimately by the State's highest court, the Court of Appeals.

Throughout our investigation, we have shared our findings with the Commission. This report is being released now so that the public will understand the basis upon which many of the Commission's recommendations are being made and thus can better evaluate the forthcoming

2

proposed changes in fiduciary appointment rules and practice.

Finally, except when discussing certain matters that already have received extensive attention in the media, we have not identified individuals whose actions are described in the report.  As noted, the purpose of this public report is to provide a factual context for recommendations to improve the process, not to make accusations against people who may have committed misconduct.  This would be an inappropriate forum in which to do so.  Rather, under the State Constitution (N.Y. Const., Art. 6, § 28) and statutory law (Jud. Law §§ 212(1)(h), (m), (s) and (t)), and pursuant to the authority and direction of the Chief Administrative Judge of the Courts, our investigation has resulted in referrals to appropriate disciplinary authorities, with additional referrals currently under consideration.  The law provides that these are confidential processes in which the subjects are not revealed unless they waive their statutory right to confidentiality or unless a finding of misconduct is made.  Although many have long urged that disciplinary charges against judges and lawyers be made public at an earlier point, as of yet there has been no legislative action in that regard.

## REGULATORY BACKGROUND

### Part 36

The cornerstone of regulatory oversight of the fiduciary appointment process in New York is Part 36 of the Rules of the Chief Judge (see 22 NYCRR Part 36). Promulgated in 1986, the Part 36 rules apply to the appointment of guardians, guardians ad litem, court evaluators, attorneys for alleged incapacitated persons, receivers, persons designated to perform services for a receiver and referees. Under the rules, individuals interested in being considered for appointment must submit an application to the Office of Court Administration. OCA compiles lists of the applicants, which are made available to judges who must make the appointments (§ 36.2(a)). Anyone is eligible for inclusion on the lists, except a person who is a relative of, or related by marriage to, a judge of the Unified Court System within the sixth degree of relationship (§ 36.1(b)(1)).[1] Thus, although the application that a prospective fiduciary appointee submits to OCA contains extensive information about the applicant, such as prior experience, education, employment history, area of expertise and criminal record, the only factor that renders an applicant ineligible for inclusion on the list is relation to a judge within the sixth degree.

The rules contemplate that judges will make fiduciary appointments from the list. A judge may deviate from the list, however, if the appointee "is better qualified for appointment in a particular matter, either because of prior experience with the ward or estate, or because of particular expertise necessary to the case." When deviating from the list, the judge must place the reasons for doing so as well as the appointee's qualifications on the court record (§ 36.1(a)). The

---

[1] The sixth degree of relationship extends to second cousins.

rules provide generally that the appointing judge is "solely responsible" for determining the qualifications of a fiduciary appointee.

Part 36 sets forth strict filing requirements for fiduciaries.  Before accepting an appointment, a prospective appointee must file with the court a written certification that the appointment will not violate the Part 36 rules (UCS Form 830.3; <u>see</u> § 36.1(d)).  In essence, this is a certification of two facts.  First, as noted, it is a certification that the prospective appointee is not related to a judge within the sixth degree.  Second, it is a certification that the appointment will not result in the appointee receiving within a 12-month period more than one appointment, calculated from the date of appointment, in which the anticipated compensation will exceed $5,000.  The prospective appointee's certification must also include a list of any fiduciary appointments received within the preceding 12 months.

If the appointee is unable to make this certification, the judge is not authorized to make the appointment, with one limited exception.  The judge may waive the $5,000 rule upon determining, in writing, that "unusual circumstances of continuity of representation or familiarity with a case require" the appointment (§ 36.1(c)).

Within ten days of receiving an appointment, the fiduciary must file with OCA a "notice of appointment" form (UCS Form 830.1; <u>see</u> § 36.3(a)).  The filing provisions, however, do not apply to every fiduciary appointee.  Section 36.1(e)(3) provides that the provisions do not apply to the Mental Hygiene Legal Service, a nonprofit institution performing social services or an appointment of a relative or a person having a legally recognized duty or interest with respect to the affairs of the infant, ward, incapacitated person, decedent or beneficiary of an estate.

When the judge approves payment in excess of $500 to any fiduciary, including family

5

members and social service agencies, the judge must file with OCA a "statement of approval of compensation" specifying, among other things, the amount of compensation authorized (UCS Form 830; see Jud. Law § 35-a, 22 NYCRR Part 26).[2] The statement of approval of compensation also includes a certification by the fiduciary that he or she submitted a notice of appointment form to OCA, and a certification by the judge that the fee authorized is fixed by statute or is a "reasonable award" for the services rendered (§ 26.4). The rules further provide that no fee shall be awarded unless the fiduciary has filed the notice of appointment form and the certification of compliance (§ 36.4(c)).

OCA enters information from these filings in the Unified Court System's fiduciary database, which, along with the applications submitted by prospective fiduciaries and the lists of the applicants, is now available to judges on the Judiciary's internal computer network. This information is also available to the public.

## Secondary Appointments

Since its promulgation in 1986, Part 36 has included within its ambit "persons performing services for a receiver." Section 36.1(a) provides that their appointments, like those of receivers, guardians and the other fiduciaries enumerated in that section, "shall be made by the judge authorized by law to make the appointment." All of the disqualifying factors, filing requirements and other provisions of Part 36, therefore, apply with equal force to such persons. Thus, receivers cannot appoint their own counsel or property managers, judges may not appoint relatives of judges to those positions and the appointees must make all the filings required by Part 36.

---

[2] Last year, the Legislature raised the threshold for filing from $200 to $500.

Despite the clear mandate of Part 36, a practice evolved in the courts in which the receivers, and not the judges, selected their own counsel and property managers in cases in which the receivers determined it was advantageous to retain these professionals. To correct this widespread noncompliance with the rules, Chief Administrative Judge Jonathan Lippman in March 2000 issued a memorandum reiterating for judges across the State that appointments of persons designated to perform services for a receiver must be made by the judge, and that such appointments were subject to all the requirements of Part 36 (see Attachment A).

## Rules of Judicial Conduct

The Rules of Judicial Conduct also address fiduciary appointments. The rules provide that a judge "shall not make unnecessary appointments . . . . shall avoid nepotism and favoritism . . . . [and] shall not approve compensation of appointees beyond the fair value of services rendered" (22 NYCRR § 100.3(C)(3)). The rules also provide generally that a judge "shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," and "shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment" (22 NYCRR §100.2(A) & (B)).

7

## A.    APPOINTMENTS IN GUARDIANSHIP CASES

### In General

A court may appoint a guardian only after determining that the appointment is necessary to provide for the personal needs of that person and/or to manage the property and financial affairs of that person, and that the person has agreed to the appointment or is incapacitated (MHL § 81.02(a) (1) & (2)).  The standard in determining incapacity is whether the person is likely to suffer harm because he or she: (1) is unable to provide for personal needs or property management or both, and (2) cannot adequately understand and appreciate the nature and consequences of the inability.  A determination that a person is incapacitated must be based on clear and convincing evidence, and requires a  hearing, even in cases where the alleged incapacitated person (the "AIP") consents to the appointment of a guardian (MHL § 81.11(a)).  The court also must assess the functional abilities of the AIP in order to properly tailor the guardianship order so that it meets the needs of the individual (MHL § 81.02(c)).

A guardianship proceeding (often referred to as an Article 81 proceeding) begins with the filing of an order to show cause and supporting petition.  The majority of guardianship petitions are filed by local social services agencies, hospitals and healthcare facilities, with most of the remainder brought by relatives or friends of the AIPs.

At the time of issuance of the order to show cause, the court must appoint a court evaluator (unless counsel for the AIP is appointed) (MHL § 81.10 (g)).  Court evaluators must be selected from the OCA fiduciary list.  In addition, all court evaluators must complete a training program approved by OCA.  Although the court may waive this training, that is rarely done (MHL § 81.40(c)).

8

In selecting a court evaluator, the court may choose from a broad spectrum of professions, including attorneys, physicians, psychologists, accountants, social workers, nurses or any other persons the court determines possess the knowledge and skill to perform the task (MHL §, 81.09(b)(1)). Additionally, in cases in which the AIP resides in a state facility, hospital, nursing home or adult home, the court has the option of appointing Mental Hygiene Legal Service ("MHLS") as the court evaluator (MHL § 81.09(b)(2)).

The court evaluator acts as an independent investigator and gathers information to aid the court in its determination of the AIP's capacity, the availability and reliability of alternative resources, the proper powers to be assigned to the guardian and selection of the guardian (MHL § 81.09). The court evaluator's specific responsibilities include meeting with and interviewing the AIP to explain the proceedings, the rights to which the AIP is entitled, and the general powers and duties of a guardian. The court evaluator also must interview the petitioner, assess whether legal counsel should be appointed for the AIP and submit a written report providing extensive information with recommendations to the court (MHL § 81.09(c)(5)). All of these tasks must be performed on an expedited basis, because the court must conduct a hearing within 28 days of the filing of the petition (MHL § 81.07(a)(1)).

An AIP for whom a guardianship is being sought has the right to be represented by legal counsel of that person's choosing (MHL § 81.10). Although the court also may appoint counsel for the AIP, this is not always required. Appointment of counsel is mandatory, however, if: (1) the AIP requests counsel; (2) the AIP contests the petition; (3) the AIP does not consent to a request in the petition for removal to a nursing home or other residential facility; (4) the AIP does not consent to necessary medical or dental treatment; (5) the petition seeks temporary powers; (6)

9

the court determines that a conflict exists between the court evaluator's role and the advocacy needs of the AIP; or (7) counsel would be helpful to the resolution of the case (MHL § 81.10(c)).

Following a hearing, the court may appoint a guardian to attend to the personal needs of an incapacitated person (the "IP") and/or to manage the IP's property and financial matters.  In general, courts give preference to a family member or to a person nominated by the IP.  If no family members or nominated persons are qualified to serve, however, the court may select an appropriate person to serve as guardian.  If the petition is brought by a social service agency and the IP resides or plans to return to the community, a community guardianship program may be appointed as guardian (MHL § 81.19(a)(2)).[3]

A guardian may exercise only those powers authorized in the appointment order, which must be tailored to the specific needs of the IP.  In general, a guardian usually is required to oversee the IP's assets, make health care and medical decisions, pay bills, supervise home health care or select a health care facility, and periodically visit the IP.

In addition to providing personal care and managing the IP's finances, the guardian  must file periodic reports with the court.  These reports should document the IP's financial status, including income, assets, expenditures and unpaid claims, as well as medical condition and health care.  The reports are reviewed by court examiners who have been appointed by the Appellate Division (MHL § 81.32).  Upon the termination of a guardianship, the guardian must file with the court a final report providing a financial accounting of the entire period during which the guardian served.

---

[3]  A community guardianship program is a non-profit organization that has contracted with a social service agency to provide guardianship services to certain eligible incapacitated persons.

## Compensation of Article 81 Fiduciaries

Article 81 prescribes how the court evaluator, counsel for the AIP and guardian are to be compensated (MHL §§ 81.09(f), 81.10(f) and 81.28).  Under the  statute, the cost of the guardianship proceeding is to be paid by the IP, unless he or she has minimal or no assets.  However, if the proceeding is dismissed or discontinued and the court determines that appointment of a guardian is not warranted, the petitioner is usually responsible for his or her own attorney's fees and possibly even the fees of the court evaluator and counsel to the AIP.  If an AIP is indigent, the Court of Appeals has held that the cost of attorney fees should be borne by the county pursuant to Article 18-B of the County Law.[4]  And in cases commenced by local social service agencies in which there are minimal or no assets, the court evaluator receives a stipend of $600, to be paid by the petitioner.

Typically, if the AIP has some or substantial assets, the court evaluator and the counsel for the AIP are paid a fee from those assets based on the fair and reasonable value of the services rendered.  When determining reasonable compensation for a court appointee, the court generally must consider the following factors: time spent, difficulty involved, nature of the services, amount of assets involved, professional standing of the counsel and results obtained.[5]  In making this determination, the court should rely on detailed time records submitted by the court appointees.

Compensation for the guardian is addressed in MHL § 81.28, which provides that the court shall establish a plan for reasonable compensation of the guardian.  While the statute

---

[4]  See Matter of St. Luke's-Roosevelt Hospital Center (Marie H.), 89 N.Y.2d 889 (1996).

[5]  See Matter of Freeman, 34 N.Y.2d 1 (1974); Matter of Potts, 213 A.D. 59, 62 (4th Dept. 1925), aff'd 241 N.Y. 593 (1925).

hours working on routine matters. In the cases we examined in which the IP had assets, the court rarely reduced the fee requested by the court evaluator. The following are some examples:

- In one case, the court evaluator was awarded compensation of $36,753, at an hourly rate of $400. An examination of the supporting affidavit made reference to over 80 telephone calls with no explanation provided as to the nature of these calls, each billed at $100. Further, the court evaluator billed almost five hours for preparing the fee application, and billed (at $400 an hour) for picking up a court transcript, calling the court clerk and preparing the OCA forms. The court awarded the entire fee requested, and also appointed the individual co-guardian for the IP at a rate of $400 per hour.

- In another case, a court evaluator who was an attorney was awarded compensation at an hourly rate of $250 for non-legal tasks such as faxing documents, telephoning directory assistance to obtain telephone numbers, renting a car, selecting clothing for and bringing food to the AIP.

- In another case, the court evaluator and associate each billed six hours for interviewing the AIP, medical personnel, and family members at a rate of $425 and $240 an hour, respectively. Further, the associate billed nearly two hours for arranging appointments and preparing the OCA forms.

Although the court evaluator appointments were divided among 199 individuals, a much smaller group of individuals--23 (12%)--received over 50% of the total compensation awarded. Many of these individuals had connections either to each other or the political establishment. For example, two of the appointees were associates at the same small law firm, two were counsel to

14

and one was an officer of a county political party committee, and one employed a county political party leader.

### Counsel to AIP

As discussed, not every guardianship proceeding requires the appointment of a counsel for the AIP. The court appointed an attorney for the AIP in only 130 of the cases reviewed (in three of those cases a successor attorney was appointed). In over half of these cases, the court appointed Mental Hygiene Legal Service as the attorney. The other 64 appointments were divided among 47 attorneys. While most of the attorneys only received one appointment, a few were appointed in two or more of the cases.

In total, only 56 of those appointed were required to file the Part 36 forms. Of these, 33 (59%) filed a notice of appointment and 32 (57%) filed a certification of compliance. In the 46 cases in which the attorney was awarded compensation, only 25 (54%) statements of approval of compensation were filed. While 35 attorneys were awarded compensation, a much smaller group of attorneys received most of the money. Six attorneys received more than 70% of the total fees awarded. Two of these attorneys, one a former judge and the other a high-level local bar association officer, were each awarded fees in excess of $50,000 in two cases. By comparison, none of the other 29 attorneys was awarded a fee over $6,000 in any one case.

### Guardians

In 129 (46%) of the cases reviewed in which a guardian was appointed, the court selected as the guardian a friend or family member of the IP. In over 20% of those cases, the court appointed a private attorney to act as the co-guardian. Usually, a friend or family member was appointed as co-guardian to handle the IP's personal needs, and the attorney co-guardian managed

15

the IP's property and financial matters.

In 29% of the proceedings, a community guardianship program was appointed guardian. In a few cases, a successor guardian was appointed either to replace a community guardianship program when the IP was placed in a health care facility or when a guardian was discharged or resigned. In 53 (16%) of the proceedings, a guardian was not appointed. In some of those cases, the petition was withdrawn prior to the hearing, and in others the court determined after the hearing that a guardian was not necessary.

Of the 111 guardians required to file the Part 36 forms, only 60 (54%) filed a notice of appointment, and only 65 (59%) filed a certification of compliance. In total, 41 guardians were awarded compensation. Of these cases, the court filed the approval of compensation form in 31 (76%) of the cases.

As discussed, the courts use a variety of methods in determining a guardian's compensation. Generally, the fee arrangement is determined at the time of appointment. Some judges, however, delay choosing a method of compensation until completion of the guardianship or when payment of the guardian is warranted, such as after the review of the annual report by a court examiner. An examination of the cases revealed that the majority of judges calculated the guardian's compensation based on the statutory commissions while a few judges set a fixed hourly rate for the guardian. Other judges did not commit to a method of compensation, and noted in the appointing order that the guardian's commission was to be based on either SCPA § 2307 or SCPA § 2309, "whichever was higher." In cases where a family member or friend was appointed guardian, compensation was frequently waived.

For 104 (29%) guardians compensation was based on a statutory commission. For 66

16

(19%) guardians, compensation was based on an hourly billing rate ranging from $10 to $450 per hour. For 59 (17%) guardians, no method of compensation was specified in the court file, and 49 (14%) appointees waived compensation. For 68 (19%) guardians, commission was determined pursuant to section 473-d(3)(d) of the Social Service Law. The remaining eight (2%) guardian's compensation was paid by the local social service agency.

Some judges have expressed dissatisfaction with the compensation provided for guardians under SCPA §§ 2307 and 2309, particularly when the guardian's responsibilities include both personal and property management.[7] In response, judges have awarded additional compensation to guardians when they had extensive responsibilities or appointed co-guardians. In setting the guardian's fee, courts have applied factors such as the type and nature of assistance provided to the IP, the amount of time the guardian expended in providing both personal needs assistance and property management and the allocation of time between the personal needs assistance and property management.

In some cases, judges approved payment of legal fees in addition to statutory commissions to guardians who were attorneys, even for services that appeared to be responsibilities of a guardian as delineated in the statute. When setting hourly fees, the courts often did not differentiate between legal services rendered and guardianship services such as shopping for clothes and toiletries, paying bills and visiting the IP.

The following are some examples:

- In one matter, the IP's relative and an attorney were appointed co-guardians. The

---

[7] See, e.g., In re Pineda, N.Y.L.J., May 28, 1997, p. 26 (Sup. Ct., New York Co.); In re Schwartz, N.Y.L.J., May 2, 1996, p. 33 col. 2 (Sup. Ct., Nassau Co.).

court set compensation amounts of $250 per hour for the attorney and $50 per hour for the relative. The IP resided in a health care facility and many of her personal needs were taken care of by the relative co-guardian. The attorney's role in the care of the IP, therefore, should have been limited. However, within a year, the attorney received over $65,000 in compensation, based on billing at the attorney's legal rate for tasks such as visiting an eyeglass store, attending a holiday party, exchanging clothing, inventorying the IP's wardrobe and sewing and ironing labels on the IP's clothing. Administrative duties such as drafting fee applications, calling financial institutions and returning apartment keys were also billed at the attorney's legal billing rate. Recently, a second judge assigned a special referee to examine the compensation awarded and the nature and type of guardian services provided in this case.

- In another matter, the court appointed as guardian of the property an individual who had never before served as a guardian and was not on OCA's fiduciary list at the time of appointment. The IP had limited assets and the case did not present complex legal issues. After about eighteen months, the guardian sought over $12,000 in compensation for services such as: 12 hours shopping for clothes, 12 hours handling banking matters, nearly 45 hours attending medical appointments with the IP, and attending the mandatory eight-hour guardianship training course. In addition, the guardian hired two attorneys to prepare and file the guardian's two affirmations of services, at a total cost of $1,275. Both MHLS and the court examiner opposed the guardian's fee requests, arguing that many of the services

the guardian billed for could have been provided by the health care facility or were unnecessary. The court approved the guardian's full fees. If the guardian's compensation had been based on the statutory commission, it would have been less than $6,000.

- In another matter, a guardian who received compensation based on a fixed hourly rate billed over 100 hours for many tasks that appeared to be unnecessary. The guardian repeatedly spent over four hours traveling to a bank in another borough to deposit a $50 monthly social security check; each trip to the bank cost the IP $300. Additionally, the guardian billed at least seven hours for each court appearance. In total, the guardian received a fee over $8,700. If the guardian received the statutory commission, the fee would have been less than $3,000.

The investigation revealed that many of the recipients of multiple and lucrative appointments had relationships with judges, court system personnel, politics or in some cases each other. For example:

- One attorney received 10 appointments and approximately $250,000 in compensation from a judge for whom the attorney regularly served as a special master.[8] In an affirmation, the attorney listed as qualifications being "raised in a medical family" and having a "personal history of multiple surgical hospitalizations." The attorney also claimed to have been practicing elder law for 15 years, but later, when interviewed and asked to elaborate, admitted the reference

_____

[8] This was a non-paying, periodic assignment in which the attorney, on behalf of the judge, reviewed motion papers and attempted to expedite matters.

was to personal experience with elderly relatives.  Moreover, the attorney had declared bankruptcy twice.

- Two attorneys informed us that they received appointments from judges for whom they had provided free legal services.  One of the attorneys represented a judge in a civil matter and had a social relationship that included lunches, dinners and visits to each other's home.  Another attorney handled a real estate matter for the spouse of a judge from whom he had received fiduciary appointments; the attorney did not recall whether a fee was charged for handling the matter.

- One individual, who was both a law graduate and a registered nurse, received guardianship appointments from a judge with whom the nurse was a close friend.  The nurse had been appointed to manage the assets of IPs, despite the fact that the nurse had declared personal bankruptcy.  The judge also recommended to one fiduciary appointee that he hire the individual to provide nursing care for his ward.

- A tax accountant received appointments from a judge for whom the tax accountant had provided free accounting services over a multi-year period.  The judge also suggested to other court appointees that they hire the accountant to provide financial services for their wards.

- The spouse of a law clerk has received numerous appointments, including three from the judge in the court part to whom the law clerk is assigned.

- Two attorneys, both counsel to a county political leader, received over 110 appointments in guardianship and receivership matters and were awarded compensation of approximately $400,000.

20

- One attorney, the spouse of a high-level managerial employee of the court system, received over 120 appointments in guardianship and receivership matters, resulting in over $360,000 in compensation.

## Two Selected New York County Guardianship Cases

Two guardianship cases illustrate the problems discovered in many of the cases reviewed. In the first case, a guardianship proceeding was commenced by the hospital where the AIP, a retired college professor who had suffered a stroke, was a patient. The AIP was seriously ill and the hospital was seeking his discharge so he could spend his final days at home. The court appointed two guardians: an attorney who had regularly served as the judge's special master was appointed to handled the IP's personal needs, and a friend of the IP was appointed to handle the IP's property and financial matters. The IP's friend resigned shortly thereafter and was replaced as co-guardian by a tax and financial manager.

A few months after the IP returned home from the hospital, he unexpectedly began to recover from his illness, and soon required much less assistance from the 24-hour home health aides. As he continued to recover, the IP attempted to take a more active role in his financial affairs, and he repeatedly complained about the harsh treatment he was receiving from one of the home health aides. Despite the IP's many requests and complaints, there was no change in his 24-hour health care, the hostile home health aide was not replaced and the guardians provided him with no information about his finances.

The IP eventually retained his own attorney, and the attorney filed a motion to terminate the guardianship. In response, the court appointed a court evaluator to investigate and determine whether the IP still needed a guardianship. Following an extensive investigation and a trial period,

21

the court evaluator concluded that the IP was capable of managing his own affairs. In her report, the court evaluator harshly criticized both guardians, and questioned whether the personal needs guardian had fulfilled his fiduciary obligations. Thereafter, the court discharged the home health aides and made arrangements for the IP to resume control of his finances. Although the guardians' day-to-day responsibilities now were no longer required, they continued to bill for another 70 hours, which included time spent researching the placement of the IP in an assisted living facility and the creation of a burial trust.

Although he provided no legal services, the personal needs guardian was compensated at his legal billing rate of $215 per hour. The guardian of the property was compensated at a rate of $200 per hour. In all, the guardians spent approximately $480,000 of the IP's money, with nearly half paid to court appointees. The guardians requested over $160,000 combined, nearly $100,000 more than they would have received had they been paid statutory commissions. The judge handling this case subsequently appointed the guardians again in another proceeding.

In the second case, a guardianship petition was brought by a niece of the AIP who was concerned about the handling of the AIP's substantial assets by his newly retained attorney. At the time of the petition, the AIP was a wealthy retired doctor who was living at home with his wife of 50 years.

The judge appointed a high-ranking local bar association official with whom the judge was friendly as counsel to the AIP, and a friend of the bar association official as court evaluator. Subsequently, the judge appointed the court evaluator as temporary guardian of the IP's property and financial matters and also as temporary personal needs co-guardian with the IP's wife. The temporary guardian then hired the original counsel for the IP (who was no longer needed in that

22

capacity once a guardian was appointed) as his counsel and hired two other attorneys to advise him on other issues. At the same time, the court appointed another attorney, also a close friend of the bar association official, as court evaluator. After the guardians were in place, the court kept the court evaluator in the case to advise the court on financial issues.[9] Later, without holding a hearing, the temporary guardians were made the permanent guardians.

Over time, tension between the guardian and the IP's family developed. When the guardian questioned the capacity of the IP's wife to serve as co-guardian of the IP's personal needs, the judge temporarily suspended the wife as the co-guardian. The family eventually hired an attorney who, arguing that the animosity between the IP's wife and the guardian was having a detrimental effect on the IP and his family, requested that the court appoint the IP's niece as the sole guardian of the IP's personal needs. The judge declined to remove the guardian, but appointed the judge's personal physician to serve as personal needs co-guardian for the IP.

After the family's attorney renewed the request for removal of the guardian, the judge appointed a new counsel for the IP to determine whether the IP wished to withdraw his original consent to appointment of guardian. The family also requested that all fees previously awarded to the guardian and his attorneys be disallowed.[10] Shortly thereafter, the guardian resigned. The judge withdrew approval of some of the fees previously awarded and directed the guardian and his attorneys to return a portion of the fees pending further review by the court. The judge then

---

[9]  Because a court evaluator is appointed to recommend whether the AIP needs a guardian, once a guardian is appointed the court evaluator's services generally are no longer required.

[10]  Among the fee requests that the judge had approved was a bill that the guardian had submitted that included 42 hours of work for in single day. The improper billing was discovered by the family's attorney upon his review of the guardian's affirmation of services. The overpayment of $12,600 was subsequently returned.

appointed the IP's wife and niece as co-guardians of the IP's property and person and directed the prior guardian to file a final accounting of the proceeding. The judge also withdrew from the case. The new judge then released the court evaluator and the counsel to the IP, and ordered a hearing to determine whether the guardianship was necessary.

By the conclusion of the guardian's tenure over $750,000 in fees had been requested by the guardian, his attorneys, accountants and investigative and investment services. The guardian and the second court evaluator each billed at a rate of $300 per hour. The guardian's three attorneys billed at rates ranging from $325 to $400 per hour, often for the same services. For example, the guardian's billing records reveal that a great deal of his time was spent updating each attorney on the work the other attorneys were doing. Additionally, there were numerous meetings and conference calls involving all of the attorneys and the guardian, with each billing for the time spent. In all, the guardian has requested over $277,000 in compensation for services he provided as guardian and as the first court evaluator. The second court evaluator has received almost $60,000 in compensation. The guardian's three attorneys have requested nearly $290,000 in compensation.[11] Approximately $200,000 was requested for accountants, investment consultants and investigative services.

## Findings From Other Jurisdictions

In Queens County, we reviewed a random sample of 25 cases in which guardians were appointed. The court appointed Mental Hygiene Legal Service as court evaluator in one case and a family member as guardian or co-guardian in 10 cases.

---

[11] This includes the fee received by counsel to the AIP.

Compliance with the filing requirements was mixed. Although 21 of 24 court evaluators (88%) filed a certification of compliance and 23 of 24 (96%) filed a notice of appointment, only eight of 14 guardians (57%) filed a certification of compliance and nine of 14 (64%) filed a notice of appointment. In addition, only 12 approval of compensation forms were filed for the 23 fiduciaries for which they were required (52%).

Guardians were compensated in accordance with SCPA § 2307, SCPA § 2309 or through hourly fees (generally at lawyers' rates). In at least five of the cases in which guardians were paid pursuant to the SCPA, additional hourly fees awarded to guardians appeared to be for duties that the guardian is statutorily required to perform. Some of these routine tasks included:

- preparing the OCA forms;

- obtaining the bond;

- gathering the assets of the ward;

- meeting with the court examiner;

- preparing the annual accounting;

- reviewing the final accounting of the previous guardian; and

- preparing the final accounting and order.

Moreover, some of the guardians who were attorneys billed hourly rates for all of the guardianship work they performed, which often included time spent visiting the IPs and performing personal chores for them such as shopping for clothing and toiletries. In one case, the following occurred:

- The guardian requested fees of $300 per hour for himself, $155 per hour for an associate and $125 per hour for an employee of the firm. On many occasions the

25

guardian and one of his employees visited the IP together and both billed for their time.

- One shopping trip cost the IP over $1,000 in fees--$750 for the partner and $387 for the associate.

- The guardian and an employee billed $850 to celebrate the IP's birthday when they bought her flowers and a birthday cake and visited with her at the nursing home. Another visit to the nursing home by the guardian's employee included "shopping for Thanksgiving pies and ice cream," for which the IP was billed $375 in fees.

- On another occasion, when the guardian and the guardian's employee visited the IP at the nursing home, they took her out for a walk and bought her an ice cream cone. The guardian billed $1,275 for this visit.

Several attorneys received multiple appointments that appear to have violated the $5,000 rule. For example:

- One attorney received five appointments in a 12-month period in which the compensation ultimately received was $31,894, $18,600, $8,000, $11,902 and $15,405, respectively. That attorney received nine separate appointments in a period of just over two years for which the compensation exceeded $5,000. In all, the attorney appears to have violated the $5,000 rule eight times in that time span. All of the attorney's appointments were made by the same judge, and none of the files indicate that the attorney received the appointment pursuant to an exception to the $5,000 rule.

- Another attorney received four appointments in a three-month period where the

ultimate compensation exceeded $5,000, including two appointments where the compensation was $37,174 and $24,230.

A review of the OCA fiduciary database for the period 1995 through 1999 reveals that about a dozen attorneys received many lucrative appointments in Queens County. Some of these attorneys also received lucrative appointments from judges in other jurisdictions, including New York, Kings, Nassau and Suffolk counties. One of the attorneys received approximately 130 appointments totaling over $525,000. Another attorney received 46 appointments in Queens County, of varying amounts, totaling over $130,000. One attorney received 73 smaller cases totaling over $100,000 and another received 46 fiduciary appointments resulting in over $130,000 in fees. A former judge received over 110 fiduciary appointments in a variety of jurisdictions, including Queens, with compensation over $400,000.

In <u>Kings County</u>, we reviewed a random sample of 50 guardianship cases. The court appointed a family member as the guardian or co-guardian in 30 of the cases and a non-profit organization as guardian in six of the cases reviewed. The court appointed a total of 24 guardians or co-guardians who were not relatives of the IP or a non-profit organization. Court evaluators filed a notice of appointment form in 38 (76%) of the cases, and a certification of compliance in 42 (84%) of the cases. Only six (25%) of the 24 guardians filed a notice of appointment, and only 10 (42%) filed a certification of compliance. Approval of compensation forms were filed for court evaluators in 32 (76%) of the 42 cases where they were required and in 9 (53%) of the 17 cases where they were required for guardians.

As in Queens County, the court awarded compensation to guardians that included both statutory commissions and legal fees. Additionally, the court awarded legal fees for work that is

27

part of a guardian's routine responsibilities. As just one example, the following occurred in a case we reviewed:

- The guardian was paid $9,000 in legal fees (at an hourly rate of $250), in addition to over $6,000 in guardian commissions. The items identified as legal work in the guardian's affidavit of services included such routine tasks as a review of the IP's assets, preparation of an initial and annual accounting, and conversations with personnel at the IP's nursing home.

- Despite the award to a guardian of $9,000 in legal fees, the guardian performed no legal work. The sole legal matter that arose was a lawsuit that had been filed against the IP, for which the guardian hired an attorney.

- The approval of compensation form stated that the guardian was awarded $2,785 in compensation, but our review of the court file revealed that the guardian received over $15,000 in fees. During an interview, the guardian claimed that all records pertaining to the case had been misplaced.

- Although an attorney himself, the guardian hired another attorney for assistance, at a rate of $250 per hour. The OCA fiduciary database reveals that the other attorney has received over 120 fiduciary appointments and over $350,000 in fees. In this case, the attorney was awarded $1,400 in fees for assisting the guardian in preparing his annual accounting, which is part of the guardian's routine duties. When the guardian withdrew from the case nine days prior to the IP's death, his attorney was appointed as successor guardian. Although guardian for only nine days, the successor guardian was awarded $10,000 in commissions and $5,000 in

28

legal fees.

We concluded that at least two guardians received appointments in apparent violation of the $5,000 rule. One attorney received three guardianship appointments within a 12-month period that ultimately paid $31,006, $21,286 and $15,000, respectively. Another received two appointments where the compensation was $10,000 and $7,500, respectively. The court files in these cases contained no documentation that the appointing judges waived the rule based on the narrow exception.

In <u>Nassau County</u>, we reviewed a random sample of 25 cases in which guardians were appointed. Mental Hygiene Legal Service was appointed as court evaluator in three cases and a family member was appointed as guardian or co-guardian in six cases. Of the 19 court evaluators required to file forms, 17 (89%) filed a certification of compliance and 16 (84%) filed a notice of appointment. Seven of the 11 guardians (64%) required to file forms filed a certification of compliance and six (55%) filed a notice of appointment. Approval of compensation forms were filed on behalf of 17 of the 19 court evaluators (89%) and two of the five guardians (40%) for whom filing was necessary.

Our review of these cases revealed the following:

- In two matters it appears that the guardians, who were attorneys, were awarded separate fees for guardianship services and legal services. The "legal services," however, included preparing and filing the final accounting, which is part of the guardian's responsibilities.

- In another matter, the guardian, who was an attorney, hired another attorney to perform legal work. The guardian's attorney's affirmation included time spent

29

meeting with the guardian to discuss procedures, preparation and review of the guardian's affirmation of services and preparation and review of the final report and account. Thus, the attorney was compensated for services for which the guardian was also compensated by the payment of commissions.

- One IP had been deceased for over three years before the guardian submitted his final accounting.

It also appears that several appointees in Nassau County may have violated the $5,000 rule. In these cases, there was no documentation in the court files suggesting that the court found that these appointees met the narrow exception to the rule.

In <u>Erie County</u>, we reviewed a random sample of 50 cases in which guardians were appointed. Mental Hygiene Legal Service was appointed attorney for the AIP in one case, court evaluator in five cases and guardian in one case, a nonprofit organization was appointed as guardian in eight cases and a family member was appointed guardian or co-guardian in 28 cases. Three of the 12 counsel for the AIP (25%) filed a certification of compliance and five (42%) filed a notice of appointment; 11 of 46 court evaluators (24%) filed a certification of compliance and 19 (41%) filed a notice of appointment; and four of 19 guardians (21%) filed a certification of compliance and two (11%) filed a notice of appointment. Where approval of compensation forms were required to be filed, three of 7 were filed for counsel for the AIP (43%), 14 of 46 for court evaluators (30%) and three of 14 for guardians (21%).

The audit revealed that in many of the cases, guardians were awarded both commissions and legal fees. Some of the fees appear to have been excessive or unsubstantiated. For example:

- Some of the appointees were awarded compensation even though they failed to

30

submit an affidavit.

- One judge approved a fee based on illegible handwritten time sheets.

- In one case the guardian recommended that the court evaluator receive a fee that was higher than the requested fee, on the ground that the guardian had seen how hard the court evaluator had worked. The court awarded the higher fee based on the guardian's oral recommendation.

- In another matter, the court evaluator was appointed as guardian, and was awarded both a commission and an hourly fee. The legal fees, however, included billing for routine guardianship responsibilities that are covered by the statutory commission, such as visiting the IP, corresponding with the court examiner and preparing the annual accounting.

In <u>Westchester County</u>, we reviewed a random sample of 25 cases. The court appointed Mental Hygiene Legal Service as court evaluator in two cases. Family members were appointed as guardians or co-guardians in 11 of the 25 cases. Of the 16 court evaluators appointed, 12 (75%) filed a certification of compliance and 14 (88%) filed a notice of appointment. But of the eight guardians required to file, only two (25%) filed a certification of compliance and only one (13%) filed a notice of appointment. An approval of compensation form was filed on behalf of 11 court evaluators (79%), but none were filed on behalf of six guardians.

In some of the cases we reviewed, appointees received compensation in excess of the statutory fee originally authorized by the court. In one matter, the appointing order specified that the guardian was to be compensated pursuant to SCPA § 2309. Thereafter, the successor guardian received guardianship commissions and legal fees for filing the final accounting. Despite the

original court order, the guardian was compensated based on a calculation using SCPA § 2307, rather than SCPA § 2309, resulting in an increase in fees of over $1,000. The guardian also received legal fees for preparation of the final accounting, a task that a guardian should be expected to perform as part of the guardianship commission.

In <u>Monroe County</u>, we reviewed a random sample of 25 cases. Mental Hygiene Legal Service was appointed court evaluator in two cases, a nonprofit agency was appointed guardian in 10 cases and family members were appointed guardian or co-guardian in 12 cases. Compliance with the filing requirements was poor. None of the appointees filed the certification of compliance form. Only one of five (20%) counsel for the AIP filed a notice of appointment, while only eight of 20 (40%) court evaluators filed and none of the four guardians filed. Fees were awarded to 20 court evaluators but only two approval of compensation forms (10%) were filed, and five counsel for the AIP were compensated but no forms were filed. No guardians received compensation.

It appears from the OCA database that one attorney received appointments that violated the $5,000 rule. The attorney was initially appointed as the court evaluator in one case and awarded over $5,000 and then appointed guardian in that same case for which the attorney earned $17,000; subsequently, the attorney was appointed guardian in another case for which the attorney eventually earned over $13,000.

We also reviewed a random sample of 25 cases in <u>Schenectady County</u>. Mental Hygiene Legal Service was appointed counsel to the AIP or court evaluator in five cases, and 14 family members were appointed guardian or co-guardian. Of those required to file the forms, one (25%) counsel for an AIP filed a certification of compliance and two (50%) filed a notice of appointment;

seven of the 22 (32%) court evaluators filed a certification of compliance and 13 (59%) filed a notice of appointment; and two (20%) of the ten guardians filed a certification of compliance and two (20%) filed a notice of appointment.   Of those appointees for whom an approval of compensation form was required, none were filed for the counsel for the AIP, seven (35%) were filed for the court evaluators and two (22%) were filed for the nine guardians.



**Non-Compliance With Filing Requirements**
**Guardians**

Legend:
- Notice of Appointment NOT filed
- Certification of Compliance NOT filed
- Approval of Compensation NOT filed

\* None of the guardians in Monroe County received compensation; therefore, the statement of approval of compensation forms were not required.