

Non-Compliance With Filing Requirements
**Court Evaluators**

- Notice of Appointment NOT filed
- Certification of Compliance NOT filed
- Approval of Compensation NOT filed

**B.    APPOINTMENTS IN RECEIVERSHIP CASES**

<u>In General</u>

Under New York law, when there is a risk that a business or property that is the subject of a civil action in a superior court may be "removed from the state, or lost, materially injured or destroyed," a person with interest in the business or property may move for appointment of a receiver to manage the business or property while the action is pending (CPLR § 6401(a)). Generally, the receiver is authorized to take and hold real and personal property and sue for, collect and sell debts or claims (CPLR § 6401(b)).  In the most common proceeding in which a receiver is appointed--a mortgage foreclosure proceeding--this means that the receiver is authorized to collect rents and institute or defend lawsuits related to the collection of rent or the eviction of tenants.

34

In general, a receiver's fee, which is paid from the proceeds of the property or business that is the subject of the receivership,  may not exceed five percent of the total sums the receiver collects and disburses (CPLR § 8004(a)).  In cases in which the receiver's commission, based on the five percent formula, would not amount to $100, the court may authorize a fee of up to $100 for the services rendered.  In addition, in cases in which the receiver collects no sums, or is in possession of no sums at the termination of the receivership, the court may authorize a fee based on the services rendered (CPLR § 8004(b)).  A receiver "shall have no power to employ counsel unless expressly so authorized by order of the court" (CPLR § 6401(b)).  As noted, Part 36 provides that "persons designated to perform services for a receiver" shall be appointed by the court (22 NYCRR § 36.1(a)).  If a counsel is appointed, the fees for such appointees must be reasonable.  A receiver may also be reimbursed for expenses necessarily incurred in the performance of his or her duties, such as clerical, auditing, legal or other services.  If the receiver is an attorney, however, routine legal services should be performed without separate compensation.[12]  Additionally, if the receiver hires an individual to do work that should properly be performed by the receiver, the receiver's commission should be reduced accordingly.[13]  A receiver must provide a full accounting and document in sufficient detail the services provided (see generally CPLR § 6404).

---

[12]  See Strober v. Warren Properties Co., 84 A.D. 2d 834 (2d Dept. 1981).

[13]  See Lentine v. Fundaro, 56 A.D. 2d 592 (2d Dept. 1977).

**Kings County**

### The Cypress Hills Case

An illustration of the dynamics of fiduciary appointments in receivership proceedings in Kings County is the case of <u>People of the State of New York v. Cypress Hills Cemetery</u> (Index. No. 38143/93). The Cypress Hills case is not a mortgage foreclosure proceeding, and it is far more complex and protracted than the typical Brooklyn receivership proceeding. Yet the relationships of the fiduciary appointees in this case to the Brooklyn political establishment and to each other are emblematic of the process in many of the more routine receivership cases in Brooklyn.

In 1993, the State Attorney General's Office initiated an action in Brooklyn Supreme Court requesting that Cypress Hills Cemetery be placed in receivership because of mismanagement. It was also revealed that the Cemetery Board had permitted over 1,000 bodies to be buried in a "hill" of construction debris that had been created for cemetery plots.

Since its inception, the matter has been handled by Supreme Court Justice Richard D. Huttner. Justice Huttner appointed the first receiver for the cemetery in 1993. The receiver then hired the Brooklyn law firm of Garry & Ludwig as counsel to the receiver. The firm was composed of two partners, William J. Garry and Arnold J. Ludwig, and associate Thomas J. Garry, William Garry's younger brother. Arnold Ludwig, a former law secretary to two Brooklyn Supreme Court Justices, is an officer in the Brooklyn Democratic organization and was a member of the County party's law committee. Thomas Garry is also an officer of the Brooklyn Democratic organization and was a member of the party's law committee. William Garry and Thomas Garry, who joined the firm in 1995, are the sons of a Brooklyn Supreme Court Justice.

The receiver also hired a property manager to manage the cemetery.

Although the first receiver was replaced in 1996, Garry & Ludwig were continued as counsel. Then, in 1998, Justice Huttner replaced the second receiver with Manhattan attorney Ravi Batra. Beginning in 1995, Mr. Batra has employed the Brooklyn Democratic County Leader in an "Of Counsel" capacity. Since then, the number of Mr. Batra's fiduciary appointments has substantially increased.

Following his appointment as receiver, Mr. Batra continued to employ the services of Garry & Ludwig and the property manager. On December 6, 1999, however, he wrote to Garry & Ludwig advising that he was replacing them as counsel to the receiver with his own law firm, not only in the Cypress Hills case but also in three other pending cases in which Mr. Batra was serving as the receiver. Conflicting reasons have been offered for the replacement of Garry & Ludwig as counsel. Mr. Batra claims that the firm was incompetent and was attempting to "churn" legal fees. Garry & Ludwig claim that Mr. Batra was motivated by greed.

Cypress Hills was a lucrative appointment for all concerned. Since the inception of the case, well over $1.5 million has been awarded to the various receivers, counsel and property manager. From April 1994 through May 1998, the two initial receivers were awarded $128,000 in commissions. Mr. Batra initially sought $117,000 in compensation for the period of June 1998 through November 1998, but his commission was reduced to $31,400. As counsel to the receivers, Garry & Ludwig received approximately $250,000 in fees. Based on a series of one-year contracts approved by the Cemetery Board providing for monthly management fees ranging from $14,500 to $17,100, the property manager has received over $1.2 million in fees for its management of the cemetery.

Interviews disclosed that shortly after their termination, Garry & Ludwig sought the assistance of the Brooklyn Democratic County Leader and the Chair of the Brooklyn Democratic Law Committee as intermediaries. When their attempts at resolving the dispute failed, Thomas Garry and Arnold Ludwig sent a letter, dated December 20, 1999, to the Law Committee Chair resigning their positions as members of the Committee.[14]

As the letter explains:

> It has become apparent that our diligent work and unquestioned loyalty to the Organization over the many years are clearly not as important as the desires of Mr. Ravi Batra. Although Mr. Batra holds no party or elected position in our County, he has nevertheless imposed himself on the political workings of our Organization for the sole purpose of his own personal financial gain. * * * * [W]e will be unable to continue to represent candidates for elected and/or judicial office free of charge as we have done so in the past . . . . while the Organization sits idly by and permits Mr. Batra to maliciously injure our practice and reputation without consequence * * * * To continue on in our capacity as Law Committee members in light of Mr. Batra's inexcusable actions would be far too much to expect, given the fact that the Organization has permitted an individual with no party position or history in this County to dictate how our Organization is run. . . . Mr. Batra has never assisted the Law Committee on any level whether it be collecting signatures, binding petitions or trying an election law case, etc. In fact, it is unknown as to what Mr. Batra has accomplished in any capacity to benefit our Organization.

The letter concludes:

> It is unfathomable that such action would be tolerated by any other political organization within this City or State. It is quite evident that permitting Mr. Batra's behavior has severely damaged our credibility and reputation as a political Organization. * * * * We hope that one day in the not so distant future we will be able to work together again when the interests of the Organization are once again paramount to the unfettered

---

[14] A copy of the letter is attached to this Report (see Attachment B). In their letter, the attorneys announced their resignation from their positions as members of the party's Law Committee, but not from their positions as officers in the county Democratic organization.

demands of one non-contributing individual.

Garry and Ludwig sent copies of the letter to dozens of other party officials. Weeks later, the press obtained the letter, which was also attached as an exhibit to papers filed in the Cypress Hills litigation. Months later, Mr. Batra resigned his appointment as receiver in the case, and he was replaced by the property manager. In September 2000, the cemetery filed a petition in federal Bankruptcy Court seeking reorganization under Chapter 11.

### Findings

Our investigation in Brooklyn Supreme Court concentrated on all mortgage foreclosure cases in which a receiver was appointed between January 1, 1995 and October 31, 2001. Although receivers are occasionally appointed in other types of Supreme Court cases, these appointments overwhelmingly arise in mortgage foreclosures.

The investigation identified 468 mortgage foreclosure cases in which a receiver was appointed between January 1, 1995 and December 31, 1999. We reviewed the court files in only 417 of these cases, because the Clerk's Office was unable to locate the remaining 51 files. Of the files we reviewed, many were incomplete, with required forms and information about appointments and compensation either missing or inadequate.[15] Additionally, we reviewed OCA's fiduciary appointment database to determine whether the filings required under Part 36 were made in these cases. We also conducted a wide range of interviews with judges, fiduciary appointees, other attorneys involved in these cases and court personnel.

---

[15] Given the incompleteness of the court files, the amount of compensation earned by fiduciaries in these cases may well be higher than what we have been able to document in this report.

In sum, our investigation of these cases revealed the following:

- In general, there was extremely poor compliance with the filing requirements of Part 36.

- Although the judges appointed a range of individuals as receivers, and a majority of those appointed received only one or two appointments, a few individuals received numerous appointments.

- In general, receivers were authorized to decide themselves whether to retain counsel or a property manager; contrary to the requirements of Part 36, the receivers, not the judges, appointed their counsel and property managers.

- In the vast majority of the cases in which receivers retained counsel, they retained the law firm of Garry & Ludwig, in violation of the requirements of Part 36.

- In the vast majority of the cases in which receivers retained property managers, one of two companies was retained.

- Little documentation was provided to the court substantiating fees charged by receivers and their secondary appointees.

## Compliance with Filing and Other Requirements

In the 417 cases reviewed, 439 receivers were appointed (successor receivers were appointed in some cases). Of these 439 receivers, only 125 (28%) filed a notice of appointment, while 89 (20%) filed a certificate of compliance. Although, as discussed, the fiduciary rules provide that a judge shall not authorize payment to a fiduciary appointee unless the fiduciary has

filed a notice of appointment and a certificate of compliance, our investigation identified no cases in which a judge refused to authorize compensation to a receiver on the ground that filings had not been made. In addition, we found no approval of compensation statements filed in any of the cases we reviewed.

We identified 418 "secondary" appointments in the 417 cases we reviewed. Of these, 253 were appointments of counsel and 165 were appointments of property managers. None of these appointees filed a notice of appointment or a certificate of compliance. Moreover, no statements of approval of compensation were filed for any of these appointees.

In contrast to these findings of widespread lack of compliance with the filing requirements, the investigation did not reveal widespread violations of the $5,000 rule. Only one individual apparently obtained receivership appointments in violation of this rule. In addition, by virtue of its numerous appointments as counsel to a receiver, the law firm of Garry & Ludwig obtained appointments in violation of this rule. Two management companies, by virtue of their receipt of most of the property manager appointments in these cases, also apparently obtained appointments in violation of the rule. This is more fully discussed below.

## Appointment of Receivers

The 439 receivership appointments made during the period from January 1, 1995 to December 31, 1999 were awarded to 132 people, 109 of whom were on the OCA list of eligible fiduciary appointees for Kings County. Most of the appointees received only one or two appointments. However, a small group of individuals affiliated with the Brooklyn Democratic

political organization received a greater number of appointments.[16]

The following highlights our key findings:

- One individual, who at the time was an official of the Brooklyn Democratic organization, received 46 appointments as receiver, or roughly 10% of all appointments during the period examined. During this period, this person received $137,242 in fees, or 34% of the total fees awarded to receivers in mortgage foreclosure cases.

- In early 1999, the individual described above who received the 46 appointments resigned his appointments. He recommended an attorney with close ties to a top party official as his replacement in those cases that were still outstanding. The individual asserted in motion papers that the attorney was already familiar with the cases and willing to accept the assignments. During our interviews we learned that, in fact, the attorney was not familiar with the specifics of these cases. Judges appointed the attorney as successor receiver in four of these cases. This attorney received a total of 15 appointments.

- The two-member law firm of a high-ranking official of the Brooklyn Democratic organization received 34 receivership appointments.

- One judge made 31 receivership appointments during the period examined, more than twice as many as the judge making the second most appointments. Of the 31

---

[16] Several people have informed us that for a number of years the Brooklyn Democratic organization provided judges assigned to the Ex Parte Part (where the overwhelming number of receivership appointments are made) with a list of "recommended" fiduciary appointees. Those on the list were all active in Brooklyn Democratic politics. We were informed that this practice ended several years ago in the wake of rumors of a federal criminal investigation.

appointments, 21 went to one individual. That appointee contended in motion papers that he needed to hire counsel in those cases because he had no experience in mortgage foreclosures and receiverships.

Overall, a group of 16 individuals (which includes the two-partner law firm noted above) received over half of the receivership appointments during the period examined. Additionally, an even smaller number of appointees--six--received over half of the receivership fees. The appointee with the largest number of appointments received the greatest total amount of compensation--$137,242. The remaining 65 other individual appointees received a total amount of $173,557.

### Distribution of Kings County Receivership Appointments

52% of Appointments (227 out of 439) to 16 Receivers

48% of Appointments (212 out of 439) to 120 Receivers



43

## Secondary Appointments

In the 417 cases in which receivers were appointed in Kings County during the 1995-99 period, 253 counsel appointments and 165 property manager appointments were made. As discussed, despite the requirements of Part 36, a practice had evolved in the courts in which the receivers selected their own counsel and property managers. In fact, in all of the cases we reviewed in which counsel or property managers were appointed, the appointments were made by the receiver. The qualifications of those appointed were never reviewed by the court. The only cases in which the court reviewed a receiver's decision to appoint counsel or a management agent were those in which a motion opposing the appointment was filed.

A primary consequence of this practice was that the law firm of Garry & Ludwig, which actually was ineligible for this work because of the prohibition against relatives of judges receiving fiduciary appointments, was appointed as counsel to the receiver in at least 189 cases, or 74% of the cases in which a receiver retained counsel.[17] The firm received $464,554 from these assignments (in addition to the $250,000 it received from the Cypress Hills assignment). By comparison, the other counsel to the receiver appointees received a combined total amount of $130,472.

---

[17] Garry & Ludwig apparently was able to learn of the appointment of a receiver before the receiver was notified of the appointment. Acting on behalf of another law firm that represented one of the leading mortgage lending institutions in Brooklyn, Garry & Ludwig frequently would file with the Ex Parte Clerk's Office the bank's applications for the appointment of a receiver. The firm thus would learn from the clerk's office when a receiver was appointed, and then would notify the appointee. This arrangement obviously facilitated the firm's retention as counsel to the receiver in many cases.

44

**Distribution of Counsel to Receiver Appointments in Kings County**

74% of Appointments to 1 Counsel to Receiver

26% of Appointments to 27 Counsel to Receivers



**Distribution of Counsel to Receivers' Recorded Total Fees**

78% of Recorded Fees to 1 Counsel to Receiver



45

Two management companies received 63 and 66 appointments respectively, or 76% of the property manager appointments during the period examined. In addition, these two companies received 84% of the fees awarded to property managers (not including the additional money that one received from its Cypress Hills assignment).

In their orders appointing receivers, judges addressed the issue of the receiver's authority to retain counsel in a variety of ways. Some judges permitted the receiver to retain counsel for any matter or purpose. Others specified that the receiver was limited to retaining landlord/tenant counsel if it became necessary to bring an eviction or collection of rent proceeding, but was not permitted to retain counsel for any other purpose. Yet other judges, not intending to limit the receiver's authority at all, crossed out provisions in the order that would have restricted the receiver to retaining counsel only for landlord/tenant matters.

In many cases in which the appointing order did not authorize the receiver to retain counsel or a property manager, the receiver would hire counsel or a property manager anyway. Subsequently, when the time came for payment in these cases, the counsel would prepare a motion to have himself or herself and the property manager appointed *nunc pro tunc* (that is, after the time when it should have been done, with a retroactive effect). In some cases opposition papers were filed, with opposing counsel arguing that the receiver had retained counsel and a property manager without court approval and thus they were not entitled to compensation. These arguments, however, were never successful--in all of the cases we reviewed, the court always authorized payment to such appointees retained without initial court approval.

Regardless of the language in the appointing orders, receivers in Brooklyn routinely

retained counsel. This was true even if the receiver was an attorney and had prior experience as a receiver. An attorney who was a recognized expert in receivership law regularly hired counsel whenever he was appointed as receiver. In fact, in several of the cases reviewed, that attorney and another attorney switched roles--when one was appointed receiver he would retain the other attorney as counsel.

The apparent explanation for the great incidence of receivers hiring counsel is a financial one. Our investigation revealed that the nature of the work performed by counsel to the receiver appears to be routine, typically involving review of documents, preparation of accountings and meeting with tenants and property managers.[18] Receivers, however, are compensated at the statutory rate of five percent of receipts and disbursements, whereas counsel for the receiver are compensated at their hourly rate for legal services. Thus, in the average Brooklyn foreclosure receivership case, in which the receipts and disbursements tend to be relatively small, compensation for the counsel is usually more lucrative than for the receiver. Even in cases in which little rent is collected, the counsel to the receiver could still earn over five times the amount earned by the receiver by billing for work that was the receiver's responsibility.

Indeed, in 85% of the cases in which counsel was retained, the counsel's fees exceeded those of the receiver. In 25 of the cases, counsel earned at least twice as much as the receiver, and in one case the counsel actually earned 75 times as much as the receiver. Property managers also

---

[18] Notably, in Lentine v. Fundaro, 56 A.D.2d 592 (2d Dept. 1977), the court found upon its review of the fee request made by the counsel to the receiver that counsel spent time on tasks that the receiver should have performed, such as telephone calls and letter writing. In reducing the fees awarded to the counsel and to the receiver, the court held that receivers must perform services to earn their commission, and if those services are performed by others then the receiver's commission should be reduced.

typically earned more than the receivers. In 85% of the cases in which property managers were retained, their fees were higher than the receivers' fees. In 17 cases, the property manager earned at least twice as much as the receiver, and in one case the property manager earned 40 times as much as the receiver.

We also reviewed the cases in Kings County in which a receiver was appointed <u>after</u> Chief Administrative Judge Lippman's March 9, 2000 memorandum reiterating that appointments of persons designated to perform services for receivers must be made by the judge and that these secondary appointments are subject to the requirements of Part 36. We focused on the period from April 2000 to October 2001. Our review revealed that the memorandum has reduced, but not eliminated, the longstanding practice in which the secondary appointees are selected and retained by the receiver. Of the 25 cases in which a counsel to the receiver was actually retained:

- In 11 cases, the order appointing a receiver directed the receiver to apply to the court for approval before retaining counsel.

- In three cases, the order appointing a receiver specified the name of the counsel the receiver should retain.

- In 11 cases, the order appointing a receiver did not instruct the receiver to apply to the court for approval before retaining counsel.

Of the 24 cases in which a property manager was actually retained:

- In seven cases, the order appointing a receiver directed the receiver to apply to the court for approval before retaining a property manager.

- In seven cases, the order appointing a receiver specified the name of the property manager the receiver should retain.

48

- In ten cases, the order appointing a receiver did not place any restrictions on the receiver retaining a property manager.

### <u>Compensation</u>

As discussed, the CPLR expressly limits a receiver's fee to <u>a maximum</u> of five percent of the amounts received and disbursed (CPLR § 8004(a)). In cases in which this limitation would result in a fee of less than $100, the court may approve a fee of up to $100 for the services rendered (<u>Id</u>.). In many of the Kings County cases we reviewed, judges awarded receivers compensation in excess of these statutory limits. Additionally, in other cases judges reduced the receiver's fee but awarded the counsel to the receiver and the property manager their full fee requests, which were always considerably higher than the receiver's fee. And in some cases in which the receiver collected no rent at all, fees were awarded to the receiver, the counsel to the receiver and the property manager.

The following are some examples:

- In one case, the receiver requested and was awarded ten percent--double the statutory amount--as well as attorney fees for preparation of the attorney's own bill.

- In another case, the receivership was terminated without any rent collected. The court awarded the receiver the entire $725 requested. A portion of the receiver's bill included time spent determining whether or not to accept the appointment, reading the statutes governing receiverships (owing to unfamiliarity with the law) and conversing with a political party official about the identity of the defendant's attorney.

49

- In a case in which very little rent was collected, the court clerk advised the judge that the receiver was entitled under the statute to a fee of only $79.55, not the $500 requested. The judge awarded the receiver $500.

- In a case in which the receivership lasted only 20 days, the receiver failed to collect any rent. The court awarded the receiver $500, the property manager $500 and the counsel to the receiver $5,817.

- In a case in which the receivership lasted only nine days, it was requested that the receiver take no action because the parties were attempting to settle the matter. Although no rent was collected, the receiver sought $500 for himself, over $2,000 for general counsel, $400 for landlord/tenant counsel and $800 for the property manager. In an effort to settle the case, the petitioner agreed to pay the requested amounts.

In many cases, counsel to the receiver submitted bills to the court in which their work was not itemized. Frequently, counsel merely informed the court of their hourly rate and then stated the amount of time they had spent on the case. In some cases, the bills simply reflected "court appearance" with a multi-hour charge and no further indication of what had occurred. In some of the final accountings, counsel failed to detail expenditures, stating simply that the receipts and bills were available for review; in others, receivers offered to produce receipts and other documentation but only if an objection was filed. In the cases examined, rarely did the court request specification. Even in cases in which opposing counsel objected to the amount of the fees sought and requested further specification, the court did not require further specification and simply awarded the fees requested. Although opposing counsel occasionally did object to the fees

50

requested, we learned that they generally did not challenge questionable fee requests because they believed it would be futile to do so as well as prohibitively expensive.

In many cases, a significant portion of the counsel's bill was for preparation of bills for the receiver and counsel. When required to explain these bills, additional billing resulted.

The following are some examples:

- In one case, an objection to the final accounting was filed because the receiver had failed to specify the disbursements and explain why the amount of rent collected had varied from month to month. The receiver, counsel to the receiver and the property manager were all awarded the entire amounts they had originally sought. The counsel was also paid an additional $2,000 for litigating the receiver's final accounting.

- In another case, an opposition to the receiver's final accounting was filed in which billing for boiler repair was questioned because the building did not have a boiler. The parties ultimately settled the matter.

- In another case, the receiver's first accounting erroneously requested an amount in excess of the statutory limit. Thereafter, the counsel to the receiver (who was the receiver's brother) prepared a second bill, and was awarded $750 for the preparation of each bill.

- In a case in which the receivership lasted for approximately seven months, no rent was collected and the only money received was $1,100 from the mortgagor. The receiver requested a fee of $500, along with $6,266 for his outstanding bills which included $3,200 for counsel and $2,100 for the property manager. The petitioner

51

opposed the payments, arguing that a property manager was not needed because the building was a vacant single family home, the property manager had never even visited the premises and the receiver had no authorization to retain counsel. The court approved the final accounting, and awarded the receiver his full fee but cut the payment for the outstanding bills to $3,500, although it did so without specifying how the receiver should distribute the money.

Moreover, in many of the cases reviewed, the receiver and the secondary appointee had a business relationship or were actually the same person. For example, in a number of cases the owner or an employee of a property management company was appointed as receiver and then hired his or her company as the property manager. In other cases, paralegals were appointed receiver and then hired their employers as counsel to the receiver. And in a few cases, the receivers hired themselves or their own law firms as counsel and then were awarded receivership fees and counsel fees.

Contrary to what transpired in most of the cases, routine mortgage foreclosure proceedings in which a receiver is appointed do not necessarily require the appointment of a counsel and a property manager. Some receivers performed the necessary work themselves and did not hire counsel or property managers. Receivers in these cases told us they realized that funds might not be plentiful and so they took steps to minimize expenditures. Additionally, in some cases, efforts were made to contain expenses by charging lower hourly rates and by not charging for preparing the receiver's final accounting.

**Findings From Other Jurisdictions**

Our review of receivership cases in other counties uncovered many of the same problems

we identified in Kings County. Compliance with the filing requirements was poor, many courts authorized payment to appointees without ensuring that the Part 36 forms were filed, very few courts made the secondary appointments and compensation was often excessive, unsubstantiated or in violation of statutory requirements.

In <u>Nassau County</u>, where we reviewed a random sample of 25 receivership cases, there was little compliance with the filing requirements. Only four out of 26 receivers (15%) filed a certification of compliance and only six (23%) filed a notice of appointment. Filing of the approval of compensation forms was also poor, with only 15% of the forms filed for the receivers and no forms filed for secondary appointees. Moreover, the court failed to make any of the appointments of counsel or property managers. In fact, many of the orders appointing receivers expressly authorized the receiver to retain a counsel and property manager. Additionally, in two cases the receivers were awarded fees that were higher than the five percent statutory commission rate. In one case, the receiver was awarded double his permissible compensation.

In <u>Erie County</u> we reviewed a sample of 24 cases in which 26 receivers were appointed.[19] Compliance with filing requirements was inadequate, with only five (19%) of the receivers filing a certification of compliance form and six (23%) filing the notice of appointment forms. Only three of the ten (30%) required approval of compensation forms were filed. None of the property managers, many of whom were not appointed by the court, filed either a certification of compliance or a notice of appointment.

Additionally, in several cases the receivers were awarded fees higher than the statutory

---

[19] Selection of these cases was significantly hampered by the Erie County Supreme Court's lack of a reliable method of identifying foreclosure cases in which receivers are appointed.

commission rate.  The following are two examples:

- In one case, the receiver miscalculated the commission and received nearly double the permissible compensation.

- In another case, the receiver was compensated on an hourly basis, resulting in a payment almost three times higher than it would have been had the receiver been compensated in accordance with the statute.  The receiver's bills included five hours per month for apparently routine receivership duties such as site inspections, rental of units and conferring with contractors and vendors about repairs.

In Westchester County, we reviewed a sample of 29 cases in which receivers were appointed. All of the cases were selected randomly from the OCA fiduciary database, because the court maintains no method by which foreclosure cases in which receivers are appointed can be identified.  Thus, because cases are entered in the OCA database only when at least one fiduciary form for a case has been filed with OCA, we had no way of precisely measuring the rate at which fiduciary appointees and judges in Westchester receivership cases comply with the filing requirements. We did determine, however, that only 15 (52%) of the receivers filed a certification of compliance (which is filed only in the court file and not with OCA), and that no secondary appointees filed any of the forms.  In addition, of the 24 fiduciaries who received compensation-- 23 receivers and one counsel to a receiver--only three (13%) approval of compensation forms were filed.

The court did not appoint most of the counsel and property managers retained by the receivers; in fact, many of the orders appointing the receivers, including receivers who were themselves attorneys, authorized the receiver to appoint a counsel and a property manager.

54

Further, in eight of the cases, the receivers' fees were higher than the statutory commission rate:

- In four of these cases, the court cited a stipulation between the petitioner and the receiver as justification for the fee.

- Judges in the other four cases provided no explanation for approving compensation exceeding the statutory limit.

- In most of the cases, the fees were at least 50% higher than the statutory rate.

- In a few cases, the fee was nearly 200% higher than the statutory rate.

Moreover, in some cases, in addition to collecting their commission, fiduciaries were awarded hourly fees for routine services they were required to perform. In one matter, a receiver hired his own law firm as his counsel. He also hired an accountant and a property manager. The counsel's affidavit of services included many items that appear to be routine responsibilities of a receiver, including calculating the receiver's commission and preparing the final accounting. The receiver, his law firm, the accountant and the property manager each earned approximately $20,000. The court file, however, contained no documentation supporting the fees for the accountant and property manager.

In <u>Schenectady County</u>, we reviewed a sample of 17 cases in which receivers were appointed. Because the court was only able to provide a list of ten cases in which receivers were appointed during the five-year period under examination, the additional seven cases were selected randomly from the OCA fiduciary database. Again, because cases are entered in the OCA database only if at least one of the required forms has been filed, an accurate analysis of compliance with the filing requirements is not possible. In the 17 cases reviewed, there were 18 receivers appointed including a successor receiver. Of these, ten receivers (56%) filed a notice of

appointment and only two (11%) filed a certification of compliance.  In addition, of the 13 receivers and one property manager who received fees necessitating the filing of an approval of compensation form, only two such forms (14%) were filed.

The court rarely appointed the counsel, property managers or accountants hired by the receivers.  Moreover, a number of the orders appointing receivers expressly authorized the receiver to appoint counsel or property managers whenever they thought they were necessary, without any further involvement of the judge:

- In one matter involving a large commercial property, the court appointed the property manager but authorized the receiver to employ such legal counsel as he deemed necessary. The receiver was awarded almost $100,000, or approximately three percent of the receipts, and the property manager was awarded five percent of the receipts. The case file, however, did not contain documentation supporting all of the fees awarded.

- In another matter, the receiver hired an accountant without approval from the court and paid the accountant for his services.  When the plaintiff objected, the court awarded the receiver a commission but deducted the amount paid to the accountant.

We reviewed a random sample of 25 receivership cases in Queens County.  Only two (7%) of the 28 receivers appointed in these cases filed a certification of compliance form and only five (18%) filed a notice of appointment.  No approval of compensation forms were filed for the 12 receivers who received compensation requiring the filing of such forms.

In the cases reviewed, eight secondary appointments were made--four counsel and four

56

property managers. The court did not make these appointments, and none of the required forms were filed. A review of the appointment orders disclosed that the receivers were given broad authority to appoint counsel and property managers as deemed necessary, without any court intervention. In addition, in some of the cases the receivers were paid excessive fees. In one matter, the receiver was paid both the statutory commission and separate legal fees for routine services required of a receiver, such as filing the bond and preparing the accounting.



57

## C.    GUARDIAN AD LITEM APPOINTMENTS

### In General

A court appoints a guardian ad litem to protect the rights of an individual under a disability who is involved in litigation. The Surrogate's Court Procedure Act (SCPA) defines a person under a disability as: (1) an infant under 18 years of age; (2) a person judicially declared incompetent to manage his or her affairs; (3) an incapacitated person; (4) an unknown person or one whose whereabouts are unknown; or (5) a person confined as a prisoner who failed to appear under circumstances that the court finds are due to confinement in a penal institution (SCPA §§ 103, 402).  A guardian ad litem may also be appointed where unborn or unascertained persons may eventually become entitled to an interest in the proceedings (SCPA § 315), or where a possible conflict of interest between a representative of the ward (such as a guardian) and the ward exists (SCPA §§ 315, 402).

A guardian ad litem differs from a guardian of the person or the property under Article 81 in several respects.  Most importantly, a guardian ad litem is appointed to act on behalf of the party under disability for the limited purpose of the matter before the court and not for the party's general care and welfare.  Moreover, since the guardian ad litem is appointed to protect the person under disability in the context of the litigation before the court, the guardian ad litem must be an attorney admitted to practice in New York (SCPA § 404(1)).

At the time of appointment, the guardian ad litem must file a consent to act and an affidavit affirming that he or she is qualified to protect the ward's rights, does not have a relationship with any of the parties, does not have an interest in the estate and does not have a conflict with the

58

interests of the ward (SCPA §§ 402(1), 404). Once qualified to act, the guardian ad litem must take whatever steps are necessary to protect the interest of the person under disability. The final act of the guardian ad litem is to file with the court a report detailing his or her findings and recommendations (SCPA § 404(3)).

In Surrogate's Court, guardians ad litem are appointed most frequently in will probate proceedings and proceedings to settle the accountings of executors, administrators and trustees. Other proceedings that involve appointment of guardians ad litem include: (1) compromise of wrongful death and personal injury actions; (2) adoptions; (3) applications for the disposition of real property; (4) construction proceedings under SCPA § 1420; (5) heirship proceedings; and (6) Mental Hygiene Law Article 81 proceedings.

The guardian ad litem's fees are determined in a manner similar to the general process for setting attorney's fees. The statute provides that the guardian ad litem shall receive reasonable compensation for the services rendered (SCPA § 405(1)). Relevant factors in setting the fee include: the nature, extent and necessity of the services provided; actual time spent on the matter; the nature and complexity of the issues involved; the professional standing of the guardian ad litem; the results obtained in the case; the size of the estate; and the size of the interest of the ward in the estate.[20] Typically, the guardian ad litem's compensation is paid from the estate or the interest of the person under disability (SCPA § 405). In determining the value of the guardian ad litem's services, the court reviews the time records supplied by the guardian ad litem.

---

19. See, e.g., Matter of Will of Slade, 99 A.D.2d 668 (4th Dept. 1984); Matter of Springett, 35 A.D.2d 927 (1st Dept. 1970); Matter of Burk, 6 A.D.2d 429 (1st Dept. 1958); Matter of Potts, 213 A.D. 59 (4th Dept.), aff'd 241 N.Y. 593 (1925).

**Nassau County**

Our review of guardian ad litem appointments in Nassau County was limited by the recordkeeping procedures of the Surrogate's Court. The Nassau County Surrogate's Court assigns each case a number that stretches back in chronological order to that court's very first case in 1898. The number assigned, however, does not reference the year that the case was filed. As a result, the court was not able to supply us with a list of all matters that began in any particular year. Additionally, we were informed that, until the spring of this year, the court maintained no records of information pertaining to the appointments of guardian ad litem. The court did not keep a list of the guardian ad litem appointments made, the fees awarded to the guardians ad litem or the filings made to OCA. Accordingly, we were compelled to rely on records of guardian ad litem appointments contained in the OCA fiduciary database.

We reviewed the listings in the OCA database of guardian ad litem notices of appointment for each of the last ten years. The number of recorded guardian ad litem appointments made in Nassau County between 1995 and 2000 averaged 255 per year. We selected for review all cases recorded in the OCA database in which a guardian ad litem appointment was made between January 1, 1998 and December 31, 1998, as our goal was to review recent cases but also those in which the guardian ad litem work's would have been concluded.

The OCA database contained filings for 278 guardian ad litem appointments in 272 cases in Nassau County Surrogate's Court for calender year 1998. This included six adoption matters that could not be reviewed because the files had been sealed by the court. In addition, the court clerks were unable to locate eight other court files. Of the 258 cases we were able to review, the court files in two cases contained no information concerning a guardian ad litem. In six cases, the

60

court appointed an additional guardian ad litem, and in one case the court appointed two additional guardians ad litem. Thus, we reviewed a total of 264 appointments.

At the conclusion of our review of these appointments, however, we were informed by the clerk of the court that, in fact, the court had kept some records of guardian ad litem appointments. For the first time, we were informed that the practice of the court, for several years prior to 1999, had been to send a letter notifying all attorneys who had been appointed as guardian ad litem of their appointment. The court began to keep copies of these letters in October 1999. The court had copies of 42 letters sent to guardians ad litem concerning appointments during the period of October 1, 1999 to December 31, 1999. Of these 42 letters, seven were duplicates or pertained to cases the clerks could not find. We reviewed all 35 of the cases where the court had sent a letter to the guardian ad litem and the clerks could locate the file. The court also had 286 copies of letters sent to guardians ad litem in cases that originated in 2000. As we were unable to adequately establish the compliance with the Part 36 filing requirements in our review of appointments made in 1998, we examined the filings made by guardians ad litem in 2000.

In addition to reviewing these cases, we also interviewed judges, court personnel and numerous fiduciary appointees.

## Compliance with Filing and Other Requirements (1998)

As noted, we had to rely on the OCA fiduciary database to identify cases in which guardians ad litem had been appointed. Thus, it was impossible to establish the level of compliance for filing the notice of appointment forms. We were, however, able to evaluate the number of certification of compliance forms that were filed (these are filed with the court but not with OCA). Our review of the 264 appointments made in 1998 found that 261 (99%) of the appointees had filed the

61

certification of compliance form with the court. This finding of almost perfect compliance is tempered by the fact that the only appointments we were able to review were of guardians ad litem who had filed their notice of appointment forms, and the certification of compliance typically is filed contemporaneously with the notice of appointment.

We were also able to evaluate compliance with the requirement that the court file a statement of approval of compensation form at the time the fiduciary is awarded a fee. We found that approval of compensation forms were filed in only 147 of the 264 cases (56%). We reviewed the 117 cases where the approval of compensation was not filed and found that in 34 of those cases, a statement of approval of compensation was in the court file, although only four of those forms were complete and signed by the court while the remaining 30 forms were not signed by the court.

### Distribution of Appointments and Compensation (1998)

The 266 guardian ad litem appointments made in 1998 were awarded to 96 people, 95 of whom were on the OCA fiduciary list of eligible appointees. Over two-thirds of the appointees received only one or two appointments and small amounts of compensation. A smaller group of appointees, most of whom had some connection to the court--such as former interns --received almost half of the total appointments, although they also received relatively small fees. A third, even smaller, group received one or two very lucrative appointments. This small group that received lucrative appointments included two retired judges and the former head of the law department of the Surrogate's Court in a neighboring county. With the exception of one attorney, the appointees who received frequent appointments received no cases involving high fees, and the attorneys who received lucrative appointments did not handle the smaller cases. This finding is contrary to the widely-held perception that fiduciaries who take appointments for no fee or for a

minimal fee are often rewarded with high-paying appointments.

Throughout these years, the court's system of selecting guardians ad litem was as follows: if the value of the estate was greater than $1 million, the Surrogate would appoint the guardian ad litem without consulting his staff. If the value of the estate was less than $1 million, the chief clerk would recommend to the Surrogate a candidate for appointment and, with rare exception, the Surrogate would then appoint the recommended candidate.

The nature of the case in which the guardian ad litem was appointed dictated the size of the fee the appointee received. In the majority of the cases we reviewed, a petition for probate of a will was filed with no objections. In these cases, the guardian ad litem's role was limited to a review of the validity of the execution of the will, resulting in a report to the court. If the guardian ad litem approved the probate of the will, he or she would not have to make an appearance before the court and the responsibilities generally were completed in ten hours or less. In these straightforward cases, the guardian ad litem's compensation was based on a schedule keyed to the size of the estate, and the guardian ad litem would not file an affidavit of compensation. But if the guardian ad litem sought a fee greater than that allowed by the schedule or greater than $2,500, he or she would file an affidavit of services.

The following highlights our key findings:

- A total of 96 individuals received guardian ad litem appointments in 1998. Of that total, 65 (68%) received only one or two appointments.

- A much smaller group of 11 attorneys received over five appointments each for a total of 105 appointments. Three of these attorneys received over ten appointments each, with the largest number of appointments an individual attorney received being

20. The average compensation awarded was approximately $1,000 per appointment, usually for cases involving simple petitions for the probate of a will.

- We were unable to establish the size of the fees awarded to the guardian ad litem in 42 (16%) of the cases. Of the 222 cases in which the compensation was set forth in the case file, the total compensation awarded was $506,587.

- A group of 11 attorneys received 20 appointments with a total compensation of $237,352. These 11 attorneys received 47% of the total compensation awarded in 1998.

- One individual who was not on the OCA fiduciary list received five appointments in 1998, for which he earned a total of $8,600. None of the case files contained a written record of the reasons why he was appointed despite not being on the OCA list. The OCA database showed that between 1996 and 2000, this attorney reported 24 appointments from Nassau Surrogate's Court and $35,300 in compensation. The attorney stated that he was friendly with the court clerks and had performed legal work for some of the clerk's families. He also told us that, in the early 1990s, he had asked several of the clerks to give his wife guardian ad litem appointments. The OCA database reveals that his wife received 31 guardian ad litem appointments in Nassau Surrogate's Court between 1992 and 2000.

40% of Appointments to 11% of Guardians Ad Litem



**Nassau County**

| | |
|---|---|
| A | 105 appointments to 11 GALs |
| B | 159 appointments to 85 GALs |

## Compliance (Fall 1999)

We also reviewed the 35 cases identified in the letters that the court sent to guardian ad litem appointees in October, November and December of 1999. The 35 appointments were given to 24 attorneys, with 16 receiving a single appointment. The remaining eight appointees received a total of 19 appointments. We were able to determine the amount of the fees the guardians ad litem received in 33 of the 35 appointments, and a total of $63,450 in fees was awarded. In two of the cases, the guardians ad litem received no fees. The fees awarded ranged from $150 to $12,000, and the average compensation was approximately $2,000.

Twenty-three (66%) of the appointees filed notice of appointment forms. In the 12 cases in which a notice of appointment had not been filed, a copy of the form was found in half of the

court files. The certification of compliance form was present in 30 of the 35 case files (86%). The court filed a statement of approval of compensation in 23 of the 35 cases. Of the 12 cases in which a statement of approval of compensation was not filed, three of the court files contained completed forms; additionally, in two cases, filing was not required because the guardian ad litem was not awarded any fees. Thus, forms were filed in 71% of the cases in which they were required.[21]

### One Selected Nassau County Case

Although it was an unusual and complicated proceeding, one case provides an example of how court appointees in Nassau Surrogate's Court frequently have close ties to the court and to each other. The case, which lasted for nearly five years and began as a will probate contest and later continued as an accounting proceeding, involved the appointment of two guardians ad litem, one assistant to the guardian ad litem, two counsel to the guardian ad litem, one special referee and one assistant referee. The total fees for the fiduciaries in the case were more than double the combined fees for all guardian ad litem appointments in all of the cases initiated in the court in 1998.

The estate was valued at over $80 million, and the decedent was survived by a daughter, two granddaughters and several great-grandchildren. The decedent's final will and codicils specifically disinherited one granddaughter and her children. Several law firms were retained and actively litigated the probate of the will.

The Surrogate appointed a retired Nassau County Court Judge as guardian ad litem for the

---

[21]  As noted, the court also had copies of 286 letters sent to guardians ad litem in 2000. At the time of our review, many of the appointees in these cases had not completed their duties, and thus the case files did not contain the report of the guardian ad litem or any information on compensation. Therefore, we limited our review to the examination of the filings of the notice of appointment forms. We compared these 286 letters to the information provided by OCA's database and found that notices of appointment had been filed in 229 (80%) cases. In the cases in which a notice of appointment was filed, the court clerks were unable to locate six of the court files. In 38 of the 51 cases reviewed, the notice of appointment was in the court file. In four of the cases, a guardian ad litem had never been appointed and in nine of the cases the court file did not contain the notice of appointment.

great-grandchildren who were disinherited in the will, a retired Surrogate to act as special referee to oversee the discovery and daily case developments in the matter and an attorney as guardian ad litem for the great-grandchildren who had not been disinherited in the will.

The retired County Court Judge informed us that, shortly after his appointment as guardian ad litem, he anticipated that as a solo practitioner the responsibilities of the case would be greater than he could handle alone, so he hired two attorneys to act as his assistants--his daughter, and the Nassau County Deputy Public Administrator.  Because the former County Court Judge was retired from the bench, his hiring of his daughter was not barred by any existing rules or statutes. Nor is there any legal prohibition against a fiduciary appointee hiring a relative to assist in a case. Additionally, there is no bar against a guardian ad litem retaining the Deputy Public Administrator.[22]  Nevertheless, since the guardian ad litem needed assistance with the great amount of work he anticipated, his hiring of an attorney with a full-time government position is curious. Additionally, the Deputy Public Administrator had not only been appointed by the Surrogate, but he was the Surrogate's former court officer and a close personal friend.

The former Surrogate, who was the special referee, was paid $250 per hour.  The guardian ad litem's billing rate was $300 per hour, and his daughter's and the Deputy Public Administrator's rates were $200 per hour.  The total fees awarded in the case were extensive.  The guardian ad litem received $424,500.  The billing records reveal that, over a two-month period in 1995, the Deputy Public Administrator billed for 167 hours of legal work over 22 days, or an average of almost eight hours per day.  In all, the Deputy Public Administrator submitted affidavits of services detailing

---

[22]  The Office of the Public Administrator manages estates in which no appropriate person is available to act as administrator.  Although the Deputy Public Administrator is a full-time county employee, employees of the Nassau County Public Administrator's office are not prohibited from practicing law outside of their county employment.

over 1,000 hours of work, for which he received approximately $215,000. The guardian ad litem's daughter received over $44,000. The retired Surrogate who was the special referee received $192,500, and his assistant received over $10,000. The guardian ad litem for the inheriting great-grandchildren and his counsel received over $500,000 in combined fees. All told, the combined fiduciary fees in the case were nearly $1.5 million.

## Findings From Other Jurisdictions

In Erie County, we reviewed a random sample of 50 cases in which 60 guardians ad litem were appointed during the period January 1, 1995 through December 31, 1999. A review of these cases revealed that all of the certificate of compliance forms and 47 (78%) of the notice of appointment forms were filed. In addition, 52 of 55 (95%) statements of approval of compensation were filed. A review of the court files, however, showed that the notice of appointment forms, the court orders appointing fiduciaries and the court's records concerning the appointments often had different appointment dates recorded. This creates confusion regarding the actual date of appointment and makes it more difficult for appointees to comply with the rules. We notified the court about this problem, and the court has now corrected its procedure to ensure that consistent and correct dates are recorded.

Our review of guardian ad litem fees was difficult because in a majority of cases the amount of compensation was determined by the litigants, not the court. The Surrogate told us that his longstanding policy was to approve the fees that the parties agreed upon unless they "shocked the conscience." Typically, if the parties did not prepare an affidavit of services, the court did not request one. The standard hourly fee requested was generally within the range of $125 to $175.

It appears from a review of the OCA database that as many as seven attorneys may have

68

violated the $5,000 rule.  In the cases reviewed, there was no documentation in the court file indicating whether the appointees met the narrow exception to the $5,000 rule.  Moreover, some of these appointees did not include in their certifications of compliance, as required, a list of appointments they received within the previous 12 months, even though they had received recent prior lucrative appointments.  For example:

- One guardian ad litem was awarded $18,000.  Later the same month, he received a second appointment for which he was compensated over $61,000, and less than eight months later he received another appointment for which he earned $18,000.

- A guardian ad litem was appointed and received over $16,000. Less then five months later, he received another appointment for which he was paid over $26,000.

- Another guardian ad litem received an appointment for which he earned almost $10,000, and was shortly thereafter appointed in another case in which he earned over $17,000.

In Westchester County, we reviewed a random sample of 25 cases.  Of this sample, 23 of 27 guardians ad litem (85%) filed a notice of appointment, and 26 of 27 (96%) filed a certification of compliance.  The court filed approval of compensation forms for 19 of 22 (86%) appointees. It appears that one of these attorneys received appointments in violation of the $5,000 rule.

We also reviewed a random sample of 25 cases in Monroe County.  Our examination revealed that 21 of 25 guardians ad litem (84%) filed a notice of appointment, and 24 of 25 (96%) filed a certification of compliance.  The court, however, had filed no approval of compensation forms since October 1993.  The chief clerk explained that this was an oversight possibly related to the court's revamping of its case management system.  We also selected a random sample of ten

cases in which guardians ad litem had been appointed and determined that five of the appointees were not included on the OCA fiduciary list. The court files, however, contained no indication that the court had provided a reason for selecting an appointee who was not on the OCA list.

In one case that came to our attention involving a sizeable estate, a guardian ad litem was awarded $4,000 for 3.75 hours of legal work.

Our random sample of 25 cases in <u>Queens County</u> revealed that all of the appointees had filed a certification of compliance, 30 (91%) had filed a notice of appointment and 26 (79%) approval of compensation forms had been filed. It appears that at least three individuals were appointed in violation of the $5,000 rule. One received four guardian ad litem appointments within a 12-month period in which she earned $7,500, $10,500, $7,500 and $31,500, respectively. Another received three appointments within a five-month period in which he earned $11,500, $8,500 and $27,500, respectively.

Our review of 25 cases in <u>Schenectady County</u> revealed that all of the guardians ad litem filed a certification of compliance form and all but one filed a notice of appointment. However, approval of compensation forms were filed for these appointees in only 40% of the cases. Similarly, in <u>Onondaga County</u>, all appointees filed a certification of compliance form and only one failed to file a notice of appointment form. Approval of compensation forms were filed for 83% of these appointees.

## Non-Compliance With Filing Requirements
### Guardians Ad Litem



- ☐ Notice of Appointment NOT filed
- ■ Certification of Compliance NOT filed
- ▦ Approval of Compensation NOT filed

Note: Our examination revealed that guardians ad litem in Schenectady, Erie and Onondaga counties had 100% compliance in their filing of certifications of compliance.

71

**CONCLUSION**

As this Report makes abundantly clear, the fiduciary appointment process in New York is in need of reform. We have documented a wide range of problems that regularly arise in these cases in courts throughout the State. In doing so, we have confirmed the validity of many of the public criticisms concerning the fiduciary process.

Although our findings are troubling, for the following reasons we are confident that the system is now undergoing significant improvement. First, the Commission on Fiduciary Appointments, which at Chief Judge Kaye's request has been examining the appointment process, has completed its own review and is about to release its report and recommendations. The recommendations will include, among other things, proposals to strengthen eligibility and qualifications for fiduciary appointment, tighten restrictions on the number of appointments that individual fiduciaries may receive and upgrade oversight of the appointment process. If implemented, these recommendations will lead to significant improvements in the existing system.

Second, court administration already has taken major steps to correct the flaws we found in the fiduciary filing process. Last Spring, a new oversight system was implemented, in which special fiduciary clerks have been appointed in every Judicial District. Reporting directly to the District Administrative Judges, the fiduciary clerks serve as the clearinghouse for all forms appointees and judges are required to file with OCA, and they will be monitoring the OCA fiduciary database to verify that information concerning who is receiving appointments and how much they are paid is entered accurately. The goal is to ensure that all forms are properly filed in every single case in which a fiduciary is appointed and that no fiduciary appointee is paid unless he or she has filed the necessary forms.

Third, in cases in which we have uncovered clear violations of the fiduciary rules or ethical

standards, Chief Administrative Judge Lippman has referred individuals to appropriate disciplinary authorities. We have every expectation that these referrals, and any future referrals that may be made, will send an unmistakable message to the bar and bench that violations of the fiduciary rules will not be tolerated.

Finally, our work does not end with this report. In establishing the Office of the Inspector General for Fiduciary Appointments, Chief Judge Kaye made clear that the office will be a permanent entity within the court system. Together with OCA's Internal Audit Unit, our examination of fiduciary appointment practices throughout the State is ongoing. We will continue to identify problems in this process and recommend that individuals be referred to relevant disciplinary authorities, as appropriate. Moreover, in the coming months, we will help to ensure compliance with the rules, monitor the effectiveness of the reforms, and assist the bench and bar in meeting their responsibilities in regard to fiduciary appointments.

# Attachment A



*State of New York*

*Jonathan Lippman*
*Chief Administrative Judge*

*25 Beaver Street*
*New York, N.Y. 10004*
*(212) 428-2100*

# M E M O R A N D U M

March 9, 2000

TO:      Justices and Judges of the Supreme Court,
         County Court and Surrogate's Court

FROM:    Jonathan Lippman

RE:      Appointment of persons designated to
         perform services for a receiver

In light of recent disclosures alleging that appointments of persons to perform services for receivers have been made based upon political considerations, we want to ensure, to the extent those practices may exist, that such appointments are made in conformity with court rules that are designed to remove favoritism from this appointment process. It appears that some of you may not be aware of how these court rules apply to appointments of persons to perform services for receivers, and it is important that everyone understands and properly applies our existing rules while the newly appointed Commission studies the entire fiduciary appointment process.

Part 36 of the Rules of the Chief Judge [22 NYCRR], governing certain designated fiduciary and fiduciary-related appointments by judges, sets forth special procedures and restrictions in the making of these appointments -- including selection from lists of applicants, limitations on the number of substantial appointments, prohibition of appointment of relatives of judges, and pre- and post-appointment certification and reporting obligations of the appointee. A copy of Part

RE: Appointment of persons designated          March 9, 2000
to perform services for a receiver                Page 2

36 is attached. Section 36.1(a) expressly applies these requirements to the appointment of persons designated to perform services for a receiver (which include attorneys, agents, appraisers, auctioneers and accountants), and it requires that the court, and not the receiver, make these appointments and do so in accordance with these procedures and restrictions. Your orders appointing receivers should conform to these requirements.

We expect to be issuing shortly additional memoranda addressing in more detail the requirements and logistics of Part 36 to make sure that they are not inadvertently overlooked.

Thank you for your cooperation.

JL/job

Attach.

cc: Hon. Joseph J. Traficanti, Jr.
     Hon. Joan B. Carey
     Hon. Ann T. Pfau
     Administrative Judges

# PART 36. APPOINTMENT OF GUARDIANS, GUARDIANS AD LITEM, COURT EVALUATORS, ATTORNEYS FOR INCAPACITATED PERSONS, RECEIVERS, PERSONS DESIGNATED TO PERFORM SERVICES FOR A RECEIVER, AND REFEREES

## § 36.1  Appointments

(a) All appointments of guardians, guardians ad litem, court evaluators, attorneys for alleged incapacitated persons (under Article 81 of the Mental Hygiene Law), receivers, persons designated to perform services for a receiver and referees shall be made by the judge authorized by law to make the appointment upon evaluation by that judge of the qualifications of candidates for appointment. The appointing judge may select the appointee from the list of applicants established by the Chief Administrator of the Courts pursuant to section 36.2(a) of this Part. Except for the appointment of court evaluators, should the appointing judge decide that a person or institution not included on the list of applicants is better qualified for appointment in a particular matter, either because of prior experience with the ward or estate, or because of particular expertise necessary to the case, the judge may appoint that person or institution, and in such instance shall place the reasons for such appointment and the qualifications of such appointee on the record. The appointing judge shall be solely responsible for determining the qualifications of any appointee.

(b)(1) No person shall be appointed who is a relative of, or related by marriage to, a judge or housing judge of the Unified Court System of the State of New York, within the sixth degree of relationship. This provision shall apply only to known relatives of judges and not to the professional associates of those relatives.

(2) No person serving as a judicial hearing officer pursuant to Part 122 of the Rules of the Chief Administrator shall be appointed in actions or proceedings in a court in a county where he or she serves on a judicial hearing officer panel for such court.

(3) No person shall be appointed who is a full-time or part-time employee of the Unified Court System.

(c) No person or institution shall be eligible to receive more than one appointment within a 12-month period, calculated from the date of appointment, for which the compensation anticipated to be awarded to the appointee exceeds the sum of $5,000, except that where the appointing judge determines that unusual circumstances of continuity of representation or familiarity with a case require an appointment for which compensation would exceed that permitted by this subdivision, the judge may make such appointment and must set forth in writing the reason for the exception.

(d) A prospective appointee whose appointment is subject to these rules shall certify in writing to the appointing judge, prior to the acceptance of the appointment, that the appointment will not be in violation of these rules. The certification shall include a statement that the appointment will be in compliance with subdivisions (b) and (c) of section 36.1 of this Part and shall include a list of all previous appointments received within the preceding 12 months. The certification shall be placed in the case file.

(e) The provisions of this Part shall not apply to:

(1) appointments of law guardians pursuant to section 243 of the Family Court Act, guardians ad litem pursuant to section 403–a of the Surrogate's Court Procedure Act, or the Mental Hygiene Legal Service;

(2) an appointment without compensation; and

(3) the appointment of any of the following:

(i) a relative of, or person having legally recognized duty or interest with respect to the affairs of, the infant, ward, incapacitated person, decedent or beneficiary of an estate;

(ii) a guardian ad litem nominated by an infant of 14 years of age or over;

(iii) a nonprofit institution performing social services;

(iv) a bank or trust company as a depository for funds;

(v) a public administrator or a public official vested with the powers of an administrator;

(vi) a person or institution whose appointment is required by law;

(vii) a physician whose appointment as a guardian ad litem is necessary where emergency medical or surgical procedures are required.

(f) The reporting and certification requirements set forth in sections 36.1(d), 36.3(a) and 36.4(c) of this Part shall not apply to the appointment of a referee whose compensation for such appointment is not anticipated to exceed $550.

## § 36.2  Lists of Available Applicants

(a) The Chief Administrator of the Courts shall provide for the application by persons and institutions seeking appointment as guardians, guardians ad litem, court evaluators, attorneys for alleged incapacitated person, receivers, persons designated to perform services for the receiver, and referees. The Chief Ad-

ministrator shall assemble such applications and shall maintain and make available for use by the appointing judge lists of applicants for appointment.

(b) The lists maintained by the Chief Administrator shall contain such information as will enable the appointing judge to be apprised of the background of the applicants set forth therein. The lists may be maintained by court, county, judicial district, judicial department or combination thereof, and may be differentiated by type of appointment and area of special expertise.

## § 36.3  Reporting of Appointments

(a) Every person and institution receiving an appointment pursuant to this Part shall file a notice of the appointment with the Chief Administrator of the Courts, in a manner to be prescribed by the Chief Administrator, within 10 days of receipt of notice of the appointment. Such notice shall be a public record. The appointee also shall certify in writing to the appointing judge that the notice of appointment has been filed. The Chief Administrator shall arrange for the periodic public publication of the names of all persons and institutions appointed by each appointing judge in appropriate law journals and periodicals.

(b) No later than March 31 of each year, the Chief Administrator shall report in writing to the Chief Judge of the operation of the procedures set forth in this Part, including recommendations for modification. A copy of each report shall be transmitted to the members of the Court of Appeals and the Administrative Board.

## § 36.4  Compensation

(a) Fees to appointees pursuant to this rule shall not exceed the fair value of the services rendered.

(b) Each award of fees of $2,500 or more to appointees pursuant to this section shall be accompanied by an explanation, in writing, of the reasons therefor by the judge making the award.

(c) No fees shall be awarded unless the appointee has filed the notice of appointment and certification of compliance required by section 36.3(a) of this Part.

## § 36.5  Education and Training

The Chief Administrator or the appointing judge may require that applicants for appointment complete designated courses or training curricula prior to receiving an appointment.

# APPENDICES

## APPENDIX A.  NOTICE OF APPOINTMENT FOR GUARDIANS, GUARDIANS AD LITEM, CONSERVATORS, COMMITTEES OF THE INCOMPETENT OR PATIENT, RECEIVERS, PERSONS DESIGNATED TO PERFORM SERVICE FOR A RECEIVER

[See Rules of Chief Judge, § 36]

UCS–830.1
Rev. 12/1/90

NOTICE OF APPOINTMENT
FOR GUARDIANS, GUARDIANS AD LITEM, CONSERVATORS, COMMITTEES
OF THE INCOMPETENT OR PATIENT, RECEIVERS, PERSONS DESIGNATED TO
PERFORM SERVICE FOR A RECEIVER.
PURSUANT TO PART 36 OF THE RULES OF THE CHIEF JUDGE.
22 NYCRR PART 36

(Please print—see instructions on reverse side)

1. _____ Court, _____ County.
                                   2

2. Appointee
   Name        _____    Firm Name, if any_____
     5
   Address     _____
               _____    Federal Employment
                                            Identification No. _____
                                                                  35
   Soc. Sec. No. _____  Phone No. _____
                  35
   Occupation:  ☐ Attorney                   ☐ Other (Specify) _____
                 45                           45

3. Date of Appointment        /      /

APPENDICES                                          **Part 36, App. A**

MONTH   DAY   YEAR
46

4.  Court Docket/File/Index Number   ☐☐☐☐☐☐☐
                                      52

5.  Title of Proceeding
    (Limit to 25 spaces)   ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐
                           60

6.  Name of Appointing Justice/Judge  _____
                                      85

7.  Person or Interest Appointee Represents (Limit to 15 spaces)
                           ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐
                           98

8.  Nature of appointment (check one):
    2 ☐ Guardian (d)                    ☐ Receiver (g)
      ☐ Guardian ad litem (e)           ☐ Service as a _____ for a receiver (z)
      ☐ Conservator (j)
      ☐ Committee of the Incompetent
        or Patient (b)

    _____          _____
        Date                          Signature of Appointee

---

CERTIFICATION
I HEREBY CERTIFY THAT A COPY OF THIS NOTICE OF APPOINTMENT
WAS FILED WITH THE OFFICE OF COURT ADMINISTRATION.

    _____          _____
        Date                          Signature of Appointee

UCS—830.1
Rev 12/1/90

INSTRUCTIONS FOR COMPLETING NOTICE OF APPOINTMENT
Pursuant to Part 36 of the Rules of the Chief Judge

Item 1   Enter the specific title of the court, e.g., Supreme Court, Surrogate's Court,
         etc., and enter the name of the county in which the appointing court is located.

Item 2   Name and Address:
             Enter name and mailing address of Appointee.

         Social Security Number:
             Enter social security number of Appointee.

         Occupation:
             Check appropriate box.  If "other," please specify, e.g., physician, accoun-
             tant, etc.

         Firm Name:
             Appointee's firm name must be entered here regardless of whether a
             member, partner, associate, counsel or employee and regardless of wheth-
             er any fee or allowance received is to be retained or is to go to the firm.

         Federal Employer Identification No.
             Enter firm's Internal Revenue Service Federal Employer's Identification
             Number.  Where no number is available, enter "None".

         Phone No:
             Enter appointee's phone number.

Item 3   Enter date of appointment—month, day and year.

Item 4   Enter either the docket, file, index number or any other identification assigned
         by the court to this matter.  If there is no number assigned, enter "None".

Item 5   Enter the title of the action or proceeding in which appointed, e.g., Smith v.
         Jones, Matter of Adams, etc.  Please limit the title to 25 spaces.  If it is a
         multiparty action, name only the first party, e.g., Smith et al. v. Jones et al.

Item 6   Enter the first initial and full last name of the judge or justice who made the appointment.  If made by the judges of a multi-judge court, enter "the Court."

Item 7   Enter the name of the person or interest represented.  If there are multiple parties, enter the specific name of the client.  If appointee represents all plaintiffs or defendants in a multi-party case, state "all plaintiffs".  If appointee represents the court, state "the Court".  Please limit entry to 15 spaces.

Item 8   Check the appropriate box for the nature of appointment.

| 1) SUBMIT NOTICE OF APPOINTMENT TO: | REFER INQUIRIES TO: |
|---|---|
| Office of Court Administration | Office of Court Administration |
| Attn: Fiduciary | Attn: Fiduciary |
| Post Office Box 3171 | 80 Centre Street—Rm. 500D |
| Church Street Station | New York, N.Y. 10013 |
| New York, N.Y. 10008 | |

2) SUBMIT NOTICE OF APPOINTMENT, WITH COMPLETED CERTIFICATION OF FILING, TO THE APPOINTING JUDGE.

IMPORTANT:   The Notice of Appointment must be filed with the Office of Court Administration at the above address no later than the first business day of the week following appointment.  A copy of the Notice of Appointment, with a signed certification, also must be filed with the appointing judge.
NO COMPENSATION WILL BE AWARDED UNLESS BOTH FILINGS HAVE BEEN COMPLETED.

# APPENDIX B.   CERTIFICATION OF COMPLIANCE

[see Rules of Chief Judge, § 36]

UCS–830.3
12/1/90

CERTIFICATION OF COMPLIANCE
PURSUANT TO PART 36 OF THE RULES OF THE CHIEF JUDGE

1. _____ Court, _____ County.
2. Appointee
   Name
   Address _____   Firm Name, if any _____

   Federal Employment
   Identification No. _____
   Soc. Sec. No. _____   Phone No. _____
   Occupation: ☐ Attorney   ☐ Other (Specify) _____
3. Court Docket/File/Index Number _____
4. Title of Proceeding _____
5. Name of Appointing Justice/Judge _____
6. Person or Interest Appointee Represents _____
7. Have you received any other appointments within the previous 12 months? YES__ NO__
   If yes, please attach list of appointments.  Include a) court of appointment, b) type of appointment, c) date of appointment, d) title of proceeding and case index number.
8. Pursuant to 22 NYCRR section 36.1(d) (Rules of the Chief Judge), I hereby certify that:
   a) I am not a relative of, or related by marriage to, a judge of the Unified Court System of the State of New York and,
   b) Receipt of this appointment will not give me more than one appointment within the prior 12 months for which the compensation was or is anticipated to exceed the sum of $5,000.00.

_____          _____
Date                                             Signature

NOTICE TO APPOINTEE
This certification must be submitted to the appointing judge prior to

accepting any appointment.
NOTICE TO APPOINTING JUDGE
This certification is a permanent record and must be placed in the court file.

UCS-830.3
12/1/90

CERTIFICATION OF COMPLIANCE
Pursuant to Part 36 of the Rules of the Chief Judge

Item 1   Enter the specific title of the court, e.g., Supreme Court, Surrogate's Court, etc., and enter the name of the county in which the appointing court is located.

Item 2   Name and Address:
         Enter name and mailing address of Appointee.

         Social Security Number:
         Enter social security number of Appointee.

         Occupation:
         Check appropriate box.  If "other," please specify, e.g., physician, accountant, etc.

         Firm Name:
         Appointee's firm name must be entered here regardless of whether a member, partner, associate, counsel or employee and regardless of whether any fee or allowance received is to be retained or is to go to the firm.

         Federal Employer Identification No.:
         Enter firm's Internal Revenue Service Federal Employer's Identification Number.  Where no number is available, enter "None".

         Phone No.:
         Enter appointee's phone number.

Item 3   Enter either the docket, file, index number or any other identification assigned by the court to this matter.  If there is no number assigned, enter "None".

Item 4   Enter the title of the action or proceeding in which appointed, e.g., Smith v. Jones, Matter of Adams, etc.  If it is a multiparty action, name only the first party, e.g., Smith et al. v. Jones et al.

Item 5   Enter the first initial and full last name of the judge or justice who made the appointment.  If made by the judges of a multi-judge court, enter "the Court."

Item 6   Enter the name of the person or interest represented.  If there are multiple parties, enter the specific name of the client.  If appointee represents all plaintiffs or defendants in a multi-party case, state "all plaintiffs".  If appointee represents the court, state "the Court".

Item 7   If you have received any other appointments within the previous 12 months, attach a separate page listing appointments.  Include a) court of appointment, b) type of appointment, c) date of appointment, d) title of proceeding and case index number.

Item 8   Date, sign and submit to the appointing Judge.  If you have a problem completing this certification, contact the appointing Judge immediately.

# Attachment B



**DEMOCRATIC PARTY**

Kings County
Democratic County
Committee

Clarence Norman Jr.
Chair
Executive Committee

Pat V. Guadagnino
Vice Chair
Executive Committee

Steven D. Cohn
Secretary
Executive Committee

Joan L. Millman
Chair
County Committee

Lee A. Barrie
Secretary
County Committee

Thomas J. Garry
Treasurer

Marymae Settle
Assistant Treasurer

Michael M. Freeman
Chair
Law Committee

Jeffrey C. Feldman
Executive Director

December 20, 1999

Michael M. Freeman, Esq.
Law Chairman
Kings County Democratic Party
16 Court Street
Brooklyn, New York 11241

Dear Michael,

It is with great unhappiness that we must inform you that we hereby resign our positions as members of the Kings County Democratic Law Committee.

It has become apparent that our diligent work and unquestioned loyalty to the Organization over the many years are clearly not as important as the desires of Mr. Ravi Batra. Although, Mr. Batra holds no party or elected position in our County, he has nevertheless, imposed himself on the political workings of our Organization for the sole purpose of his own personal financial gain.

Therefore, we will be unable to continue to represent candidates for elected and/or judicial office free of charge, as we have done so in the past. One cannot reasonably expect our firm to continue to avail to the Organization our professional services, the utilization of our employees, and the use of our office facilities, while the Organization sits idly by and permits Mr. Batra to maliciously injure our practice and reputation without consequence.

16 Court Street
Brooklyn, NY 11241
Tel (718) 875-5870
Fax (718) 596-4013

As I am sure that the facts surrounding our termination as Mr. Batra's attorneys on his numerous Court appointed Receiverships will be discussed by many members of our Organization, we feel it is now necessary to clarify the issues surrounding our recent termination.

As you have been made aware, on December 7, 1999, Mr. Batra, via facsimile correspondence, terminated our firm as his attorneys on all of his many Receivership matters: including the representation of Mr. Batra with respect to his Receivership of the Cypress Hills Cemetery. It must be clearly noted that Mr. Batra stated in his termination letter of December 7, 1999, that his own firm will now represent him on all Receivership matters. Mr. Batra claims that our firing was as a result of our firm's lack of competent legal representation. As you can personally attest, our firm is well recognized as an authority in the area of Receivership law. I can assure you that any such claims are merely a transparent attempt to deflect attention from Mr. Batra's true motive of obtaining both the legal fees generated from these matters in addition to collecting a Receiver's commission from said cases.

It is indisputable that our firm has done an excellent job in protecting the interests of our clients, a fact that can be attested to by many members of our own Organization. I must reiterate that Mr. Batra is merely attempting to secure legal fees for his own firm while continuing to collect commissions on these matters as well.

Although, we have the utmost respect and affection for you and the excellent work you have done as the Law Chairman, we are left with no alternative but to resign as members of the Law Committee. To continue on in our capacity as Law Committee members in light of Mr. Batra's inexcusable actions would be far too much to expect, given the fact that the Organization has permitted an individual with no party position or history in this County to dictate how our Organization is run. As Law Chairman you are well aware of the fact that Mr. Batra has never assisted the Law Committee on any level whether it be collecting signatures, binding petitions or trying an election law case, etc. In fact, it is unknown as to what Mr. Batra has accomplished in any capacity to benefit our Organization.

I cannot stress to you enough the sense of betrayal we presently are experiencing. Clearly, you recognize the unwavering loyalty and dedication our firm, as well as that of our predecessors, have shown to this Organization over the course of the past twenty five (25) years. It is unprecedented and disheartening how one man's greed and self absorption can go so unchecked. Simultaneously, such an act reduces the credibility of the once

most powerful political organization in the nation, to an Organization that permits unprovoked attacks by an outsider without consequence.

It is unfathomable that such action would be tolerated by any other political organization within this City or State. It is quite evident that permitting Mr. Batra's behavior has severely damaged our credibility and reputation as a political Organization.

We hope that one day in the not so distant future we will be able to work together again when the interests of the Organization are once again paramount to the unfettered demands of one non-contributing individual.

Regretfully submitted,

Thomas J. Garry
Treasurer, County Committee

Arnold J. Ludwig
Treasurer, Brooklyn Democrats

cc:   Hon. Clarence Norman, Jr.
      Hon. Jeffrey C. Feldman
      Hon. Joan L. Millman
      Hon. Leo A. Barrile
      Hon. Herbert E. Berman
      Hon. Roberta Sherman
      Hon. Diane M. Gordon
      Hon. Decosta Headley, Jr.
      Hon. Lewis Fidler
      Hon. Renee Hauser
      Hon. Booker T. Ingram

Hon. Mary L. Hobson
Hon. Heather E. Gayle
Hon. William H. Boone
Hon. Jacob Gold
Hon. Lori Citron Knipel
Hon. Ann Levine
Hon. Michael R. Geller
Hon. Marsha Rapaport
Hon. Paul Podhaizer
Hon. Joan E. Ribaudo
Hon. Charles J. Ragusa
Hon. Pat V. Guadagnino
Hon. Dov Hikind
Hon. Joseph A. Bova
Hon. Maryrose Sattie
Hon. Linda Minucci
Hon. Steven D. Cohn
Hon. Azalia Rivera
Hon. Angel Rodriquez
Hon. Elizabeth R. Daly
Hon. Ralph J. Perfetto
Hon. Vito J. Lopez
Hon. Narcisa Ruiz
Hon. Martin Malave-Dilan
Hon. Nellie Santiago
Hon. Essie Duggan
Hon. William F. Boyland, Jr.
Hon. Annette Robinson
Hon. Albert Vann
Hon. Freddie Hamilton
Hon. Kendell Stewart
Hon. Edith Wingfield