# EXHIBIT B

# REPORT OF THE
# COMMISSION
# ON FIDUCIARY
# APPOINTMENTS



DECEMBER 2001

# TABLE OF CONTENTS

Page

SUMMARY OF RECOMMENDATIONS.................................................................... iii

INTRODUCTION.................................................................................................. 1

I.      THE COMMISSION AND ITS DELIBERATIONS............................... 4

II.     FIDUCIARY APPOINTMENTS IN NEW YORK................................. 7

        A.      Categories of Fiduciary Appointments........................................ 7

        B.      Regulation of the Fiduciary Appointment Process....................... 12

        C.      The Administration of Part 36..................................................... 18

III.    CONCERNS WITH THE EXISTING PROCESS................................. 21

        A.      Public Concerns........................................................................ 21

        B.      The Garry/Ludwig Letter.......................................................... 22

        C.      Problems Identified by the Special Inspector General
                and the Auditors......................................................................... 25

        D.      Problems Identified by the Commission...................................... 33

IV.     CONCLUSIONS AND RECOMMENDATIONS................................. 37

        A.      Eligibility and Qualifications...................................................... 37

        B.      The Appointment Process.......................................................... 44

        C.      Oversight of the Appointment Process........................................ 56

        D.      Additional Recommendations...................................................... 60

CONCLUSION.................................................................................................... 66

APPENDIX

A.   Commission Members

B.   Individuals Who Met With the Commission

C.   Individuals Testifying at Public Hearings

D.   Garry/Ludwig Letter

E.   Commission's Interim Recommendations -- Oversight of Filing Process

F.   Chief Administrative Judge's Memorandum -- Oversight of Filing Process

G.   Proposed Preamble

# SUMMARY OF RECOMMENDATIONS

### A. Eligibility and Qualifications:

*Training Should be Required for Inclusion on the Fiduciary Lists.*

*State and County Political Party Leaders and Their Immediate Relatives and Law Firms Should be Ineligible for Appointment.*

*Immediate Relatives of Higher-Level Nonjudicial Employees Should be Ineligible for Appointment.*

*Former Judges Should be Ineligible for Appointment for Two Years After Leaving the Bench.*

*The Rules Should Clearly Provide that Criminal Offenders and Disbarred or Suspended Attorneys are Ineligible for Appointment.*

*Information Regarding a Fiduciary's Bankruptcy History Should Continue to be Available.*

*Procedures Should be Adopted to Remove Fiduciaries From the List for Good Cause.*

### B. The Appointment Process:

*Judges Should Have Full Authority to Select the Fiduciary.*

*Judges Should Select Fiduciaries From the OCA List.*

*Specialized Fiduciary Lists Should be Created.*

*Re-registration Should be Required for All Those on the Fiduciary List.*

*Additional Types of Appointees Should be Governed by the Fiduciary Rules.*

*Additional Types of "Secondary" Appointees Should be Governed by the Rules.*

*New Limits Should be Imposed on the Number of Higher-Paying Appointments that Individual Fiduciaries may Receive.*

*Judges Must be More Scrupulous in Reviewing Applications for Compensation.*

*Limits Should be Imposed on Appointment of Other Article 81 Fiduciaries as the Guardian.*

**C.  Oversight of the Appointment Process:**

*All Persons on the Fiduciary List Should be Assigned an Identifying Number.*

*Law Firms Should Report More than $25,000 in Fiduciary Compensation.*

*Compensation Should be Reported to OCA in All Cases, Even Those in Which No Compensation is Received.*

*Periodic Audits Should be Conducted of the Fiduciary Filing Process.*

**D.  Additional Recommendations:**

*The Revised Fiduciary Rules Should Include a Preamble.*

*Judges Should Receive Training on the Fiduciary Appointment Process.*

*The Court System Should Designate an Ombudsman to Provide Information and Field Complaints About the Fiduciary Process.*

*Public Funds Should be Available to Compensate Article 81 Guardians in Cases Involving Minimal or No Assets.*

*Where Practical, Article 81 Cases Should be Assigned to a Small Group of Judges in Each Jurisdiction.*

*An Administrative Support Office Should be Created as a Resource for Judges Handling Guardianship Matters.*

*Attorneys Should not Contribute to Judges' Campaigns for the Purpose of Receiving Fiduciary Appointments.*

*"[P]ublic confidence in the courts is put at risk when judicial appointments are based on considerations other than merit. Simply put, the public must have faith that the courts operate free of favoritism and partiality."*

Chief Judge Judith S. Kaye, State of the Judiciary address, January 10, 2000.

## INTRODUCTION

Fiduciary appointments are judicial assignments of individuals, usually private attorneys, to assist the courts and serve litigants in a variety of situations. For example, a court may appoint a receiver to manage a property that is the subject of litigation; a guardian to handle the affairs of an incapacitated person; or a guardian ad litem to represent the interests of a child or incapacitated person involved in a Surrogate's Court proceeding. Fiduciary appointees generally receive their fees from the assets of the individual or business the fiduciary has been assigned to represent or manage. Although in many cases the fees are relatively small or even non-existent, in some cases they can be quite lucrative.

Fiduciary appointments have long been a subject of public attention and controversy. Over 130 years ago, Benjamin Cardozo's father, Manhattan Supreme Court Justice Albert Cardozo, was harshly criticized and ultimately forced to leave the bench in large part because

of his repeated appointment of relatives and political cronies as fiduciaries.[1] Although public criticism of the process continued through the years, extensive regulatory limitations on appointments did not arise until the 1980s, with the promulgation of Part 36 of the Rules of the Chief Judge.

Even with the promulgation of Part 36, however, public concerns about the fiduciary appointment process have persisted. Indeed, these concerns may have reached their peak in January 2000, when a controversial letter written by two politically-connected Brooklyn attorneys who had received numerous fiduciary appointments was made public. In their letter, the attorneys complained that, contrary to what they perceived to be the "long-standing practice" in Brooklyn, certain lucrative fiduciary appointments were being assigned to another attorney who, although having close ties to a top political party official, had no record of party service and thus had not demonstrated his "entitlement" to the appointments. To many, the letter confirmed the widely-held perception of the inappropriate influence of politics on the fiduciary appointment process.

In response to these developments, Chief Judge Judith S. Kaye, in her 2000 State of the Judiciary address, announced a three-part program to reform the fiduciary appointment process. First, she created the Office of the Special Inspector General for Fiduciary Appointments, with authority to investigate violations of the fiduciary rules and recommend referrals of such violations to appropriate disciplinary and other enforcement authorities.

---

[1] *See* Andrew Kaufman, *Cardozo*, pp. 16-19 (Harvard Univ. Press 1998).

2

Second, she directed the State's Administrative Judges to evaluate the fiduciary appointment process in their judicial districts and suggest operational changes that should be made. Finally, Chief Judge Kaye established the Commission on Fiduciary Appointments, with the responsibility to examine the existing rules and procedures governing fiduciary appointments and offer recommendations to improve them.

This Report is the result of over a year of painstaking analysis of New York's complex fiduciary appointment process. The Commission interviewed scores of judges, attorneys, court personnel and others familiar with the process; it examined reports, recommendations and related materials submitted by judicial associations, bar associations and other interested organizations; it conducted public hearings; it reviewed voluminous fiduciary appointment data; and it surveyed fiduciary appointment practices in other jurisdictions across the nation.

Based on this extensive study, the Commission found that many fiduciary appointees are fulfilling their obligations with considerable skill and professionalism -- indeed, the Commission was impressed to learn of the hundreds and hundreds of cases in which fiduciary appointees serve for minimal or no compensation. But the Commission also found extensive and significant flaws in the existing process. This Report presents the Commission's findings, and offers detailed recommendations for addressing these problems so that full public confidence in the integrity and impartiality of New York's fiduciary appointment process may be maintained.

3

## I.   THE COMMISSION AND ITS DELIBERATIONS

In creating the Commission on Fiduciary Appointments, Chief Judge Kaye chose a broad cross-section of leaders of the bench, bar and academia. A list of the 17 Commission members and their backgrounds is attached as Appendix A. The Chief Judge's statement announcing the Commission noted that the Commission would "assess the effectiveness of the current regulatory structure" governing fiduciary appointments,  and "evaluat[e] the efficacy of existing administrative rules."  Among the issues that the Commission was charged with examining were "the appointment process, monetary limits on compensation, eligibility and expertise requirements for appointment and ethical standards pertaining to fiduciary assignments."

The Commission conducted an extensive, wide-ranging review of the fiduciary appointment process in New York, obtaining the views and recommendations of many individuals with day-to-day involvement and practical understanding of the process.  For example, the Commission received presentations from and held briefing sessions with: the Presidents of the Supreme Court Justices Association of the State of New York, the Supreme Court Justices Association of the City of New York and the Surrogates Association of the State of New York, as well as individual judges with experience in this area; the Presidents, selected committee chairs and other representatives of the New York State Bar Association, the Association of the Bar of the City of New York and the New York County Lawyers Association; and the Chief Clerks of several Supreme Courts and Surrogate's Courts.  The

4

Commission also met on a number of occasions with Sherrill Spatz, the Unified Court System's Special Inspector General for Fiduciary Appointments.  A complete list of the individuals who met with the Commission is attached as Appendix B.

In addition, the Commission conducted two public hearings: in Buffalo on November 29, 2000, at which judges and attorneys testified; and in Manhattan on December 7, 2000, at which judges, attorneys, litigants and other interested individuals testified.  A complete list of persons testifying at the two public hearings is attached as Appendix C.

Commission members also held informational sessions with Supreme Court Justices and Surrogates during the two-week Annual Judicial Seminars in Rye Brook in July 2000, and they attended meetings of the State Bar Association's House of Delegates (July 2000) and Judicial Section (May 2000).

The Commission received numerous reports, recommendations and other written materials from various individuals and organizations, including the New York County Lawyers Association and committees of the State Bar Association and the Association of the Bar of the City of New York.  The Commission also received and closely reviewed extensive information on fiduciary appointments collected by the Office of the Special Inspector General for Fiduciary Appointments and the Office of Court Administration's Internal Audit staff, as well as information from OCA's fiduciary database.  Finally, the Commission examined fiduciary appointment practices in other jurisdictions around the country, and spoke with officials in those jurisdictions about their practices.

Early on, the Commission sought to identify the primary issues requiring examination.

It then grouped the issues into three general categories -- (1) Eligibility/Qualifications for Appointment, (2) Appointment Process and (3) Oversight of the Appointment Process -- and established subcommittees for each of these categories.    In the ensuing months, the subcommittees worked to develop proposed solutions for the problems, and it was those proposals that formed the basis for discussing and developing the series of recommendations the Commission offers in this Report.

## II.    FIDUCIARY APPOINTMENTS IN NEW YORK

### A. Categories of Fiduciary Appointments

In New York, judges are frequently called upon to appoint fiduciaries to assist the court and provide services to litigants and other individuals.  The primary categories of fiduciary appointments are referees, receivers, Article 81 fiduciaries (court evaluators, guardians, attorneys for alleged incapacitated persons and court examiners) and guardians ad litem.

#### Referees

Under New York law, courts have broad powers to delegate authority to referees to determine issues and perform functions on behalf of the courts.[2]  A primary purpose for which courts use referees is to sell real property that has been the subject of a judgment of foreclosure.[3]  Typically, the referee is appointed to compute the value of the property, and then sell it at a public auction usually held at the courthouse.  The fees for these services are relatively small -- $50 to compute the value of the property, and $500 to sell the property (unless the property is of high value and the court authorizes a greater fee).[4]

#### Receivers

When there is a risk that property that is the subject of litigation may be "removed

---

[2]  CPLR Rule 4301

[3]  *See* CPLR § 5103(b); Real Prop Acts. § 1351(1).

[4]  CPLR § 8003.

from the state, or lost, materially injured or destroyed," a person with interest in the property may move for appointment of a receiver to manage the property while the action is pending.[5] The receiver is authorized to take and hold real and personal property and to sue for, collect and sell debts or claims.[6]  In the most common case in which a receiver is appointed -- a mortgage foreclosure proceeding -- this means that the receiver may collect rent and institute or defend lawsuits relating to the collection of rent or the eviction of tenants.  The receiver's fee, which is paid from the proceeds of the property in receivership, may not exceed five percent of the total sums the receiver collects and disburses.[7]

### Article 81 Fiduciaries

Under Article 81 of the Mental Hygiene Law, a court may appoint a guardian to provide for the personal care of an incapacitated person and/or manage the property and financial affairs of that person.[8]  When a petition for appointment of a guardian is filed, the court first appoints a **court evaluator.**  The court evaluator conducts an investigation and submits a report and recommendations to the court addressing whether the alleged

_____

[5]  CPLR § 6401(a).

[6]  CPLR § 6401(b).

[7]  CPLR § 8004(a).  In cases in which the receiver's commission, based on the five percent formula, would not amount to $100, the court may authorize a fee of up to $100 for the services rendered.  And in cases in which the receiver collects no sums, or is in possession of no sums at the termination of the receivership, the court may authorize a fee based on the services rendered. CPLR § 8004(b).

[8]  MHL § 81.02(a).  Surrogate's Courts may appoint a guardian for an infant, SCPA Article 17, or for a mentally retarded person or a developmentally disabled person.  SCPA Article 17-A.

8

incapacitated person ("AIP") is in fact incapacitated, the availability and reliability of alternative resources and the selection of and powers that should be assigned to the guardian. In practice, the court evaluator is usually a private attorney, but he or she may be a physician, psychologist, accountant, social worker, nurse or any other qualified person.[9] If the AIP is a patient in a facility such as a hospital or nursing home, the facility may be appointed as the court evaluator; or if the AIP has minimal or no assets, the Mental Hygiene Legal Service may be appointed.[10]

The AIP has the right to be represented in the proceeding by counsel of his or her choice.  But in other situations, such as when the AIP requests counsel or the court determines that appointment of counsel would be helpful, the court may appoint **counsel for the AIP**.[11]

If the court determines, after a hearing, that the AIP is incapacitated and that appointment of a guardian is necessary, the court may proceed to appoint a **guardian**.[12]  In appointing a guardian, preference is usually given to a person nominated by the incapacitated

---

[9]  MHL § 81.09(b)(1).

[10]  MHL § 81.09(b)(2) & (3).

[11]  MHL § 81.10.

[12]  The guardian's powers must be limited to those the court has found "necessary to assist the incapacitated person in providing for personal needs and/or property management." MHL § 81.16(c)(2).

9

person or to a family member.[13] If the incapacitated person does not nominate anyone, and if no family member is available for appointment, the court must appoint some other "suitable" individual, usually a private attorney.  In cases in which the incapacitated person has minimal or no assets, the court may appoint an appropriate social services agency or not-for-profit organization to serve as guardian.[14]

Along with providing for the personal care and/or managing the property and financial affairs of the incapacitated person, the guardian must file periodic reports and financial accountings with the court.  The reports, which must address the incapacitated person's condition and care, and the accountings[15] are reviewed by a **court examiner** appointed by the court.  The court examiner, also usually a private attorney, submits his or her own report to the court evaluating the report submitted by the guardian.[16]

All persons appointed as court evaluators, guardians or court examiners must complete a training program approved by the Chief Administrator of the Courts.[17]  Article 81 fiduciaries generally are paid from the assets of the incapacitated person.  Court evaluators and attorneys for AIPs are usually paid hourly fees based on the fair and

---

[13] MHL § 81.17; Bailly, Practice Commentaries, McKinney's Cons. Laws of N.Y., Vol 34A, MHL § 81.19, p. 360 (1996).

[14] MHL § 81.19(2); *see also* Soc. Serv. Law § 473-d (community guardian programs).

[15] MHL §§ 81.30, 81.31.

[16] MHL § 81.32.

[17] MHL §§ 81.39 - 81.41.

reasonable value of their services.[18]   The court must establish a plan for the guardian's compensation, which may be based on a percentage of the amounts the guardian receives and disburses, a percentage of the incapacitated person's assets, an hourly fee or a combination of these or other methods.[19]   Court examiners are paid a set fee that is based on the amount of the incapacitated person's assets (the fees are set by the Appellate Division).

### Guardians Ad Litem

Surrogate's Courts frequently appoint guardians ad litem to protect the interests of individuals incapable of protecting themselves.[20] Under section 403 of the Surrogate's Court Procedure Act, appointment of a guardian ad litem generally arises when an unrepresented person under a disability is a necessary party to a proceeding and is incapable of adequately protecting his or her rights.[21]   Persons under a disability include infants, incompetent and incapacitated individuals, prisoners, unknowns and unborns.

The guardian ad litem, who must be an attorney,[22] undertakes an investigation of the facts and reviews all operative documents (the will, trust, accounting, tax return, etc.) and other materials to determine if there has been compliance with applicable laws and

---

[18]   *See* Bailly, Practice Commentaries, McKinney's Cons. Laws of N.Y., Vol. 34A, MHL § 81.09, p. 308 (1996).

[19]   MHL § 81.28.  *See also* SCPA §§ 2307, 2309.

[20]   Guardians ad litem are also appointed on occasion in matrimonial cases.

[21]   SCPA § 403(2).  An infant over the age of 14 may petition the court to appoint a named attorney as his or her guardian.  SCPA Article 17-A.

[22]   SCPA § 404(1).

11

procedures. Upon completion of the investigation and review, the guardian ad litem files a report with the court recommending whether objections should be made or other proceedings should be conducted to protect the interests of the ward.

The guardian ad litem's fee is generally paid out of the estate.[23] The fee must be reasonable, based on the nature and extent of the services, the time spent, the stature and experience of the lawyer, the complexity of the issues and the results achieved.[24]

**Secondary Appointments**

In cases in which fiduciaries are appointed, "secondary" fiduciaries may also be appointed or retained to perform various services. For example, receivers frequently retain counsel and property managers to assist them with legal matters and day-to-day management of the property under receivership; guardians often retain counsel and accountants and other financial professionals; and guardians ad litem occasionally retain other professionals as "assistants" to help with their responsibilities. In some cases, secondary appointees can receive lucrative fees; in receivership cases, for example, the counsel's compensation (which is calculated on an hourly fee basis) often can exceed the receiver's compensation.

**B.  Regulation of the Fiduciary Appointment Process**

Over the past several decades, a number of legislative and administrative efforts have

---

[23] The court, however, may direct that the fee be paid from the assets of the person under disability or, for good cause shown, by another party to the proceeding. SCPA § 405(1).

[24] *See* Turano, Practice Commentaries, McKinney's Cons. Laws of N.Y., Vol. 58A, SCPA § 405, p. 391 (1994).

been taken to promote fairness and openness in the fiduciary appointment process.

## Judiciary Law § 35-a

In 1967, the Legislature enacted section 35-a of the Judiciary Law to "bolster confidence in the disposition of court appointments" by ensuring that information about the compensation of court appointees is made available to the public.[25] Section 35-a originally required that all court appointees, other than those compensated with public funds, file with the Office of Court Administration a notice of appointment when appointed and a statement of award of compensation when paid.[26] Several years of experience with this requirement, however, demonstrated that in a great many cases the appointees were not making these filings. Accordingly, in 1975, the Legislature amended section 35-a to eliminate the appointee's filing requirements and substituted the requirement of a single filing -- of the compensation awarded -- to be made by the judge, not the appointee.[27] Placement of the filing requirement with the judge was considered a more reliable means of ensuring that the filings would be made.

---

[25] *See* Governor Rockefeller's approval message, L. 1967, c. 625, McKinney's 1967 Session Laws of New York, p. 1535.

[26] By its terms, the statute applies to a broader category of court appointments than those that could be considered "fiduciary" appointments: that is, "any person appointed by the court in any capacity, including but not limited to appraiser, special guardian, guardian ad litem, general guardian, referee, counsel, special referee, auctioneer, special examiner, conservator, committee of incompetent or receiver."

[27] L. 1975, c. 834, §1. This requirement was also promulgated in Part 26 of the Rules of the Chief Judge (22 NYCRR Part 26). Notably, Part 26, reflecting the mandate of section 35-a, applies to fiduciary appointments but also to a much broader group of court appointments.

13

**Appellate Division, First Department Rules**

In the 1970s, extensive public criticism of the fiduciary appointment process arose in response to the practice of certain Supreme Court judges in New York City to appoint close relatives of other Supreme Court judges.  To address this problem, the Appellate Division, First Department, promulgated rules in 1977 for the Supreme Court in New York and Bronx counties (22 NYCRR § 660.24).  Under these rules, the judge presiding over a case in which a fiduciary was to be appointed did not select the fiduciary.  Rather, another judge of the court, whose name came up next on a strict rotational list, made the selection.

**Silverman Committee Report**

In 1978, shortly after its promulgation of section 660.24, the First Department also appointed a committee to study the fiduciary appointment process and make recommendations for improvement.  The Committee, chaired by Justice Samuel Silverman, was composed of 15 judges and lawyers in the First Department.

The Silverman Committee issued its report in 1980.  It concluded that section 660.24 was unduly cumbersome and should be repealed.  Instead, the Committee recommended that the judge handling the case be trusted to select the fiduciary, but with certain limitations. Among the proposed limitations were that relatives of judges be ineligible for appointment and that former judges be ineligible for two years after leaving the bench.  The Committee also recommended that fiduciary appointees be ineligible to receive more than one "substantial" appointment within a 12-month period.

The Silverman Committee's recommendations were converted to rule form and

14

presented to the Administrative Board of the Courts.  Following the opposition of the Judicial Conference and the Association of Supreme Court Justices, however, the Administrative Board rejected the rules and declined to refer them to the Court of Appeals.

### Part 36 of the Rules of the Chief Judge

Several years later, in the wake of renewed public charges of favoritism in the appointment process, then-Chief Judge Lawrence Cooke proposed that fiduciaries be selected randomly from computer-generated lists of qualified candidates.  Although this proposal was not adopted either, shortly thereafter a new set of rules was drafted, circulated for public comment and promulgated with the approval of the Court of Appeals.  The new rules, Part 36 of the Rules of the Chief Judge, took effect on April 1, 1986.

The 1986 version of Part 36 governed appointments of guardians, guardians ad litem, conservators, committees for the incompetent, receivers and persons designated to perform services for a receiver.[28]  It was thought that these appointments were the most common and the most remunerative, and that it would be impractical to apply the new oversight procedures to additional categories of appointments.  The new rules placed the determination of the appointees' qualifications squarely with the appointing judge.[29]  This meant that there

---

[28]  22 NYCRR § 36.1(a).  Although the rules expressly included and thus required that the judge make secondary appointments in receivership cases -- "persons designated to perform services for a receiver"-- they did not address secondary appointments in other types of cases in which fiduciaries are appointed.  In addition, the Part 36 rules applied to a narrower category of appointees than did the Part 26 rules, which, in implementing section 35-a of the Judiciary Law, applied essentially to all court appointees other than those compensated with public funds.

[29]  *Id.*

were no minimum qualifications for placement on the newly-created lists of prospective appointees. And the rules provided that the judge need not even use the lists, so long as the judge set forth on the record the reasons for not doing so.

The 1986 version of Part 36 rendered ineligible for appointment *any* known relative of any judge of the Unified Court System, whether by blood or marriage.[30] There were no exceptions, no matter how far removed the relative was down the judge's family tree or geographically from the appointing judge's court.

A key component of Part 36 was the limitation on the number of highly compensated appointments that an individual fiduciary could receive. The rules provided that no appointee could receive more than one appointment in any 12-month period for which the compensation was anticipated to be more than $5,000, except in unusual circumstances involving continuity of representation or familiarity with the case.[31] No limits, however, were imposed on the number of below-$5,000 appointments an individual appointee could receive.

Finally, the rules imposed obligations on fiduciary appointees to make two separate filings. First, the prospective appointee had to file a certification of compliance verifying to the appointing judge that the appointment would not be in violation of Part 36 and specifying all appointments received within the previous 12 months.[32] Second, after the appointment

---

[30]  22 NYCRR § 36.1(b)(1).

[31]  22 NYCRR § 36.1(c).

[32]  22 NYCRR § 36.1(d).

was made, the appointee had to file a notice of appointment with the Office of Court Administration.[33] The notice of appointment was filed as a public record, and the Chief Administrator of the Courts was required to arrange for the periodic publication of the names of the persons appointed.[34] The rationale underlying the filing requirements was to open up the appointment process to public view and to provide sufficient information to the appointing judge to facilitate compliance with the rules.

### Changes in Part 36

The current Part 36 retains its essential character from its original enactment 15 years ago, with a few changes. In 1989, the rules were amended to disqualify a judicial hearing officer from receiving appointments in a court of a county in which he or she serves on a JHO panel.[35] In 1990, the rules again were amended to require that the notice of appointment be filed "no later than the first business day of the week following the appointment," that the appointee certify in writing to the appointing judge that the notice of appointment has been filed and that no fees be awarded unless the appointee filed the notice of appointment and certification of compliance.[36]

In 1991, an 11-member committee was appointed by the Administrative Board to review the rules and recommend whether any changes were needed. The committee, chaired

---

[33] 22 NYCRR § 36.3(a).

[34] *Id.*

[35] 22 NYCRR § 36.1(b)(2).

[36] 22 NYCRR §§ 36.3(a), 36.4(c).

by Nassau County Surrogate C. Raymond Radigan, issued a report and recommendations in 1993. Along with a number of technical, fine-tuning recommendations,[37] the committee recommended that the $5,000 rule -- that an individual appointee may receive only one appointment in a 12-month period for which it is anticipated that the compensation will exceed $5,000 -- be increased to $10,000. The Administrative Board and the Court of Appeals ultimately approved the technical changes, but rejected the recommendation to raise the $5,000 threshold.

Finally, in 1994, Part 36 was amended to include referees among the categories of appointments subject to the rules.[38] And in 1996, the strict ban against appointment of any relative of a judge was loosened, to prohibit appointment of relatives of judges within the sixth degree of relationship (which extends to second cousins).

## C. The Administration of Part 36

Individuals seeking inclusion on the fiduciary list must complete and send to OCA a four-page application with background information on education and experience, including all prior court appointments in the last five years, and the category (or categories) of

---

[37] These included that the rules be amended to reflect changes necessitated by the enactment of Article 81 of the Mental Hygiene Law -- that is, to apply the rules to court evaluators and attorneys for alleged incapacitated persons, and to delete references in the rules to conservators and committees.

[38] However, under the rules, referees are not subject to the filing requirements of Part 36 if their compensation is not anticipated to exceed $550 (the statutory amount specified in CPLR § 8003(b)). 22 NYCRR § 36.1(f). *See also* 22 NYCRR § 26.2 (judge must submit approval of compensation form to OCA only if appointee's compensation is more than $500).

fiduciary appointments requested. The information from the application is entered in a computer database, which can segregate the data by county, type of appointment and other criteria. The database is contained in the court system's Intranet computer network, which is available to judges and court personnel throughout the State.

OCA conducts no screening of the applications; except for relatives of judges within the sixth degree of relationship, all applicants are placed on the fiduciary list. Thus, any determination of a prospective appointee's qualifications is left entirely to the appointing judge, who has access to the database as well as the hard copies of the application forms.

Once the judge selects a fiduciary from the list (or not, if good reason is set forth in the record), the prospective appointee is notified and is required to file a notice of appointment form (UCS Form 830.1) and a certification of compliance form (UCS Form 830.3), which must list all appointments received within the previous 12 months. The certification of compliance form is filed with the court and placed in the court file. The notice of appointment form is filed with both the court and OCA.

The rules require that the notice of appointment form be filed within 10 days of the fiduciary's receipt of notification that the appointment was made. There is no mechanism, however, to enforce the 10-day filing requirement, and OCA will accept the forms no matter when they are filed. After the form is received, relevant data from the form is entered into the OCA fiduciary database.

When the fiduciary seeks approval to be paid and the compensation exceeds $500, he or she completes a statement of approval of compensation form (UCS Form 830) and submits

19

it to the appointing judge for approval. The judge in turn signs the approval and submits the completed form to OCA.[39] These forms specify the amount of compensation approved, and contain a certification by the fiduciary that the notice of appointment was filed with OCA (without which the judge may not approve any fees). Relevant data from the form is then entered in the database.

All of this information -- hard copies of the fiduciary applications, notices of appointment, statements of approval of compensation and information from these documents that is entered in the OCA database -- is available to the public upon request.

_____

[39] 22 NYCRR § 26.2.

20

## III.   CONCERNS WITH THE EXISTING PROCESS

### A. Public Concerns

With the promulgation in the mid-1980s of Part 36 of the Rules of the Chief Judge, the court system began its first comprehensive effort to regulate the fiduciary appointment process in New York. Nevertheless, widespread concerns over the impartiality and fairness of the process have persisted. These concerns have been reflected in a continuous stream of newspaper articles highlighting questionable practices in the appointment process in a number of courts. Some of the articles revealed that former judges were receiving large numbers of appointments and in certain cases extremely lucrative appointments.[40] Other articles documented the disproportionately large number of appointments received by high-level political party officials.[41] Yet other articles focused on appointments received by close

---

[40] *See, e.g.,* Maggie Haberman, et al., "Dirty Dozen Grab Patronage $$$," New York Post, January 30, 2000, p. 8, col. 3; Salvatore Arena, "Top Politicians Get Lucrative Court Jobs," Daily News, January 30, 2000, p. 30, col.1; Jordan Rau and Katie Thomas, "Select Cast Gets Lucrative Roles," Long Island Newsday, September 24, 1999; Ed Tagliaferri, "High-Paying Surrogate Court Cases Go to Politically Connected, Records Show," Gannett Suburban Newspapers, June 10, 1998, p. A1, col. 4; Jack Newfield, "Judges: Patronage Saints to their Pals," New York Post, May 13, 1993, p. 7, col. 1.

[41] *See, e.g.,* Joe Calderone & Thomas Zambito, "System's Exploiting the Helpless," Daily News, May 21, 2001, p. 6, col. 1; Salvatore Arena, "Top Politicians Get Lucrative Court Jobs," Daily News, January 30, 2000, p. 30, col. 1; Dan Morrison, "Dem Leader Profits From Court System: Judges Steer Assignments to Manton's Firm," Long Island Newsday, January 30, 2000; Jordan Rau and Katie Thomas, "Select Cast Gets Lucrative Roles," Long Island Newsday, September 24, 1999; Ed Tagliaferri, "High-Paying Surrogate Court Cases Go to Politically Connected Judges, Records Show," Gannett Suburban Newspapers, June 10, 1998, p. A1, col. 4; Maggie Haberman, et al., "Here's Who Gets Pick of Judge's Patronage Plums," New York Post, November 10, 1997, p. 6, col. 1; Michael Finnegan, "Judge Rolls Out Pork Barrel," Daily News (Queens edition), June 20, 1993, p. 1 (Q-LI), col. 1; Jack Newfield, "Judges: Patronage Saints to

relatives of non-judicial court officials, and by persons who contributed to the appointing judges' judicial campaigns.[42]

The last concern was also the subject of a report of the Committee on Government Ethics of the Association of the Bar of the City of New York. That report examined the fiduciary appointments of two New York City Surrogates who had recently run for office. The report revealed that a majority of the Surrogates' appointments (66% and 54%, respectively) were received by lawyers who either had contributed to their judicial campaigns or worked with law firms that had contributed.[43]

## B.  The Garry/Ludwig Letter

Concerns about political influence in the fiduciary appointment process were heightened by the controversial December 20, 1999 letter written by Thomas J. Garry and Arnold J. Ludwig. Thomas Garry and Arnold Ludwig, along with William Garry, comprise the Brooklyn law firm of Ludwig & Garry. Until recently, Ludwig & Garry was the law firm of choice for receivers in Brooklyn seeking to retain legal counsel (*see* pp. 29-30, *infra*). Arnold Ludwig, a former law secretary in Brooklyn Supreme Court, is an officer of the

---

Their Pals," New York Post, May 13, 1993, p. 7, col. 1.

[42] *See, e.g.,* Dan Morrison, "Breaking the Rules," Newsday, October 17, 2000; Jack Newfield, et al., "Kings County Princes of Patronage," New York Post, November 9, 1997, p. 8, col. 1.

[43] "Contributions to Campaigns of Candidates for Surrogate, and Appointments by Surrogates of Guardians Ad Litem," Report of the Committee on Government Ethics of the Association of the Bar of the City of New York (July 1998).

Brooklyn Democratic organization and was a member of the organization's Law Committee. Thomas Garry is also an officer of the Brooklyn Democratic organization and was a member of the Law Committee. Thomas Garry and William Garry are the sons of a sitting Brooklyn Supreme Court Justice.

Among their numerous appointments as counsel to receivers, the Garry & Ludwig firm was retained as counsel by the receiver originally appointed to manage the Cypress Hills Cemetery, which had been placed in receivership pursuant to an action charging mismanagement brought in Brooklyn Supreme Court in 1993 by the State Attorney General's Office. When the court replaced the original receiver in 1996, Garry & Ludwig was continued as counsel, and the firm was again continued as counsel when the court replaced the second receiver in 1998 with Manhattan attorney Ravi Batra. Although not himself a Brooklyn Democratic official, Mr. Batra employs the Brooklyn Democratic county leader in an "of counsel" capacity. The Cypress Hills receivership, which is still pending, has proved to be a particularly lucrative case for its fiduciary appointees, with over $1.5 million in fiduciary fees paid out to date.

In early December 1999, however, Mr. Batra wrote to Garry & Ludwig to advise that he was substituting his own law firm as counsel to the receiver in the Cypress Hills case and in three other pending cases in which he was serving as the receiver. Batra claimed that the Ludwig & Garry firm was incompetent and attempting to "churn" legal fees; Garry & Ludwig claimed that Batra was motivated by his desire to obtain legal fees in addition to his receiver's commissions. In any event, their removal from the cases motivated Thomas Garry

23

and Arnold Ludwig to write to the Chair of the Brooklyn Democratic Law Committee resigning their positions as members of the Committee. They also sent copies of the letter to dozens of other Brooklyn elected and party officials. The letter was eventually obtained by the press, and the story was reported in newspapers throughout the metropolitan area in January 2000.[44]

In their letter, the lawyers articulated their understanding that their loyal service to the party entitled them -- not Mr. Batra -- to a continuing share of fiduciary appointments. They complained that their "diligent work and unquestioned loyalty to the Organization over the many years are clearly not as important as the desires of Mr. Ravi Batra [who] . . . . holds no party or elected position in our County" and "has never assisted the Law Committee on any level whether it be collecting signatures, binding petitions or trying an election law case, etc." The letter went on to state that "[o]ne cannot reasonably expect our firm to continue to avail to the Organization our professional services, the utilization of our employees, and the use of our facilities while the Organization sits idly by and permits Mr. Batra to maliciously injure our practice and reputation without consequence." The letter concluded with an expression of hope "that one day in the not so distant future we will be able to work together again when the interests of the Organization are once again paramount to the

---

[44] *See, e.g.,* Alan Feuer, "Brooklyn Lawyers, Ex-Insiders, Outline a Court Patronage System," New York Times, January 5, 2000, p. B1, col. 2; Jack Newfield, et al., "B'klyn Dems Rocked by Insider Patronage Letter," New York Post, January 5, 2000, p. 6, col. 4; Bob Liff, "2 Lawyers Quit Dem Posts, Cite Lack of Patronage Fees," Daily News, January 5, 2000, p. 46, col. 1.

unfettered demands of one non-contributing individual." A copy of the letter is attached as Exhibit D.

**C.** **Problems Identified by the Special Inspector General and the Auditors**

The ongoing investigation by the Special Inspector General for Fiduciary Appointments and OCA's auditing staff has revealed serious flaws in the fiduciary appointment process. The investigation has confirmed many of the newspaper article charges, including those concerning the receipt of multiple and lucrative appointments by high-level political party officials, former judges and relatives of nonjudicial employees of the court system. Some of the major problems in the existing system are highlighted below.[45]

***Political Party Officials have Received Numerous Appointments.***

A number of high-level political party officials have received extensive appointments. For example:

- One county political party leader has received nearly 100 appointments.

- Another county political party leader has received over 75 appointments.

- The small law firm of another county political party leader has received over 200 appointments.

- The small law firm of yet another county political party leader has received over 100

---

[45] Total numbers of appointments noted in this Report reflect only those fiduciary appointments that were reported to OCA. As discussed below, however, non-reporting by fiduciaries and judges was a pervasive problem; also, the reporting requirements do not apply to referee appointments and court examiner appointments. Thus, the totals discussed here are certainly lower than the actual number of appointments.

appointments.

- A lawyer whose small law firm employs a county political party leader has received nearly 100 appointments.

### *Former Judges have Received Numerous Appointments.*

Former judges have received numerous appointments, including some extremely lucrative individual appointments.  The following are some examples:

- A former appellate judge has received nearly 250 fiduciary appointments.

- A former Surrogate has received nearly 70 appointments.

- Another former Surrogate has received nearly 60 appointments.

- A former Supreme Court Justice has received over 60 appointments.

- A former County Court Judge has received nearly 70 appointments.

- A former judge was awarded $424,000 in fees for a guardian ad litem appointment obtained within three months of the judge's retirement from the bench.

- A former judge was awarded $350,000 in fees for a receivership appointment obtained within a year of the judge's retirement from the bench (the fee was later reduced to $200,000 by the Appellate Division).

### *Relatives of Nonjudicial Employees have Received Numerous Appointments.*

Immediate relatives of nonjudicial employees of the Unified Court System have received numerous appointments.  For example:

- The spouse of a high-level managerial employee has received nearly 250 appointments.

26

- The spouse of a law secretary has received over 100 appointments in that court.

- A county clerk's son has been retained as property manager in numerous receivership cases in that county.

### *Compliance with Filing Requirements has been Deficient.*

The investigation has also revealed widespread noncompliance with the filing requirements of Parts 26 and 36 of the Rules of the Chief Judge. The following are examples from some of the counties investigated:

- Of the more than 400 Kings County Supreme Court receivership cases reviewed, not a single approval of compensation statement was filed with OCA, as required under Part 26. In addition, in those cases, only 22% of the receivers filed a notice of appointment with OCA and only 20% filed a certificate of compliance with the court, as is required under Part 36. Of 50 Kings County guardianship cases reviewed, 76% of the court evaluators filed a notice of appointment and 84% filed a certificate of compliance, but only 25% of the guardians filed a notice of appointment and only 42% filed a certificate of compliance. Approval of compensation statements were filed for 76% of the court evaluators and 53% of the guardians.

- In Queens County Supreme Court, 25 receivership cases and 25 guardianship cases were reviewed, and in Queens County Surrogate's Court 25 cases in which guardians ad litem were appointed were reviewed. In the receivership cases, only 18% of the receivers filed a notice of appointment and only 7% filed a certificate of compliance, and approval of compensation statements were filed for none of the appointments.

27

In the guardianship cases, although 84% of the appointees filed a notice of appointment and 77% filed a certificate of compliance, approval of compensation statements were filed for only 52% of the appointments. In Surrogate's Court, compliance was much better: appointees filed a notice of appointment in 91% of the cases and a certificate of compliance in all of the cases, and an approval of compensation statement was filed for 79% of the appointees.

• In Nassau County Supreme Court, 25 receivership cases and 25 guardianship cases were reviewed. In the receivership cases, only 23% of the receivers filed a notice of appointment and only 15% filed a certificate of compliance, and an approval of compensation statement was filed in only 15% of the cases. In the guardianship cases, 84% of the court evaluators and 55% of the guardians filed a notice of appointment, and 89% of the court evaluators and 64% of the guardians filed a certificate of compliance. Approval of compensation statements were filed for 89% of the court evaluators but for only 40% of the guardians.

• In Erie County Supreme Court, 24 receivership cases and 50 guardianship cases were reviewed. Only 23% of the receivers filed a notice of appointment and only 19% filed a certificate of compliance; approval of compensation statements were filed for only 30% of these appointees. In the guardianship cases, 41% of the court evaluators and 11% of the guardians filed a notice of appointment, and 24% of the court evaluators and 21% of the guardians filed a certificate of compliance; approval of compensation statements were filed for 39% of the court evaluators and 22% of the

28

guardians. Fifty Surrogate's Court cases in which guardians ad litem were appointed were reviewed, and again the filing compliance was much better: 78% of the appointees filed a notice of appointment and 100% filed a certificate of compliance, and an approval of compensation statement was filed in 95% of the cases.

Problems also have been detected in the manner in which information from the filings is entered in the OCA fiduciary database. Names of appointees and amounts of compensation have been entered incorrectly, and multiple entries for the same individual are not uncommon (for example, John P. Doe could be listed as "John P. Doe," "John Doe," "J. Doe," "J.P. Doe," etc.)

### *The Rules were not Applied to Secondary Appointments.*

As noted, the requirements of Part 36 expressly apply to "persons designated to perform services for a receiver." § 36.1(a). Nevertheless, a practice evolved in the courts in which the rules were not applied to secondary appointees such as counsel to the receiver and property managers. Thus, the receivers, and not the judges, selected their own counsel and property managers. Moreover, these secondary appointees rarely, if ever, complied with the filing requirements, and they did not consider themselves bound by any of the other provisions of Part 36, such as the prohibition against appointment of relatives and the $5,000 rule. One extreme result of this practice was that the three-attorney Brooklyn law firm of Ludwig & Garry, two of whose members are the sons of a sitting Brooklyn Supreme Court Justice, received 75% of all counsel to receiver assignments in Brooklyn Supreme Court from 1995 through 1999, generating hundreds of thousands of dollars in fees for the firm.

29

Fortunately, this problem has been addressed.  In March 2000, Chief Administrative Judge Jonathan Lippman issued a memorandum to judges across the State emphasizing that the Part 36 rules apply to secondary appointments in receivership cases.  As a result, it has now been made clear that judges must appoint the counsel and property managers, and that these secondary appointees must comply with the filing provisions and the other requirements of the rules.

### *Widespread Billing Irregularities have been Uncovered in Receivership and Guardianship Cases.*

The investigation by the Special Inspector General and the auditors has uncovered disturbing trends in fiduciary billing practices in many cases.  As discussed, receivers are paid a percentage of the amounts they collect and disburse; guardians usually are paid similarly, or they are paid based on a percentage of the assets of the incapacitated person (*see* pp. 8, 11, *supra*).  In many receivership and guardianship cases, the receivers and guardians retain counsel (sometimes themselves or their own law firms), who are paid a separate fee, also from the assets and generally on an hourly basis.  In some of the cases reviewed, the counsel performed strictly legal services, such as litigation.  In many other instances, however, judges regularly approved legal fees for services performed by the attorney that were not of a legal nature and should have been deemed part of the receiver's or guardian's routine duties.  The legal fees approved for these services ranged from $150 per hour to over $400 per hour; and, at least in the receivership cases, the fees often exceeded the receiver's commissions.

30

The following are some examples of the types of services for which hourly legal fees were routinely approved:

- Preparing the guardian's initial, annual and final accountings and reports

- Preparing the receiver's accounting

- Locating heirs and obtaining family records

- Reviewing and reconciling bank statements

- Speaking with hospital and nursing home staff

- Preparing forms for filing with OCA

- Obtaining bonds

### *Courts Frequently Appointed the Court Evaluator as Guardian.*

It is relatively common for the court to appoint the court evaluator (or, less frequently, the court-appointed attorney for the alleged incapacitated person) as the guardian. In fact, in eight of the 50 Article 81 cases audited in Brooklyn Supreme Court, the court evaluator was appointed guardian. Yet, because a primary responsibility of the court evaluator is to advise the court on whether a guardian should be appointed, this is a potential conflict of interest in some cases, raising an appearance of impropriety. An even more serious concern arises when the court appoints the attorney for the AIP as the guardian.

### *Limits on Lucrative Appointments may have been Widely Violated.*

As discussed, except in narrow circumstances, Part 36 prohibits a single appointee from receiving more than one fiduciary appointment within a 12-month period in which the anticipated compensation will exceed $5,000. The investigation and audits have identified

31

many individual appointees who received more than one appointment in a 12-month period for which they ultimately received compensation greater than $5,000. In most of these cases, however, it is extremely difficult to determine whether violations of the $5,000 rule occurred. This is because it is often not clear at the time of appointment what the total compensation, which is a function of a series of typically unpredictable factors such as the duration of the appointment, ultimately will be. For this reason, many have urged the Commission to recommend replacement of the $5,000 rule with a simpler, more enforceable limitation on appointments.

It is also apparent that, in many cases, fiduciaries avoid the restrictions of the $5,000 rule by deliberately reducing the amount of the compensation for which they seek court approval. For example, the investigation and audits have identified an exceptionally large number of fee applications in the $4,900 to $4,999 range. In fact, some fiduciaries have openly acknowledged in their fee applications that they were deliberately reducing their fee requests to avoid the strictures of the $5,000 rule.

### _Judges have Given Appointments to High-Level Participants in their Election Campaigns._

The investigation has revealed that a number of judges have given fiduciary appointments to high-level participants in their judicial election campaigns. Appointments were given to campaign managers, coordinators, treasurers and finance committee chairs. Some of these appointments were made within a year or two of the conclusion of the campaign.

32

## D.  Problems Identified by the Commission

The Commission's extensive study of New York's fiduciary appointment process has confirmed the existence of many of the problems noted above.  The Commission has also identified other problems in the appointment process.  Some of the additional problems are discussed below.

### The Current Fiduciary Lists are Largely Unusable.

Under the existing rules, judges are expected to select fiduciaries from the lists of candidates that OCA compiles for each county of the State.  In many jurisdictions, however, these lists contain thousands of names and are essentially unusable.  For example, the New York County list has over 5,700 names, the Kings County list over 4,700, the Nassau County list over 3,900, the Westchester County list over 3,000 and the Erie County list over 1,700.  The excessive size of these lists presents significant obstacles to judges seeking to use them in any sort of systematic way.[46]  Also, because the lists are not updated, they include many people who have retired, moved away or even died.

### Inclusion on the Lists is Essentially Automatic.

The existing rules require no qualifications for inclusion on the fiduciary lists.  There are no education or training requirements,[47] and no background or experience criteria.  In

---

[46]  *See, e.g.,* Testimony of Hon. Stanley L. Sklar, President of the New York City Association of Supreme Court Justices, December 7, 2000 public hearing.

[47]  Under the Mental Hygiene Law, judges are not authorized to appoint Article 81 fiduciaries unless the appointees have completed a training program approved by the Chief Administrator of the Courts.  *See* MHL §§ 81.39 - 81.41.  Part 36 does not, however, require completion of such a program for inclusion on the fiduciary list.

33

addition, other than relationship to a judge within the sixth degree, nothing disqualifies an individual from inclusion on the lists. Thus, convicted criminals, disbarred and suspended attorneys, bankrupts, individuals whom courts have removed as fiduciaries in prior cases for poor performance, and others who arguably should not be eligible for appointment now face no limitations on their names being included on the lists.

### _Certain Individuals Who Serve in a Fiduciary Capacity are not Covered by the Existing Rules._

A number of appointees who arguably serve in a fiduciary capacity and are paid from the assets of a party or the estate are not now subject to the existing rules. In some cases these appointments are made by the court; in other cases the individuals are retained by another fiduciary who has been appointed by the court. Those appointed by the court include: court examiners (who are appointed to review the reports and accountings filed by Article 81 guardians[48]); special needs trustees (who are appointed to establish trusts on behalf of incapacitated persons when funds remain after repayment of Medicaid liens); and private law guardians (who are appointed to protect the interests of children in matrimonial cases). Those retained by a fiduciary appointee include: counsel for Article 81 guardians (who are retained by guardians to handle legal, and often non-legal, matters); accountants for Article 81 guardians (who are retained by guardians to handle tax and other financial matters); and assistants to guardians ad litem (who are retained by guardians ad litem to perform investigative and other tasks).

---

[48] _See_ p. 10, _supra_.

34

None of these appointees are governed by the fiduciary rules. Thus, they do not file the required forms, and they are not subject to the limitations that apply to other fiduciaries, such as the prohibition on appointment of judges' relatives and the $5,000 rule.

### *Public Funds are not Available to Compensate Fiduciaries in Indigent Cases.*

In a great many cases in which fiduciaries are appointed, particularly many Article 81 cases, the individual for whom the appointment is made has minimal or no assets. Unlike in other types of cases involving indigent litigants, such as criminal cases and most Family Court cases, institutional offices and private lawyers generally do not receive public funds to handle these assignments. Accordingly, the appointments become pro bono assignments, which can often impose unreasonable demands on those called upon to handle them. For example, at the public hearing that the Commission held in Buffalo, representatives of a legal services office testified at length about the tremendous time commitment and other pressures on their office that arise when the office is appointed without compensation as guardian in an Article 81 proceeding.[49] The same concerns have been raised by private attorneys who have undertaken these pro bono assignments. This has led to a practice that some (though not all) have condemned -- the tendency of some judges to reward private attorneys who have taken pro bono fiduciary appointments with lucrative appointments when they become available.

---

[49] Testimony of Karen Nicholson, Esq. and Helen Ferraro-Zaffram, Esq., of Legal Services for the Elderly, Disabled and Disadvantaged of Western New York, Inc., November 29, 2000 public hearing.

35

### *Laypersons Believe They Have Nowhere to Go with Questions and Complaints.*

At its public hearing in New York City, the Commission heard a litany of complaints from individuals who were parties, or had relatives or friends who were parties, in cases in which fiduciaries were appointed.  The Commission also received numerous letters and written submissions from other complainants.  Although the Commission had neither the resources nor the mandate to investigate these complaints, it is apparent that there is widespread mistrust and confusion among many people who are directly affected by fiduciary appointments.  Much of this results from what the Commission has concluded is a widely-held perception that the court system and its representatives are not available to answer questions and investigate complaints that ordinary citizens have about the fiduciary process.