## IV.   CONCLUSIONS AND RECOMMENDATIONS

On the basis of its extensive examination of New York's fiduciary appointment process, the Commission has concluded that there are significant flaws in the current system. These flaws are present at every stage of the process: in the procedures by which individuals qualify for appointment; in the lists judges are expected to use in selecting appointees; in the provisions that seek to limit the number of lucrative appointments that individual appointees may receive; in the judicial scrutiny of applications for fiduciary compensation; and in compliance with the filings required of judges and appointees.

The Commission has identified a series of reforms, discussed below, that can vastly improve the current process.

### A. <u>Eligibility and Qualifications</u>

Under the existing rules, anyone who applies (other than a relative of a judge within the sixth degree of relationship) can automatically have his or her name added to the OCA fiduciary list, thus becoming eligible for fiduciary appointments. In the Commission's view, it makes little sense to establish appointment lists, and expect judges to use them in selecting fiduciaries, if there are no criteria that render individuals eligible or ineligible for inclusion on the list. The Commission believes applicants should have to meet at least one critically important qualification -- fiduciary training -- to become eligible for the fiduciary list. At the same time, certain factors should render individuals ineligible for the list.

37

### *Training Should be Required for Inclusion on the Fiduciary Lists.*

By statute, persons appointed in Article 81 cases as court evaluators, guardians or court examiners must complete a training program approved by the Chief Administrator of the Courts.[50]  These appointees need not, however, complete a training program to be included on the OCA fiduciary list.  Other types of fiduciary appointees are subject to no training requirements at all, either to be eligible to receive appointments or for inclusion on the OCA list.  A number of judges and bar association representatives have recommended to the Commission that mandatory training be extended to all categories of fiduciary appointees, and that training be required not only to receive an appointment but to be included on the OCA list as well.

The Commission agrees with these recommendations, and proposes that training programs approved by the Chief Administrator of the Courts be required for all those seeking inclusion on the OCA list.  In particular, persons seeking inclusion on the lists for appointment as a "primary" fiduciary -- receivers, referees, Article 81 fiduciaries and guardians ad litem -- should be required to complete a training program on the substantive issues pertaining to that particular fiduciary category.  For example, an individual applying for consideration as a receiver and also as a guardian ad litem should be required to complete a separate program for each of those fiduciary categories.  In addition to the relevant substantive training, the programs should include instruction on the rules governing fiduciary

---

[50]  MHL §§ 81.39 - 81.41.

appointments and the filings required of fiduciaries. Persons seeking inclusion on the lists for appointment as a "secondary" fiduciary[51] should also be required to complete a training program, but their training could be limited to instruction on the rules and the filings.

Continuing training of those who have completed the initial training and been included on the list should be required when necessary, such as when major changes in the law are enacted. In addition, all training programs should apply for Continuing Legal Education accreditation (*see* 22 NYCRR Part 1500), so that attorneys who complete fiduciary training receive CLE credit.

### *State and County Political Party Leaders Should be Ineligible for Appointment.*

Among the fiduciary appointments in recent years that have generated the greatest criticism have been those received by political party leaders and their law firms (*see* Section III). Party leaders exercise considerable influence over the judicial nomination and selection process. The sheer number of appointments that they and their law firms have received thus raises a troubling perception that political considerations may be influencing these appointments.

Accordingly, the Commission recommends that State and county political party chairs, and their immediate relatives, be prohibited from receiving fiduciary appointments while they serve in that position and for a period of two years after they step down. Recognizing that this ban would not be effective if the partners or employees of political

---

[51] The Commission's recommendations concerning which "secondary" appointees should be subject to the fiduciary rules are discussed on pp. 51-52, *infra.*

party chairs who are lawyers could still receive appointments, it is further recommended that the same prohibition apply to the partners, legal associates and other employees of the political party chairs' law firms.

The Commission also debated whether, as some have suggested, a prohibition on receiving appointments should apply to elected officials. Fiduciary appointment of elected officials raises many of the same concerns that arise from the appointment of political party leaders. For several reasons, however, the Commission decided not to recommend such a ban. It was generally agreed that prohibiting *all* elected officials from receiving appointments would be overinclusive; yet it would be extremely difficult to delineate which elected officials should be banned and which should not. Moreover, although elected officials have received fiduciary appointments, the investigation and audits have not revealed that they have received large numbers of appointments or particularly high-paying appointments. One explanation for this may be that, unlike political party leaders, who are not elected to their party positions (although they may be elected officials in other capacities), elected officials are subject to the ultimate check of the voters.

### *Immediate Relatives of Higher-Level Nonjudicial Employees Should be Ineligible for Appointment.*

As discussed, under the existing rules relatives of judges within the sixth degree of relationship are ineligible for fiduciary appointments. No similar ban applies to relatives of nonjudicial employees of the court system, even though many of the same perceptions of favoritism can arise when their relatives receive court appointments, particularly when the

employees are higher-level officials. As noted in Section III, immediate relatives of higher-level nonjudicial employees have received numerous appointments.

The Commission recommends that relatives of nonjudicial employees at or higher than grade 24 be prohibited from receiving fiduciary appointments.[52] However, because judges, and not nonjudicial employees, actually make the appointments, this prohibition need not be as broad as the prohibition on appointment of relatives of judges -- prohibiting the appointment of *immediate* relatives (spouses, parents and children) of nonjudicial employees is sufficient.

### *Limitations Should be Imposed on Former Judges Receiving Appointments.*

Fiduciary appointments of former judges have also generated concern and criticism. Some former judges have received an inordinate number of appointments, and others have received extremely lucrative appointments, in some instances shortly after they left the bench. The Commission recognizes that former judges often may be among the most qualified individuals to handle fiduciary assignments. At the same time, however, their appointment raises a serious perception that sitting judges may be rewarding their former colleagues.

In an attempt to strike the proper balance between these competing interests, the

---

[52] These are the nonjudicial employees who are required to file an annual financial disclosure statement. *See* 22 NYCRR § 40.2(a). To the extent that there may be some chief court clerks in some of the upstate counties at grades lower than grade 24, their relatives should be prohibited from receiving fiduciary appointments as well.

Commission recommends a prohibition on former judges (and their relatives within the sixth degree of relationship) receiving fiduciary appointments for a two-year period after leaving the bench. A two-year ban would be similar to other existing rules, such as the two-year ban on former State appellate judges practicing in their former courts[53] and the two-year ban on former State government employees practicing or appearing before their former agencies.[54] And it would enable the courts to continue to reap the benefits of the experience and skill of former judges, but only a reasonable period of time after they step down from the bench.

A two-year ban on appointments should also apply to former higher-level nonjudicial employees (as defined above) and their immediate relatives.

### *Disbarred and Suspended Attorneys Should be Ineligible for Appointment.*

Clearly, attorneys who have been disbarred or suspended from the practice of law should not be eligible for fiduciary appointments during the period of their disbarment or suspension. The Appellate Division and the Office of Court Administration should arrange that OCA receive notice of disbarments and suspensions so that it may remove those attorneys from the fiduciary lists. Attorneys who are reinstated to the bar or whose suspensions have terminated should be eligible for appointments, but the disclosure required in the current application for inclusion on the OCA fiduciary list -- which calls for disclosure (with details) of any prior discipline by the grievance committee or the Appellate Division,

---

[53] 22 NYCRR § 16.1.

[54] Pub. Off. Law § 73(8).

including any pending disciplinary proceedings -- should be continued.[55]

### *Criminal Offenders Should be Ineligible for Appointment.*

Persons convicted of a felony offense should be permanently ineligible to receive fiduciary appointments. The only exception should be if the convicted felon receives a certificate of relief from disabilities,[56] and in that situation the individual should have to disclose the conviction in the application for inclusion on the OCA fiduciary list.

Persons convicted of a misdemeanor offense should be ineligible to receive fiduciary appointments for a five-year period following their sentencing. Again, the only exception should be if the offender receives a certificate of relief from disabilities, and he or she should still have to disclose the misdemeanor conviction in the fiduciary application. Moreover, in general, the criminal history disclosure required in the current fiduciary application -- convictions of all crimes and offenses, other than traffic violations -- should be continued.

### *Information Regarding a Fiduciary's Bankruptcy History Should Continue to be Available.*

Persons who have been adjudicated bankrupt may not be the ideal candidates for fiduciary appointments, which often require the appointee to manage the finances of another individual or a business. Nevertheless, because federal law protects the rights of bankrupts to enjoy most of the privileges and benefits available to other citizens, it may not be lawful

---

[55] As discussed in Section II, these applications are available to all judges in hard copy form and on the OCA fiduciary database.

[56] The circumstances in which a certificate of relief from disabilities may be issued are set forth in Article 23 of the Correction Law.

to render bankrupts ineligible for fiduciary appointments.  Rather, so that judges and others have access to this relevant information, the disclosure of a fiduciary's bankruptcy history currently required in the fiduciary application should be continued.[57]

### *Procedures Should be Adopted to Remove Fiduciaries From the List for Good Cause.*

No policy now exists regarding removal of an individual from the fiduciary list. Appointees who are derelict in their fiduciary duties, fail to file the required forms, engage in inappropriate billing practices or commit other misdeeds can be replaced as fiduciaries in individual cases.  But there are no procedures in place to remove them from the list so that other judges do not unwittingly select them for future appointments.

The Commission recommends that the rules be amended to authorize the Chief Administrative Judge to remove an individual from the fiduciary list for good cause.  The Chief Administrative Judge could act after receiving a complaint from a judge or litigant, upon a recommendation of the Special Inspector General for Fiduciary Appointments or based upon any other reliable information.

## B. The Appointment Process

Some of the more difficult issues that the Commission examined involved the procedures governing the appointment of fiduciaries.  These include matters concerning how a fiduciary should be selected, what role the fiduciary lists should play in this process and

---

[57] The application requires that the individual disclose, with details, whether any petition in bankruptcy has ever been filed by or against him or her.

44

whether limitations should be imposed on the number and nature of the appointments that individual appointees may receive. The Commission's recommendations follow.

### *Judges Should Have Full Authority to Select the Fiduciary.*

A seminal issue that the Commission addressed is the question of how a fiduciary should be selected. A few individuals and organizations, most notably the Association of the Bar of the City of New York, have recommended that a strict, or blind, rotational appointment system be adopted, with appointees randomly selected by computer from the OCA fiduciary list. Proponents of this approach point out that it would effectively eliminate any perception that favoritism or other inappropriate factors influence the appointment process. Although a strict rotational system is used to select bankruptcy trustees in U.S. Bankruptcy Court, the Commission is unaware of any state that has adopted this approach.

Others have suggested a variation on the strict rotational system. Under this approach the judge would select the fiduciary, but from a small list of names randomly generated from the OCA list. Yet another variation would be to allow the judge to depart from the randomly generated list, but a judge who did so would be required to provide a satisfactory reason. This is similar to the system now being used in Massachusetts.

The great majority of those who shared their views on this subject with the Commission strongly favor preserving the full authority of judges to select the fiduciary. They point out that potential candidates for a fiduciary appointment typically possess widely varying skills and expertise. They further note that cases in which fiduciaries are appointed can raise different issues and problems, and thus require particular services and talents. As

a result, they argue, any system in which fiduciaries are randomly assigned will frequently fail to match the appropriate appointee to the appropriate case. Although judges themselves sometimes have difficulty making the correct match in some cases, they do a far better job than would a system of random selection.

There was considerable interest among Commission members in a rotational system for selection of fiduciaries. But after careful analysis of this difficult question the Commission has concluded that, assuming the recommendations set forth in this Report are implemented and prove to be effective in redressing existing problems in the fiduciary appointment process, judges should continue to have full authority to select the fiduciary. This is because, in selecting a fiduciary, the paramount objective must be to choose an individual who will provide quality service to the court, the parties and others affected by the litigation. That goal is best achieved when judges, in the exercise of their discretion, select a candidate with the skills and background needed to meet the task at hand.

The Commission recognizes that leaving the selection decision entirely to judicial discretion creates a risk of inappropriate factors influencing appointments. But that does not justify removing the selection authority from the judges, particularly where there are other steps, as outlined in this Report, that can be taken to minimize this risk.

### *Judges Should Select Fiduciaries From the OCA List.*

The fiduciary rules should make clear that judges should select fiduciaries from the OCA list. Public perception of the fairness of the appointment process, moreover, would be enhanced if judges made every effort to appoint individuals with diverse backgrounds and

experiences, including minorities, women and younger persons.

In certain situations, however, judges may have reason to appoint a fiduciary who is not included on the list. For example, an individual not on the list may have a particular expertise required in the case or may have some previous involvement with the case or the parties. In these and other limited situations, judges should have authority to appoint someone not on the list, but when they do so they should be required to provide a reason in writing. Appointees who are not on the list, however, should still have to demonstrate that they could qualify for inclusion on the list -- that is, that they meet all the criteria for such inclusion.[58] Furthermore, they should be required to make the same filings as are required of those on the list.

### *Specialized Fiduciary Lists Should be Created.*

If judges are to be expected to select fiduciaries from the OCA list, as we recommend, significant changes must be made in the current list. First, criteria must be established so that it is no longer essentially "automatic" for anyone to be added to the list. The eligibility/qualification requirements proposed above, including the mandatory training requirement, should go a long way toward making inclusion on the list a more meaningful status. Second, in many counties the current lists are simply too large. One relatively simple way to address this problem is to create specialized lists based on the fiduciary category for

---

[58] This includes the proposed training required for inclusion on the fiduciary list (*see* pp. 38-39, *supra*), although the judge should be authorized to waive the training requirement if it would be impracticable, such as where the appointment will be of a short duration.

which the applicant is seeking appointment. Although some applicants request consideration for more than one category (or even for all categories), many do not. And if, as the Commission has recommended, training is required for inclusion on the list, a greater number of applicants will be more discriminating in the fiduciary categories for which they seek appointment. Specialized lists thus would be significantly smaller than a single, all-encompassing list and, as a result, far more usable.

Some have also suggested that the lists be categorized based on the experience of the applicants, similar to the programs that counties across the State have established to assign counsel to indigent criminal defendants. These "18-B" programs[59] typically include a misdemeanor panel, a felony panel and a homicide panel, with ascending levels of experience required for each. Although this idea is worthy of further exploration, the Commission is not prepared at the present time to recommend that the fiduciary lists be categorized based on experience. In the Commission's view, it would be extremely difficult to develop fair criteria for determining which applicants should be assigned to which categories. In addition, establishing and maintaining these panels would require extensive effort and resources, akin to that involved in the assigned counsel panels.

### *Re-registration Should be Required for All Those on the Fiduciary List.*

Another way to reduce the size of the fiduciary lists is to require periodic re-registration. The current list contains the names of hundreds, if not thousands, of individuals

---

[59] *See* County Law Article 18-B.

who have retired or are no longer available for fiduciary appointments.  A re-registration requirement would provide a relatively simple means of removing these persons from the list.

The Commission recommends that re-registration be required every two years.  The re-registration form should be a shorter version of the original application form, requiring that the applicant simply note any changes from the original application.

### *Additional Types of Appointees Should be Governed by the Fiduciary Rules.*

The Commission has identified a number of additional court appointees who serve in a fiduciary capacity but are not currently subject to the regulation of the fiduciary rules. Court examiners, who are appointed by the court to review the reports and accountings filed by Article 81 guardians and are paid from the incapacitated person's assets, are selected from lists compiled by the Appellate Division and are not subject to the filing and other requirements of the fiduciary rules.  The Commission has discerned no reason why court examiners should be treated any differently from other Article 81 appointees, and recommends that they be selected by the appointing authority from the OCA fiduciary list and governed by all other provisions of the fiduciary rules.[60]

Special needs trustees are usually appointed to establish and administer a trust (a special needs or "SNT" trust) so that a disabled person may continue to maintain Medicaid eligibility after receiving a substantial personal injury award.  In carrying out their duties,

---

[60] This recommendation is supported by the Appellate Division, First Department.  In fact, the First Department has considered going even further and establishing a pilot program in which court employees, or possibly an independent contractor, would perform the functions currently handled by court examiners.

they perform tasks similar to that of a guardian of property. These appointees, who receive their fees from the proceeds of the trust, should be subject to the fiduciary rules.

Judges in matrimonial cases make appointments that several bar associations and judges have maintained should be subject to regulation and disclosure. Guardians ad litem are appointed in matrimonial cases to investigate and report back to the court on particular issues, and their fees are paid by the parties. As such, they perform a function similar to that of guardians ad litem in Surrogate's Court cases. Although the current fiduciary rules could be read as applying to them, many courts have not viewed these appointees as subject to the rules. The Commission recommends that the rules make clear that they apply to these appointments.

In addition, in recent years "privately paid" law guardians are being appointed in increasing numbers to represent the interests of children in matrimonial cases. These appointees usually are selected from law guardian panels that the Appellate Division Departments designate pursuant to the Family Court Act.[61] Although the distinctions between privately paid law guardians and guardians ad litem are not always clear (in both instances fees are paid by the parties), in general the guardian ad litem serves the interests of the court whereas the law guardian performs the more traditional role of a lawyer serving the interests of the child. Given that designation of law guardian panels is a statutory

---

[61] *See* Fam. Ct. Act § 243(c). Panel members are assigned primarily in Family Court cases. Each of the Appellate Division Departments has established eligibility criteria and an extensive screening process for inclusion on the panels.

50

responsibility of the Appellate Division, the Commission does not recommend that privately paid law guardians be selected from the OCA fiduciary list. Nevertheless, it is recommended that these appointees be subject to the other requirements of the Part 36 rules, and that Part 26 be amended to make clear that judges must report the compensation they approve for privately paid law guardians.[62]

### *Additional Types of "Secondary" Appointees Should be Governed by the Rules.*

As was recently emphasized, "secondary" appointees in receivership cases are subject to the fiduciary rules and must be appointed by the court, not by the "primary" fiduciary (*see* pp. 29-30, *supra*). The Commission recommends that other types of "secondary" appointees who currently are retained by court-appointed fiduciaries should also be treated as fiduciaries subject to all of the applicable rules. These assignments, which have become quite common and can involve substantial fees, include: counsel for Article 81 guardians, who are retained to handle legal matters on behalf of the incapacitated person; accountants for Article 81 guardians, who are retained to handle tax and other financial matters on behalf of the incapacitated person; and assistants to guardians ad litem, who are retained to perform investigative and other tasks. As is true in the receivership cases, the primary fiduciary

---

[62] Some have also suggested that court-appointed experts in matrimonial cases (whose fees are paid by the parties), such as psychologists who provide opinions on custody issues and financial experts who provide valuations of marital property, should be subject to some sort of reporting requirement. The Commission agrees, and recommends that the court system make clear to judges that they should be reporting the compensation they approve for these experts, in accordance with Part 26 (which requires reporting of compensation not only for fiduciary appointments but for a broader group of court appointments).

51

should be able to request that the court appoint a particular individual for one of these assignments, but the rules must make clear that the actual appointment is to be made by the court.

### *New Limits Should be Imposed on the Number of Higher-Paying Appointments that Individual Fiduciaries may Receive.*

Many have urged the Commission to devise a more workable limitation on the number of higher-paying appointments that individual fiduciaries may receive.  Most view the existing $5,000 rule -- which requires a prospective fiduciary appointee to anticipate at the time of appointment whether his or her ultimate compensation will exceed that threshold -- as highly confusing and largely unenforceable. The Commission agrees that the $5,000 rule, at least by itself, is an ineffective means of preventing the concentration of higher-paying appointments in a few individuals.

Several alternatives have been suggested.  Some have proposed that limits be imposed on the number of appointments that an individual may receive within a specified time period. For example, once an individual receives, say, five appointments in a 12-month period, he or she would be ineligible for an appointment for another year.  In the Commission's view, such a rule would be unwise.  It would do nothing to prevent the assignment of five highly lucrative cases to an individual appointee every year; and it would have the undesirable effect of preventing an individual appointee who had received five extremely low-paying cases from receiving any additional cases during the next year.

A more sensible approach is to limit future appointments based on the amount of

compensation that an appointee has received over a given time period. Once an appointee has been awarded a threshold amount of compensation in all of his or her fiduciary assignments during any 12-month period -- the Commission recommends the threshold be $25,000 -- the appointee would be ineligible for another appointment for an additional 12-month period. For example, an individual who actually received $10,000 on March 1 for compensation in one case, $10,000 on April 1 for compensation in a second case and $5,000 on May 1 for compensation in a third case would not be eligible again for a fiduciary appointment until the following May 1. This would provide a clearer rule that would not require anyone to anticipate what the ultimate compensation might be in any case. And it would provide an effective means of preventing the type of deliberate under-billing -- that is, the spate of billings between $4,500 and $4,999 -- that has been used to evade the limitations of the existing $5,000 rule.

Although fully aware of the problems with the $5,000 rule, the Commission does not advocate its elimination. If combined with the $25,000 rule outlined above, the $5,000 rule can still serve a useful purpose. That is because the proposed $25,000 limitation, by itself, does nothing to prevent an appointee who has received potentially lucrative appointments for which he or she has not yet been compensated from receiving unlimited additional potentially lucrative appointments. For example, an individual who received an appointment on March 1 in a case in which it was expected that the ultimate compensation would be tens of thousands of dollars could receive another similarly lucrative appointment on April 1 and yet another similarly lucrative appointment on May 1, so long as he or she had not yet

actually received compensation exceeding $25,000. Despite its shortcomings, retention of the $5,000 rule can provide some protection against such a result.

### *Judges Must be More Scrupulous in Reviewing Applications for Compensation.*

The investigation and audits have identified numerous receivership and guardianship cases in which judges approved legal fees for services that were not of a legal nature. It is sometimes necessary in these cases for legal counsel to handle litigation and other matters that clearly demand the services of an attorney. In far too many of the cases, however, counsel were compensated at hourly legal rates for work that the guardians or receivers should have performed as part of their ordinary duties. For example, counsel billed and were compensated for preparing routine reports and accountings, precisely the type of work that the receiver or guardian should have performed. The apparent motivation for the receivers and guardians to retain counsel to perform this work is that receivers and guardians are usually paid on a percentage basis (for receivers, a percentage of the amounts collected and disbursed; for guardians, the same standard or in some cases a percentage of the incapacitated person's assets), not on an hourly basis. Thus, they generally will receive the same compensation regardless of the amount of work they devote to the case. Receivers and guardians have an incentive, therefore, to retain others to perform this work because it will mean less work for the receiver or guardian without reducing their compensation. In the most extreme cases, of which there are many, receivers and guardians hire themselves (or their law firms) to perform this work.

Judges should not be permitting this to occur. First, judges, should not appoint

counsel to the receiver or counsel to the guardian[63] unless it is clear that counsel will be performing services of a legal nature. Second, unless there is some convincing reason to do so -- such as a significant cost savings -- judges should not appoint the receiver or guardian as his or her own counsel. Finally, judges must be far more scrupulous in reviewing fee applications: they should flatly refuse to approve compensation to counsel, or they should compensate them out of amounts that otherwise would go to the receiver or guardian, for services that should have been performed by the receiver or guardian.

The Commission urges judges to follow these recommendations and bring these troubling billing practices to an end. If over a period of time it becomes apparent that these practices are continuing, court administration should consider pursuing more affirmative measures through administrative rulemaking or legislation.

### *Limits Should be Imposed on Appointment of Other Article 81 Fiduciaries as the Guardian.*

In Article 81 cases, it is not unusual for the court, after determining that a guardian should be appointed, to name the court evaluator as the guardian. This may raise an appearance of a conflict of interest, because the court evaluator's primary responsibility is to recommend whether a guardian should be appointed for an alleged incapacitated person (AIP). In many cases, however, particularly those in which there are minimal assets, it may be economically prudent to name the court evaluator, who will have acquired familiarity with

---

[63] As discussed (*see* pp. 51-52, *infra*), judges, and not the primary fiduciaries, should be appointing the counsel.

the case and may have established a working relationship with the incapacitated person, as the guardian. Accordingly, the Commission recommends that, as a general rule, the court evaluator should not be appointed as the guardian. In cases involving minimal assets or other extenuating circumstances, however, appointment of the court evaluator as guardian might be appropriate, but the court should provide a reason in writing when doing so.

The Commission has reached a different conclusion as to the attorney for the AIP. Unlike the court evaluator, who is appointed to investigate the facts and make recommendations to the court, the attorney for the AIP is appointed strictly as an advocate for the AIP. Thus, appointment of the attorney as the guardian, or even as counsel to the guardian, raises more serious conflict of interest concerns. The Commission recommends that this never be authorized.

## C. Oversight of the Appointment Process

Perhaps the best deterrent against abuses in fiduciary appointments is full and open disclosure of the appointment process. Providing the public with meaningful information about which judges are making appointments, which appointees are receiving appointments and how much the appointees are being paid can go a long way toward ensuring that appointments are not influenced by favoritism, politics or other inappropriate factors. Regrettably, the oversight system that was in place over the past years failed to accomplish this. As is discussed in Section III, compliance with the fiduciary filing requirements was wholly deficient. This denied the public a complete and accurate picture of the appointment

56

process, allowing for an environment in which many inappropriate appointments and other abuses were able to escape necessary scrutiny.

Fortunately, the court system has now implemented major changes in oversight procedures. Based largely on interim recommendations that the Commission forwarded to Chief Judge Kaye and Chief Administrative Judge Lippman, a revamped, comprehensive oversight program was instituted in March 2001 (a copy of the Commission's interim recommendations is attached as Appendix E). Under the new program, a special fiduciary clerk, reporting to the District Administrative Judge, has been designated in each of the judicial districts across the State.[64] The fiduciary clerk sends all relevant forms to the fiduciary appointee, receives completed forms back from the appointee and then sends the completed forms to OCA and places copies in the court file. Before seeking approval of compensation, the appointee must obtain written confirmation from the fiduciary clerk that the required forms have been filed. When the judge approves compensation, the judge submits the compensation form to the fiduciary clerk, who sends the form on to OCA. In addition to these responsibilities, the fiduciary clerk also regularly monitors the OCA fiduciary database to ensure that OCA has accurately entered all necessary appointment and compensation information. Under the new program, information will be made available on a regular basis to appropriate legal newspapers and other periodicals of the names of all fiduciaries appointed, all payments made to fiduciaries and the judges who made such

---

[64] In the Surrogate's Courts in New York City, the special fiduciary clerk reports to the respective Surrogate.

appointments and authorized such payments.   Chief Administrative Judge Lippman's memorandum to the Administrative Judges outlining the new oversight procedures and the Administrative Judges' new responsibilities is attached as Appendix F.[65]

These new procedures will result in a vastly improved oversight system, and the Commission is pleased that its recommendations were acted upon so promptly.   The following are some additional recommendations to improve the oversight process.

### All Persons on the Fiduciary List Should be Assigned an Identifying Number.

As is discussed in Section III, individual fiduciaries are frequently listed under multiple names in the OCA fiduciary database.  To avoid this, everyone on the fiduciary list should be assigned an identifying number, perhaps the last four digits of their social security number (which is the attorney identification procedure used in the federal courts).  Fiduciary appointees would be required to include their number on all forms and papers they submit. This would eliminate confusion when fiduciary forms are received as to who the individual is, and ensure that a single name is used for every fiduciary in the database.

### Law Firms Should Report More than $25,000 in Fiduciary Compensation.

The public has an interest in knowing if a law firm, as an entity, has received substantial fees from fiduciary appointments.  Although fiduciary compensation received by individual attorneys can be tracked in the database, there is no way of knowing the collective sums that an individual law firm receives.  Accordingly, the Commission recommends that

---

[65] A similar memorandum was sent to the New York City Surrogates.

law firms whose members and employees receive a total of more than $25,000 in fiduciary fees in a single calendar year be required to report such amounts to OCA. The information would be entered in the fiduciary database, and it would be regularly provided to legal newspapers and other periodicals for publication.

### *Compensation Should be Reported to OCA in All Cases, Even Those in Which No Compensation is Received.*

Under current law, judges are required to submit an approval of compensation statement to OCA only if the compensation approved exceeds $500. Many judges and lawyers have recommended that all fiduciary compensation be reported to OCA, even if no fee is paid. They maintain that the current rule prevents the public from learning of the large numbers of fiduciary assignments that appointees accept for which they receive minimal or no fees. If the extent of these "pro bono" assignments was more widely known, it is argued, the public would be less critical of the far smaller number of lucrative appointments that fiduciaries receive.

Although the Commission has some concerns about the additional burdens this could impose on judges and court personnel, it recognizes that reporting of compensation in all cases (including pro bono cases) would provide a more realistic view of the process. The reporting requirement should not apply, however, to referees in mortgage foreclosure cases -- who receive set fees that rarely exceed the $500 threshold -- except when their fees in fact exceed that threshold.

### *Periodic Audits Should be Conducted of the Fiduciary Filing Process.*

Although the new oversight program holds great promise, its effectiveness should be periodically evaluated by OCA's auditing staff. The audits should include examination of court files, fiduciary clerks' records and the OCA fiduciary database to determine whether all required forms are being filed, judges are refusing to approve compensation if forms have not been filed and information from the forms is being accurately entered in the database. Any continuing problems with the filing process should be identified and immediately addressed by court administrators.

## D. **Additional Recommendations**

### *The Revised Fiduciary Rules Should Include a Preamble.*

During the course of the Commission's work, a number of individuals suggested the need for an official articulation of the purposes of the fiduciary rules. The Commission believes there should be no confusion about the rules' objectives, and that a brief preamble setting forth those objectives should be incorporated into the revised rules. The preamble should plainly state that the rules are intended to ensure that fiduciaries are to be selected solely on the basis of merit, without favoritism, nepotism or the influence of other factors unrelated to the appointee's qualifications or the needs of the case. The preamble also should state that, because it is impossible to draft rules addressing every situation to which they should apply, judges who make fiduciary appointments should always be mindful of general ethics principles and the importance of avoiding the appearance of impropriety and

favoritism.  A proposed preamble is attached as Appendix G.

### *Judges Should Receive Training on the Fiduciary Appointment Process.*

In addition to mandatory training for fiduciary appointees, judges who make fiduciary appointments should receive instruction on the fiduciary rules and their application.  This instruction should be a regular component of the annual judicial seminars, and it should be permanently incorporated into the training program for newly elected and newly appointed judges.

### *The Court System Should Designate an Ombudsman to Provide Information and Field Complaints About the Fiduciary Process.*

Many laypersons contacted the Commission in the past year with questions and complaints about the fiduciary process.  The Commission also received extensive testimony at its public hearings on the frustrations that laypersons have experienced with the process. While it was impossible for the Commission to investigate the complaints or answer all of the questions that were raised, it is apparent that there is a great need for the court system to designate staff to perform this function.  We strongly recommend this, and suggest that the Office of the Special Inspector General for Fiduciary Appointments might be an appropriate entity to which this responsibility could be assigned.

### *Public Funds Should be Available to Compensate Article 81 Guardians in Cases Involving Minimal or No Assets.*

The Commission heard from many attorneys about the burdens imposed on those who are enlisted by the courts to serve as Article 81 guardians in cases in which the incapacitated person has minimal or no assets.  These "pro bono" assignments are taken on not only by

private attorneys but by legal services offices as well. The assignments are particularly burdensome, typically far more so than other pro bono assignments, because they often require considerable attention during non-business hours and they can last for any number of years. Moreover, the need to assign private attorneys to these cases has led to a practice that some have criticized -- some judges reward those who take pro bono cases with lucrative fiduciary assignments when they become available.

The Commission believes that a serious effort should be made to earmark public funds to compensate guardians in these cases. One option is the creation of a public guardian office, which a number of other states and many counties across the nation have established. Another option is the creation of an "18-B" type program for guardianship assignments. A third option is to fund existing legal services offices or public and private social service agencies to handle the assignments. These options, and other possible approaches, should be carefully studied, perhaps by a committee of experts in this area designated by the court system.

Additionally, the court system should take one immediate step -- albeit a relatively small one -- to address this problem. Recently, the Continuing Legal Education rules were amended to provide limited CLE credit for "performing uncompensated legal services for clients unable to afford counsel pursuant to . . . assignment by a court."[66] Service as a guardian probably does not qualify as "legal services" -- indeed, a guardian need not even

---

[66] 22 NYCRR § 1500.22(j).

be an attorney. Accordingly, this provision should be amended to provide that attorneys who perform uncompensated services as a guardian are eligible for CLE credit.

### *Where Practical, Article 81 Cases Should be Assigned to a Small Group of Judges in Each Jurisdiction.*

It had been the practice in some of the larger judicial districts to assign all Article 81 cases in a county to a single judge. This practice promoted efficiency because the judges developed expertise in handling the highly specialized issues and problems that arise in Article 81 cases. Moreover, pursuant to State law, these cases must be resolved in an expedited fashion.[67] Concerns can arise, however, if a single judge in a large county is responsible for making all of the numerous, and sometimes lucrative, fiduciary appointments that must be made in Article 81 cases.

The Commission believes that the opposite approach -- assigning Article 81 cases to the full complement of judges in a county -- is inefficient, especially in the larger counties. Accordingly, the Commission supports the court system's recent decision to assign Article 81 cases in most of the downstate counties to a small group of judges, and recommends that this approach be expanded to additional counties where it is practical to do so. This promotes efficiency while ensuring that appointments are not concentrated in a single judge. The Commission further recommends that the groups of judges handling these cases be rotated periodically.

---

[67] *See* MHL §§ 81.07(a)(1), 81.13 (absent good cause, hearing must be conducted within 28 days, and decision rendered within 45 days, of filing of Article 81 petition)

### *An Administrative Support Office Should be Created as a Resource for Judges Handling Guardianship Matters.*

Given the highly specialized nature of guardianship cases, consideration should be given to establishing an administrative support office within the court system to serve as a resource for judges assigned to guardianship matters.  This office could develop uniform procedures and forms, organize regular training programs for judges and nonjudicial staff, approve training programs for Article 81 appointees,[68] better integrate technology into the work of the guardianship parts, propose appropriate rulemaking and legislative reforms and generally serve as a central source of expertise for judges and court personnel handling guardianship cases.

### *Attorneys Should not Contribute to Judges' Campaigns for the Purpose of Receiving Fiduciary Appointments.*

The Commission was greatly disturbed by the findings of a 1998 report of the Association of the Bar of the City New York that strongly suggested a connection between lawyers' contributions to two Surrogates' campaigns and the fiduciary appointments made by those judges.  As the Administrative Board of the Courts has stated, "pay to play" is wrong and is prohibited by the Code of Professional Responsibility, which governs lawyers' conduct.[69]  The Commission agrees with those conclusions, and has reviewed a number of proposals offered by the City Bar and others to curb the practice.  However, given the

---

[68] *See* MHL §§ 81.39 - 81.41 (requiring that such programs be approved by the Chief Administrator of the Courts).

[69] *See* "Statement of the Unified Court System on "Pay to Play," March 6, 2000.

Administrative Board's strong statement condemning this practice, and its decision not to take further action at this time, the Commission, with one exception, has declined to make specific recommendations in this regard.

The one exception concerns the appointment of high-level participants in judicial campaigns. The investigation has revealed that some judges have appointed their own campaign coordinators, managers, treasurers and finance chairs to fiduciary appointments. Some of these appointments were made within a year or two of the conclusion of the judicial campaign. In the Commission's view, such appointments raise serious perceptions of favoritism that reflect unfavorably on the judiciary as a whole. Accordingly, it is recommended that judges be prohibited for a two-year period following the judicial election from appointing persons serving in the capacity of their campaign coordinator, manager, treasurer or finance chair. It is also recommended that the two-year ban apply to these campaign officials' immediate relatives and law partners and associates.

## Commission Members

**Sheila L. Birnbaum, Esq. (Chair)**
Skadden, Arps, Slate, Meagher & Flom LLP; Member, United States Judicial
Conference Advisory Committee on Rules and Civil Procedure; former Chair,
New York State Advisory Committee on Civil Practice; former Member, American
Bar Association House of Delegates; former Associate Dean and Professor of
Law, New York University School of Law

**Roger Bennett Adler, Esq.**
Private Law Practice; former President, Network of Bar Leaders; former President,
Brooklyn Bar Association

**Hon. Seymour Boyers**
Gair, Gair, Conason, Steigman & Mackauf; former Associate Justice, Appellate
Division, Second Department; former Administrative Judge, 11th Judicial District

**Gary S. Brown, Esq.**
Chief Attorney, Westchester Regional Office, New York State Department of
Law; former Executive Director, Fund for Modern Courts

**George F. Carpinello, Esq.**
Boies, Schiller & Flexner LLP; Chair, New York State Advisory Committee on
Civil Practice; former Professor of Law, Albany Law School

**Howard A. Glickstein, Esq.**
Dean, Touro College, Jacob D. Fuchsberg Law Center; former Director,
President's Task Force on Civil Rights Reorganization; former General Counsel,
United States Commission on Civil Rights

**Patricia D. Hynes, Esq.**
Milberg Weiss Bershad Hynes & Lerach LLP; former Chair, Committee on
Federal Judiciary, American Bar Association; former Executive Assistant United
States Attorney (Southern District of New York)

**Hon. George D. Marlow**
Associate Justice, Appellate Division, First Department; Co-Chair, New York
State Advisory Committee on Judicial Ethics

**Hon. E. Leo Milonas**
Pillsbury Winthrop LLP; former Associate Justice, Appellate Division, First
Department; former Chief Administrative Judge of the Courts

**Anthony R. Palermo, Esq.**
> Woods Oviat Gilman LLP; former President, New York State Bar Association; former Secretary, American Bar Association

**John J. Reilly, Esq.**
> Reilly & Reilly; Member, Judicial Advisory Council, Nassau County

**Barbara Paul Robinson, Esq.**
> Debevoise & Plimpton; former President, Association of the Bar of the City of New York

**O. Peter Sherwood, Esq.**
> Kalkines, Arky, Zall & Bernstein, LLP; former Corporation Counsel, City of New York; former Solicitor General, State of New York

**Hon. Rose H. Sconiers**
> Justice, Supreme Court, 8th Judicial District; First Vice President, New York State Association of Supreme Court Justices

**Hon. Richard D. Simons**
> McMahon, Grow & Getty; former Associate Judge and former Acting Chief Judge, New York State Court of Appeals; former Associate Justice, Appellate Division, Third Department

**Hon. James N. White**
> Former Associate Justice, Appellate Division, Third and Fourth Departments; former Administrative Judge, 4th Judicial District

**Hon. Paul J. Yesawich, Jr.**
> Former Associate Justice, Appellate Division, Third Department; former President, Cortland County Bar Association; former Commission, New York State Law Revision Commission

## Counsel

Lawrence K. Marks, Esq.

**APPENDIX B**

## Individuals Who Met with the Commission

Rose Mary Bailly, New York State Law Revision Commission

Michael Cipollino, Chief Clerk, Suffolk County Surrogate's Court

Evan Davis, President, Association of the Bar of the City of New York

Carole de Fritsch, New York County Lawyers Association

Hon. Phyllis Gangel-Jacob, Supreme Court, New York County

Charles Gibbs, OCA Advisory Committee on Surrogate's Courts

Thomas Kilfoyle, Chief Clerk (Civil Term), Supreme Court, Kings County

Hon. Edwin Kassoff, Supreme Court, Queens County

Howard Krooks, Elder Law Section, New York State Bar Association

Craig Landy, President, New York County Lawyers Association

Hon. Diane Lebedeff, Supreme Court, New York County

Michael Miller, New York County Lawyers Association

Hon. Louis Palella, President, Supreme Court Justices Association (New York State)

Hon. Edward Rappaport, President, Supreme Court Justices Association (New York City)

Thomas Rice, President, New York State Bar Association

Josh Rubinstein, Trust and Estates Section, New York State Bar Association

Hon. Jacqueline Silbermann, Administrative Judge for Matrimonial Matters

Hon. Peter Wells, President, Surrogate's Association of the State of New York

John Werner, Chief Clerk (Civil Term), Supreme Court, New York County

Hon. Virginia Yancey, Supreme Court, Kings County

**APPENDIX C**

# Public Hearings

Buffalo, New York (November 29, 2000)

Karen Nicholson (Legal Services for the Elderly, Disabled or Disadvantaged)
Hellen Ferraro-Zaffram (Legal Services for the Elderly, Disabled or Disadvantaged)
Hon. Joseph Mattina (Erie County Surrogate)
Elizabeth Clark (Surrogate's Court Committee, Erie County Bar Association)
Hon. Norman Joslin (Supreme Court, 8th Judicial District)
Samuel Houston
Chris Brunea
Emmett Creahan (Mental Hygiene Legal Services, Fourth Department)
Hon. John Michalek (Supreme Court Justices Association, 8th Judicial District)

New York City (December 7, 2000)

Hon. Stanley Sklar (New York City Association of Supreme Court Justices)
Hon. Robert Lifson (Supreme Court, Suffolk County)
Klaus Eppler (New York County Lawyers Association)
Craig Landy (New York County Lawyers Association)
Hon. Abraham Gerges (New York State Association of Supreme Court Justices)
Steven Zeidman (Fund and Committee for Modern Courts)
Howard Krooks (New York State Bar Association)
Robert Kruger (Elder Law Section, New York State Bar Association)
Standish Smith (Heirs, Inc.)
Lori Duboys
Evelyn Goldberg
Jenny Williams
Barbara Reede (New York State Supreme Court Justices Auxiliary)
Darnell Smith
Robert Abrams
Pamela Carvel
Ashley Scharge
Adrienne Lefkowitz
Elena Sassower (Center for Judicial Accountability)
George Sassower
Albina Goldbetter

**APPENDIX D**



**DEMOCRATIC PARTY**

Kings County
Democratic County
Committee

Clarence Norman Jr.
Chair
Executive Committee

Pat V. Guadagnino
Vice Chair
Executive Committee

Steven D. Cohn
Secretary
Executive Committee

Joan L. Millman
Chair
County Committee

Lee A. Barba
Secretary
County Committee

Thomas J. Garry
Treasurer

Maryrose Sattie
Assistant Treasurer

Michael M. Freeman
Chair
Law Committee

Jeffrey C. Feldman
Executive Director

December 20, 1999

Michael M. Freeman, Esq.
Law Chairman
Kings County Democratic Party
16 Court Street
Brooklyn, New York 11241

Dear Michael,

It is with great unhappiness that we must inform you that we hereby resign our positions as members of the Kings County Democratic Law Committee.

It has become apparent that our diligent work and unquestioned loyalty to the Organization over the many years are clearly not as important as the desires of Mr. Ravi Batra. Although, Mr. Batra holds no party or elected position in our County, he has nevertheless, imposed himself on the political workings of our Organization for the sole purpose of his own personal financial gain.

Therefore, we will be unable to continue to represent candidates for elected and/or judicial office free of charge, as we have done so in the past. One cannot reasonably expect our firm to continue to avail to the Organization our professional services, the utilization of our employees, and the use of our office facilities, while the Organization sits idly by and permits Mr. Batra to maliciously injure our practice and reputation without consequence.

16 Court Street
Brooklyn, NY 11241
Tel (718) 875-5870
Fax (718) 596-4013

As I am sure that the facts surrounding our termination as Mr. Batra's attorneys on his numerous Court appointed Receiverships will be discussed by many members of our Organization, we feel it is now necessary to clarify the issues surrounding our recent termination.

As you have been made aware, on December 7, 1999, Mr. Batra, via facsimile correspondence, terminated our firm as his attorneys on all of his many Receivership matters; including the representation of Mr. Batra with respect to his Receivership of the Cypress Hills Cemetery. **It must be clearly noted that Mr. Batra stated in his termination letter of December 7, 1999, that his own firm will now represent him on all Receivership matters.** Mr. Batra claims that our firing was as a result of our firm's lack of competent legal representation. As you can personally attest, our firm is well recognized as an authority in the area of Receivership law. **I can assure you that any such claims are merely a transparent attempt to deflect attention from Mr. Batra's true motive of obtaining both the legal fees generated from these matters in addition to collecting a Receiver's commission from said cases.**

It is indisputable that our firm has done an excellent job in protecting the interests of our clients, a fact that can be attested to by many members of our own Organization. I must reiterate that Mr. Batra is merely attempting to secure legal fees for his own firm while continuing to collect commissions on these matters as well.

Although, we have the utmost respect and affection for you and the excellent work you have done as the Law Chairman, we are left with no alternative but to resign as members of the Law Committee. To continue on in our capacity as Law Committee members in light of Mr. Batra's inexcusable actions would be far too much to expect, given the fact that the Organization has permitted an individual **with no party position** or history in this County to dictate how our Organization is run. As Law Chairman you are well aware of the fact that Mr. Batra has never assisted the Law Committee on any level whether it be collecting signatures, binding petitions or trying an election law case, etc. In fact, it is unknown as to what Mr. Batra has accomplished in any capacity to benefit our Organization.

I cannot stress to you enough the sense of betrayal we presently are experiencing. Clearly, you recognize the unwavering loyalty and dedication our firm, as well as that of our predecessors, have shown to this Organization over the course of the past twenty five (25) years. It is unprecedented and disheartening how one man's greed and self absorption can go so unchecked. Simultaneously, such an act reduces the credibility of the once

most powerful political organization in the nation, to an Organization that permits unprovoked attacks by an outsider without consequence.

It is unfathomable that such action would be tolerated by any other political organization within this City or State. It is quite evident that permitting Mr. Batra's behavior has severely damaged our credibility and reputation as a political Organization.

We hope that one day in the not so distant future we will be able to work together again when the interests of the Organization are once again paramount to the unfettered demands of one non-contributing individual.

Regretfully submitted,

Thomas J. Garry
Treasurer, County Committee

Arnold J. Ludwig
Treasurer, Brooklyn Democrats

cc:   Hon. Clarence Norman, Jr.
      Hon. Jeffrey C. Feldman
      Hon. Joan L. Millman
      Hon. Leo A. Barrile
      Hon. Herbert E. Berman
      Hon. Roberta Sherman
      Hon. Diane M. Gordon
      Hon. Decosta Headley, Jr.
      Hon. Lewis Fidler
      Hon. Renee Hauser
      Hon. Booker T. Ingram

Hon. Mary L. Hobson
Hon. Heather E. Gayle
Hon. William H. Boone
Hon. Jacob Gold
Hon. Lori Citron Knipel
Hon. Ann Levine
Hon. Michael R. Geller
Hon. Marsha Rapaport
Hon. Paul Podhaizer
Hon. Joan E. Ribaudo
Hon. Charles J. Ragusa
Hon. Pat V. Guadagnino
Hon. Dov Hikind
Hon. Joseph A. Bova
Hon. Maryrose Sattie
Hon. Linda Minucci
Hon. Steven D. Cohn
Hon. Azalia Rivera
Hon. Angel Rodriquez
Hon. Elizabeth R. Daly
Hon. Ralph J. Perfetto
Hon. Vito J. Lopez
Hon. Narcisa Ruiz
Hon. Martin Malave-Dilan
Hon. Nellie Santiago
Hon. Essie Duggan
Hon. William F. Boyland, Jr.
Hon. Annette Robinson
Hon. Albert Vann
Hon. Freddie Hamilton
Hon. Kendell Stewart
Hon. Edith Wingfield

**APPENDIX E**

## Oversight of the Fiduciary Appointment Process

1.   The District Administrative Judge shall have primary responsibility for oversight of the fiduciary assignment process within his or her judicial district.   The Administrative Judge shall designate a special fiduciary clerk to assist in this responsibility.

2.   At the time a appointment, the fiduciary shall file a notice of appointment and a certificate of compliance with the fiduciary clerk (rather than with OCA).   The fiduciary clerk shall record the appointment in his or her own index of appointments, and then send the filings to OCA, where they will be entered in the fiduciary database.   The fiduciary clerk will regularly monitor the database to confirm that relevant information concerning the appointment has, in fact, been accurately and timely entered.

3.   Before seeking approval of compensation, the fiduciary must first obtain a form from the fiduciary clerk confirming that the fiduciary has filed a notice of appointment and a certificate of compliance.   The fiduciary must attach this confirmation form to the application for payment, and the judge may not approve payment unless the form is so provided.

4.   A copy of the order approving payment shall be filed with the fiduciary clerk (rather than with OCA).   The fiduciary clerk shall record the payment in his or her index, and such information shall be sent to OCA, where it will be entered in the fiduciary database.   The fiduciary clerk will regularly monitor the database to confirm that relevant information concerning payments to fiduciaries has, in fact, been accurately entered.

5.   Every three months, the Administrative Judge, with the assistance of the fiduciary clerk, shall transmit to the Chief Administrative Judge a report specifying all fiduciary appointments, all payments to fiduciaries and the judges who made such appointments and authorized such payments during that period.

6.   The Chief Administrative Judge shall arrange, on a semi-annual basis, for the publication in appropriate law journals and periodicals and the court system's Web site of the names of all fiduciaries appointed, all payments to fiduciaries and the judges who made such appointments and authorized such payments during the prior year.

**APPENDIX F**

*State of New York*



*25 Beaver Street*
*New York, N.Y. 10004*
*(212) 428-2100*

*Jonathan Lippman*
*Chief Administrative Judge*

## MEMORANDUM

February 22, 2001

TO:        District Administrative Judges

FROM:      Jonathan Lippman

SUBJECT:   Oversight of Fiduciary Filings

As was announced by the Chief Judge in her State of the Judiciary address and as was discussed at the recent Statewide Administrative Judges' and Supervising Judges' meeting, we have developed a new plan to improve compliance with the fiduciary filing requirements set forth in Parts 26 and 36 of the Rules of the Chief Judge. As you know, the Rules require three separate filings in a case in which a fiduciary (as defined in the Rules) is appointed: (1) prior to accepting an appointment, a prospective fiduciary must file with the court a **certification of compliance** verifying that the appointment will not be in violation of the Rules (UCS Form 830.3); (2) within ten days of the date of appointment, the fiduciary must file a **notice of appointment** with OCA (UCS Form 830.1); and (3) at the time the judge approves compensation of more than $500 to a fiduciary, the judge must file a **statement of approval of compensation** with OCA (UCS Form 830).

Investigation by the OCA auditing staff and the Special Inspector General's Office has revealed that, across the State, compliance with these filing requirements is deficient. This raises serious concerns, because it is critical that accurate, comprehensive information be readily available so that the public can know who receives fiduciary appointments and how much they are paid. Accordingly, after consultation with the Commission on Fiduciary Appointments, we have devised a new oversight system that, by involving Administrative Judges more directly in the process, will better ensure that all required filings are made.

Under this system, the District Administrative Judges will have new responsibilities for oversight of the filing process within their judicial districts.  In carrying out these new responsibilities, the Administrative Judge shall designate a special fiduciary clerk (or clerks, if necessary) to assist in the oversight process (in the Surrogate's Courts in New York City, the Chief Clerk of each of the courts will serve as the special fiduciary clerk).   The components of the new system are as follows:

- When a fiduciary is selected, the appointing judge shall promptly send a copy of the order of appointment to the special fiduciary clerk.  The fiduciary clerk shall record the appointment in his or her own separate index of appointments, and then promptly send a "fiduciary packet" to the appointee.  The packet will include a copy of the order of appointment, a notice of appointment form (UCS Form 830.1), a certification of compliance form (UCS Form 830.3), a statement of approval of compensation form (UCS Form 830), a notice of appearance/affidavit of service (where appropriate) and instructions for completing the various forms.

- The instructions that the fiduciary clerk sends to the appointee shall direct the appointee to complete the notice of appointment form and the certification of compliance form and return them to the fiduciary clerk.  If the forms are not returned, the fiduciary clerk shall contact the appointee and request immediate submission of the forms.  (If the forms are still not returned, the fiduciary clerk will refer the matter to the Administrative Judge for appropriate action.)  Upon receipt of the forms from the appointee, the fiduciary clerk shall review them for completeness and accuracy, record their receipt in his or her separate index of appointments, ensure that the certification of compliance form is placed in the court file and then send the notice of appointment form to OCA, where the relevant information from the form will be entered in the OCA fiduciary database.  The fiduciary clerk will regularly monitor the OCA database to verify that appointment information has, in fact, been accurately entered.  If such information has not been accurately entered, the clerk shall so notify OCA.

- Before seeking approval of compensation, the fiduciary appointee must first obtain written confirmation from the fiduciary clerk establishing that the appointee has filed a notice of appointment and certification of compliance (a new form will be developed for this purpose).  The appointee must include the written confirmation with the application for approval of payment, and the judge may not approve payment unless the written confirmation is so provided (*see generally* Part 36, § 36.4(c), prohibiting approval of compensation if forms are not filed).

- When a judge approves compensation to a fiduciary appointee, the judge shall submit the approval of compensation form (UCS Form 830) to the fiduciary clerk, rather than

2

to OCA. The fiduciary clerk shall record the payment in his or her separate index, and then send the form to OCA, where payment information will be entered in the fiduciary database. The fiduciary clerk will regularly monitor the database to verify that payment information has, in fact, been accurately entered. If such information has not been accurately entered, the clerk shall so notify OCA. Judges should be advised of these new procedures, including the requirements that orders of appointment be promptly sent to the fiduciary clerk, applications for approval of payment include the fiduciary clerk's confirmation and the judge's approval of compensation form be submitted to the fiduciary clerk.

• On a regular basis, publication will be made in appropriate law journals and periodicals of the names of all fiduciaries appointed, all payments made to fiduciaries and the judges who made such appointments and authorized such payments during the prior year.

Please plan to have this new system in place in your districts by March 26, 2001. Within the next few weeks, after you have had an opportunity to begin to structure this new system, we will be conducting a training session for the newly-appointed special fiduciary clerks from across the State. Although implementation will require considerable thought and attention on your part, I do not expect that it will require new resources. If resources are an issue for you, however, please let Judge Pfau know.

Thank you for your cooperation in this critically important effort.

cc: Hon. Joseph J. Traficanti, Jr.
Hon. Joan B. Carey
Hon. Ann T. Pfau
Hon. Juanita Bing Newton

3

**APPENDIX G**

## Proposed Preamble

Public trust in the judicial process demands that fiduciary appointments be fair, impartial and beyond reproach.  Accordingly, the rules governing such appointments are intended to ensure that fiduciaries be selected solely on the basis of merit, without favoritism, nepotism or other factors unrelated to the qualifications of the appointee or the requirements of the case.  The rules also require that fiduciaries receive training in the performance of their duties.  At the same time, the rules preserve a judge's discretion to select appropriate, qualified candidates.

The rules are designed to provide guidance to judges, and to preclude certain categories of persons from eligibility for appointment, as well as set forth limitations on the number of appointments and aggregate fees any one candidate may receive.

However, the rules cannot be written in a way that forecasts every situation in which they should be applied.  Therefore, judges must also be mindful of general ethics principles and the appearance of impropriety and favoritism.  The appointment of trained, competent fiduciaries, and the avoidance of favoritism, nepotism, excessive or inadequate fees and unnecessary appointments shall be the fundamental objectives underlying all appointments made, and orders issued, pursuant to this Part.